1  BROWN RUDNICK LLP
   CATHRINE M. CASTALDI, #156089
2  ecastaldi@brownrudnick.com
   ARJUN SIVAKUMAR, #297787
3  asivakumar@brownrudnick.com
   2211 Michelson Drive, Seventh Floor
4  Irvine, California 92612
   Telephone:   (949) 752-7100
5  Facsimile:   (949) 252-1514

6  Attorneys for Chapter 7 Trustee,
   CHARLES W. DAFF

7

8

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                  **RIVERSIDE DIVISION**

12

13 | In re:                        | CASE NO. 6:17-bk-12061-WJ

14 | ALOHA POWER, LLC, a Delaware limited | Chapter 7
   | liability company,

15 |                               | Assigned for all purposes to the
   |              Debtor.          | Hon. Wayne Johnson

16

17 **CHAPTER 7 TRUSTEE'S MOTION TO
   SELL LIMITED LIABILITY COMPANY
   MEMBERSHIP INTERESTS IN REGENESIS
18 POWER, LLC: (1) OUTSIDE THE
   ORDINARY COURSE OF BUSINESS; (2)
19 SUBJECT TO OVERBID; (3) FREE AND
   CLEAR OF ALL LIENS, CLAIMS, AND
20 INTERESTS; AND (4) WITH
   DETERMINATION OF GOOD FAITH
21 PURCHASER; MEMORANDUM OF
   POINTS AND AUTHORITIES;
22 DECLARATION OF CHARLES W. DAFF;
   AND REQUEST FOR JUDICIAL NOTICE IN
23 SUPPORT THEREOF**

24 | Judge:   Hon. Wayne Johnson
   | Date:    November 6, 2018
25 | Time:    1:00 p.m.
   | Place:   Courtroom 304
26 |                3420 Twelfth Street
   |                Riverside, CA 92501

27

28

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 3

1.  INTRODUCTORY STATEMENT ................................................................. 3

2.  OVERVIEW OF RELEVANT FACTS .......................................................... 3

    A.  Relevant Background Prior To Commencement of the Case ................... 3

    B.  Commencement of this Involuntary Case and Order for Relief.............. 5

    C.  Appointment Of Trustee.......................................................................... 6

    D.  Description of Assets Being Sold............................................................ 6

    E.  Value of the Assets................................................................................. 6

    F.  Terms Of The Proposed Sale .................................................................. 7

    G.  Overview and Proposed Treatment of Liens Against the Assets............ 7

    H.  Tax Consequences Of The Sale .............................................................. 7

3.  AUCTION AND OVERBID PROCEDURES ................................................ 8

4.  JURISDICTION ......................................................................................... 8

5.  THE PROPOSED SALE OF THE ASSETS IS IN THE BEST INTERESTS OF THE
    ESTATE AND ITS CREDITORS ................................................................. 8

    A.  A Sound Business Purpose Justifies The Sale ....................................... 9

    B.  Accurate And Reasonable Notice Of The Sale Was Provided................ 9

    C.  The Price To Be Paid Is Adequate, Fair, And Reasonable.................... 10

    D.  The Sale Is Being Proposed In Good Faith ........................................... 10

6.  THE COURT SHOULD APPROVE THE PROPOSED SALE OF THE ASSETS FREE
    AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS ....................... 11

7.  DETERMINATION OF GOOD FAITH PURCHASER PURSUANT TO § 363(m)...... 12

8.  COMPLIANCE WITH BANKRUPTCY RULE 6004(F)(1) AND U.S. TRUSTEE
    GUIDELINES ......................................................................................... 12

9.  THE COURT SHOULD PERMIT IMMEDIATE RELIEF ............................. 13

i

10.    CONCLUSION ............................................................................................... 13

DECLARATION OF CHARLES W. DAFF ............................................................... 14

REQUEST FOR JUDICIAL NOTICE ........................................................................ 16

1262371 v2-iManDB-902101/0095

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Abbott Dairies of Pennsylvania, Inc.,*
    788 F.2d 143 (3d Cir. 1986) ..................................................................................10

*In re Ancor Exploration Co.,*
    30 B.R. 802 (N.D. Okla. 1983) ............................................................................10

*In re The Canyon Partnership,*
    55 B.R. 520 (Bankr. S.D. Cal. 1985) ...................................................................8

*In re Continental Airlines, Inc.,*
    780 F.2d 1223 (5th Cir. 1986) .............................................................................9

*In re Curlew Valley Assocs.,*
    14 B.R. 506 (Bankr. D. Utah 1981) .....................................................................9

*In re Equity Funding Corp.,*
    492 F.2d 793 (9th Cir. 1974) ...............................................................................8

*In re Filtercorp, Inc.,*
    163 F.3d 570 (9th Cir. 1998) .............................................................................12

*In re Gerwer,*
    898 F.2d 730 (9th Cir. 1990) .............................................................................11

*In re Industrial Valley Refrig. & Air Cond. Supplies, Inc.,*
    77 B.R. 15 (Bankr. E.D. Pa. 1987) ......................................................................9

*In re Pine Coast Enterprise Ltd.,*
    147 B.R. 30 (Bankr.N.D. Ill. 1992) ...................................................................12

*In re Walter,*
    83 B.R. 14 (9th Cir. BAP 1988) ..........................................................................9

*In re Wilde Horse Enterprises,*
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ..............................................................10

**California Cases**

*Marini v. Regenesis Power LLC,*
    2013 WL 6181124 (Cal Ct. App. November 26, 2013) ...................................4, 5

**Federal Statutes**

11 U.S.C.

§ 363 ................................................................................................1, 8, 10
§ 363(f) ..................................................................................................11
§ 363(m) ..............................................................................................12, 13

28 U.S.C.

§ 157 ........................................................................................................8
§ 1334 ......................................................................................................8

**Other Authorities**

Local Bankruptcy Rule 2002(a) ...........................................................................9

Local Bankruptcy Rule 6004(f) ..........................................................................11

Local Bankruptcy Rule 6004(f)(1) .......................................................................12

Local Bankruptcy Rule 6004(h) ..........................................................................13

Local Bankruptcy Rule 6004-1(c) .........................................................................9

1262371 v2-iManDB-902101/0095

1   **TO THE HONORABLE WAYNE JOHNSON, UNITED STATES BANKRUPTCY COURT**

2   **JUDGE; THE UNITED STATES TRUSTEE; THE DEBTOR; MR. DENNIS MARINI; MR.**

3   **WILLIAM FOSTER; MR. WILLIAM R. HEARST; MR. BRAD BEERS; MS. JOANNE P.**

4   **PINCKNEY; THE TUROCI FIRM; HARVEST LLC; WALLACE WILLIAMS LLC;**

5   **REGENESIS POWER, LLC; OTHER PARTIES IN INTEREST; AND THEIR**

6   **RESPECTIVE COUNSEL OF RECORD:**

7         Charles W. Daff, the duly appointed and acting Chapter 7 Trustee (the "Trustee") for the

8   Bankruptcy Estate (the "Estate") of Aloha Power, LLC ("Aloha" or the "Debtor"), hereby moves

9   the Court (the "Motion") for an order: (1) authorizing the sale of the Assets (as defined herein)

10   outside the ordinary course of business, free and clear of liens, claims, and interests, and without

11   commission, to William R. Hearst (the "Proposed Purchaser"), for $30,000, upon the terms and

12   conditions set forth in the Asset Purchase Agreement attached at Exhibit "1" hereto (the "APA"),

13   and subject to overbid; (2) approving the overbid procedures set forth herein; (3) waiving the

14   14-day stay set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the

15   "Bankruptcy Rules"); (4) finding that the Proposed Purchaser (or other successful bidder) is a

16   good faith purchaser of the Assets within the meaning of Section 363(m) of Title 11 of the United

17   States Code ("Bankruptcy Code"); and (5) granting such other and further relief as may be

18   appropriate.

19         The Trustee believes that the proposed sale of the Assets to the Proposed Purchaser on the

20   terms and conditions set forth in the APA is in the best interests of the Estate and fulfills all

21   relevant requirements of Bankruptcy Code Section 363.[1]  In brief, the Proposed Purchaser shall

22   pay $30,000 in cash to acquire the Assets, on an "as is" basis without any warranties,

23   representations, or recourse; free and clear of all liens, claims, and interests; without contingencies

24   or commission; with the Proposed Purchaser responsible for all costs, fees, and expenses related to

25   the Assets, including but not limited to any taxes resulting from the sale; and subject to overbid.

26

27   [1]     A true and correct copy of the APA is attached to the Declaration of Charles W. Daff ("Daff Decl.") as
Exhibit "1."

28

1

1        This Motion is made pursuant to Bankruptcy Code Section 363; Bankruptcy Rule 6004;

2    and Local Bankruptcy Rules ("Local Rules") 6004-1(c) and 9013-1, and is based upon the

3    separately-filed Notice of Motion and Notice of Sale, this Motion, the attached Memorandum of

4    Points and Authorities, Daff Decl., and Request for Judicial Notice ("RJN"), the papers and

5    pleadings on file in this case, and such other evidence as may be presented to the Bankruptcy

6    Court.

7    DATED:  October 16, 2018                    Respectfully Submitted,

8                                               BROWN RUDNICK LLP

9

10                                             By:

11                                             ARJUN SIVAKUMAR
                                               Attorneys for Chapter 7 Trustee,
12                                             CHARLES W. DAFF

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        2

## MEMORANDUM OF POINTS AND AUTHORITIES[2]

1.    INTRODUCTORY STATEMENT

The bankruptcy ease ("Bankruptcy Case") of Aloha arises out of a contested involuntary bankruptcy proceeding, which resulted in the Court's entry of an order for relief on November 3, 2017. Charles W. Daff was appointed as the Chapter 7 Trustee for the Estate on November 21, 2017.

Since the Trustee's appointment, Aloha has not filed schedules or a statement of financial affairs, although Mr. Dennis Marini ("Mr. Marini"), the owner and principal of the Debtor, has submitted a declaration attesting that the Debtor's only asset is its interest in Regenesis Power, LLC, a Delaware limited liability company ("Regenesis")[3], which is the subject of this sale motion. The only known creditors of Aloha are the petitioning creditors in this case, Regenesis and Messrs. William Foster and William R. Hearst (collectively the "Petitoning Creditors").[4]

A review of the relevant facts, as discussed below, convinced the Trustee that the best course of action was to sell the Debtor's interest in Regenesis to the highest and best bidder. After speaking with counsel for the Petitioning Creditors, Mr. Marini and his counsel, the Trustee, through his counsel, solicited bids for the Debtor's interest in Regenesis. Mr. Hearst came forward with a stalking horse bid of $30,000 and has delivered a check in that amount to the Trustee. By the Motion, the Trustee seeks approval of a sale of the Debtor's interest in Regenesis to the highest and best bidder.

2.    OVERVIEW OF RELEVANT FACTS

A.    Relevant Background Prior To Commencement of the Case

The Debtor is a Delaware limited liability company and has no current business operations.[5] The Debtor's primary asset is its ownership interest in Regenesis, which was formed

---

[2]    Unless otherwise stated, capitalized terms shall have the same meaning as defined in the Motion.

[3]    *See* Declaration of Dennis Marini ("Marini Decl.") filed with Alleged Debtor's Second Trial Brief [Dockct No. 36], ¶10. A true and correct copy of the Marini Decl. is attached to the RJN at Exhibit "3."

[4]    *See id.*

[5]    *See id.*

1  in May 2006 to develop and sell solar energy projects.[6] As indicated in the Involuntary Petition,

2  the three largest equity interest holders in Regenesis are Harvest LLC, a Delaware limited liability

3  company ("Harvest"), Wallace Williams, LLC, a California limited liability company ("Wallace

4  Williams"), and the Debtor.[7] Petitioning Creditor William R. Hearst is the owner of Harvest.

5  Petitioning Creditor William Foster is the owner of Wallace Williams.[8] Mr. Hearst is the

6  Proposed Purchaser under the APA (as discussed below).

7          In the years following its founding, Regenesis became embroiled in disputes between the

8  three largest interest holders and their respective owners. Ultimately the Debtor and Mr. Marini

9  (and another related entity called Regenesis, Inc.) filed a lawsuit against Petitioning Creditors,

10  Harvest, and Wallace Williams (the "Defendants"), bearing Los Angeles Superior Court Case

11  ("Superior Court") Case No. BC419175 ("Superior Court Action").[9] The Superior Court Action

12  alleged, *inter alia*, that the Debtor's member interests in Regenesis were diluted by improper

13  issuance of additional shares to Harvest, that Debtor and Mr. Marini were owed additional fees

14  and commissions under Regenesis' Operating Agreement (the "Operating Agreement")[10], and that

15  Defendants made false representations to Debtor and Mr. Marini.[11] After a jury trial, the Superior

16  Court entered judgment ("Judgment") in favor of Defendants and against Debtor and Mr. Marini

17  (and Regenesis, Inc.) on all counts, and awarded Defendants their attorney fees of approximately

18  _____

19  [6]    *See* Involuntary Petition filed against Aloha Power, LLC ("Involuntary Petition") [Docket No. 1], p. 5. A true and correct copy of the Involuntary Petition is attached to the RJN at Exhibit "2"; *Marini v. Regenesis Power LLC*, 2013 WL 6181124 at *1 (Cal Ct. App. November 26, 2013) (unpublished, but being cited here only for its factual findings due to their impact under the doctrine of *res judicata*).

20

21  [7]    Involuntary Petition, 5. As indicated in the APA, the Debtor has disputed past corporate actions that resulted in changes in the number of Units owned by the Debtor and the percentage of outstanding Units owned by the Debtor. Specifically, the Debtor asserts that it owned 2,174,900 Units, constituting 21.749% of total issued and outstanding Units, on the Petition Date [*see* APA, ¶2(b)], whereas Petitioning Creditors assert that the Debtor owned 1,724,000 Units, constituting 17.24% of total issued and outstanding Units, on the Petition Date [*see* Involuntary Petition, 5]. As further indicated in the APA, notwithstanding the precise number of Units and the percentage of outstanding Units owned by Debtor, however, all Units owned by the Debtor on the Petition Date are being sold pursuant to the APA. Depending on the precise number of Units owned, Proposed Purchaser may be classified as an insider under the Bankruptcy Code.

22

23

24

25  [8]    *See id.*; Marini Decl., ¶3.

26  [9]    *See* Marini Decl., ¶4.

27  [10]   *See* Operating Agreement at RJN Exhibit "9," Exhibits 5, 5A thereto.

     [11]   *See Marini v. Regenesis Power LLC, supra.*, 2013 WL 6181124 at *1-2.

28

1  $650,000.[12] The Judgment's attorney fee award was later augmented to over $1 million following

2  unsuccessful appeals of the Judgment by the Debtor and Mr. Marini.[13] The Judgment remains

3  outstanding in full and is the basis for Petitioning Creditors' claims.[14]

4        On August 29, 2016, Debtor brought Delaware Chancery Court ("Chancery Court") Case

5  No. 12697-VCMR ("Chancery Court Action"), seeking to inspect certain of Regenesis' books and

6  records.[15] The Chancery Court entered a letter opinion December 22, 2017 ("Letter Opinion")

7  granting Aloha certain inspection rights under the Operating Agreement and a statutory attorney

8  fee award, but the Trustee understands that the Chancery Court has stayed further proceedings in

9  the Chancery Court Action at the request of the parties.[16]

10       B.       Commencement of this Involuntary Case and Order for Relief

11       On March 16, 2017 (the "Petition Date"), the Petitioning Creditors, having not received

12  any payment on the Judgment, filed an Involuntary Petition against the Debtor under Chapter 7 of

13  the Bankruptcy Code.[17] Debtor filed a Motion to Dismiss the Involuntary Petition ("Motion To

14  Dismiss"), which was denied by this Court on the basis of Findings Of Fact following a contested

15  trial ("Bankruptcy Trial").[18] An Order for Relief was entered by the Court on November 3, 2017.[19]

16  / / /

17  / / /

18  / / /

19  ─────────────────

20  [12]    See 61:23-64:1 of this Court's findings of fact ("Findings of Fact") [Docket No. 57] made in connection with Order Denying Alleged Debtor's Motion To Dismiss ("Order Denying Motion To Dismiss") [Docket No. 39]

21  following a contested trial on Debtor's Motion to Dismiss. True and correct copies of the Order Denying Motion To Dismiss, the Findings of Fact, and the Judgment are attached to the RJN at Exhibits "5," "6," and "7," respectively.

22  [13]    Findings of Fact at 63:2-64-9.

    [14]    Id. at 64:10-65:2.

23  [15]    See First Amended Verified Complaint For Inspection Of Books and Records, a true and correct copy of

24  which is attached to the RJN at Exhibit "9."

    [16]    Post-Trial Letter Opinion filed in Delaware Chancery Court Case No. 12697-VCMR, a true and correct copy

25  of which is attached to the RJN at Exhibit "10"; Daff Decl., ¶10.

26  [17]    See Involuntary Petition, RJN Exhibit "3."

    [18]    See Order Denying Motion To Dismiss and Findings Of Fact, RJN Exhibits "5" and "6."

27  [19]    See Order For Relief [Docket No. 37.] A true and correct copy of the Order For Relief is attached to the RJN
    at Exhibit "4."

28

1262371 v2-iManDB-902101/0095

C.    Appointment Of Trustee

Charles W. Daff has been the duly appointed and acting Chapter 7 Trustee for the Estate since his appointment on November 21, 2017.[20]

D.    Description of Assets Being Sold

On the Petition Date, the assets of the Estate included limited liability company membership units ("Units") in Regenesis. The Debtor has disputed past corporate actions that resulted in changes in the number of Units owned by the Debtor and the percentage of outstanding Units owned by the Debtor; notwithstanding the precise number of Units and the percentage of outstanding Units owned by Debtor, however, all such Units owned by the Debtor on the Petition Date (the "Assets") are sought to be sold pursuant to this Motion. Without limiting the foregoing, the Assets include all rights of the Debtor as a member of Regenesis under the Operating Agreement and applicable law.[21]

E.    Value of the Assets

As set forth above, the Assets consist of certain interests in Regenesis. At the Bankruptcy Trial, the Court made the following Findings of Fact regarding the value of Regenesis:

> Mr. Foster testified that Regenesis is not generating income, has no prospects for generating income. Its only subsidiaries are non-operating. They're not generating any cash and have no prospects for generating cash. This testimony by Mr. Foster was unrebutted and Mr. Foster also testified that Regenesis owes creditors approximately eight million dollars. He also testified that he recently bought debt owed by Regenesis to another individual, Mr. Taylor, for – with a face amount of $560,000 for an actual payment of between 1500 to $3,000, which was consistent with Mr. Foster's testimony that the debt owed by Regenesis was worthless because Regenesis owes eight million dollars and does not have assets or funds to pay its debts. ... All of Mr. Foster's testimony on point was that Regenesis does not have any net value ... The alleged debtor did not produce any contrary evidence of any kind. ... The alleged debtor did not submit any evidence of the value of Regenesis or the value of the membership interest in Regener – in Regenesis. So all

---

[20]    *See* Notice of Appointment of Chapter 7 Trustee ("Notice of Appointment") [Docket No. 49.] A true and correct copy of the Notice of Appointment is attached to the RJN at Exhibit "8."

[21]    *See* APA, ¶¶ 2(b), 3.

6

1    the evidence and if – on that issue is in favor of the petitioning
2    creditors.[22]

3        The Trustee has received an offer from the Proposed Purchaser to purchase the Assets for

4    $30,000.  The Trustee is aware that Mr. Marini believes that the Assets are worth more than

5    $30,000, and that he intends to attend the hearing on this Motion and overbid.  The Trustee

6    believes that the market value of the Assets can best be determined by providing notice of this

7    Motion to Mr. Marini, as well as other parties in interest, and allowing competition at a public

8    auction.[23]

9        F.    Terms Of The Proposed Sale

10       The Proposed Purchaser has agreed to pay $30,000 to acquire the Assets, on an "as is"

11   basis without any warranties, representations, or recourse; free and clear of all liens, claims, and

12   interests, without contingencies or commission; with the buyer responsible for all costs, fees, and

13   expenses related to the Assets, including but not limited to any taxes resulting from the sale of the

14   Assets, and subject to overbid.[24]

15       G.    Overview and Proposed Treatment of Liens Against the Assets

16       There are no known liens, claims, or interests against the Assets.  Any valid liens, claims,

17   or interests against the Assets would attach to the sale proceeds with the same force and effect.[25]

18       H.    Tax Consequences Of The Sale

19       The Trustee has consulted with his external tax advisor, Hahn Fife and Company, who has

20   advised that no tax consequences to the Estate are anticipated as a result of the sale of the Assets

21   to Proposed Purchaser.[26]

22   / / /

23   / / /

24
---
[22]    Findings of Fact, 66:24-67:18; 68:12-14, 18-19, 20-24.
25   [23]    Daff Decl., ¶5.
26   [24]    APA, ¶¶ 2, 4, 6.
     [25]    Daff Decl., ¶8.
27   [26]    Daff Decl., ¶9.
28

7

3.    AUCTION AND OVERBID PROCEDURES

In order to obtain the highest and best possible price for the Assets, the Trustee requests that the Court authorize overbid procedures for the sale of the Assets, in the manner set forth below:

(a)    In order to participate in bidding, any bidder (including the Proposed Purchaser) must be present either physically or telephonically, or be represented by an individual or individuals with authority to participate in the overbid process, at the hearing on this Motion;

(b)    In order to participate in bidding, any bidder (except the Proposed Purchaser) must deposit with the Trustee, at the hearing on this Motion, a deposit in cash or a cashier's check made payable to the Trustee in the amount of $10,000. The Proposed Purchaser has deposited $30,000. The foregoing deposit shall not be refunded if the party subsequently is unable to complete the purchase of the Assets;

(c)    The bidding for the Assets shall begin at $30,000 or similar sale price designated by the Court at the hearing on this Motion, without any conditions or credits, with all bids being made in minimal increments of $3,000; and

(d)    The successful bidder must pay, or have paid, the full amount of the successful bid to the Trustee within 30 days of the date of the entry of an order granting this Motion. In the event that the Proposed Purchaser is not the successful bidder, the successful bidder shall then become the Buyer under the APA. Further, if the successful bidder cannot deliver the balance of the sale price within the above-referenced period, the Trustee shall be authorized to accept the offer made by the next highest bidder, and the successful bidder's deposit shall not be refunded.

4.    JURISDICTION

The Court has jurisdiction of this matter under 28 U.S.C. §§ 1334 and 157.

5.    THE PROPOSED SALE OF THE ASSETS IS IN THE BEST INTERESTS OF THE
ESTATE AND ITS CREDITORS

Bankruptcy courts are authorized to permit the trustee or debtor-in-possession to conduct a Section 363 sale of estate property outside of the ordinary course of business if such sale is in the best interests of the estate and its creditors. *See, e.g.*, *In re Equity Funding Corp.*, 492 F.2d 793 (9th Cir. 1974); *In re The Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985). A sale is in the best interests of the estate if the proponent of the sale establishes that: (1) a "sound business purpose justifies the sale"; (2) "accurate and reasonable notice" of the sale was provided; (3) the "price to be paid is adequate, *i.e.,* fair and reasonable"; and (4) "good faith, *i.e.,* the absence of any

8

1  lucrative deals with insiders, is present." *See, e.g., In re Industrial Valley Refrig. & Air Cond.*

2  *Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

3      A.    A Sound Business Purpose Justifies The Sale

4          Courts have held that this requirement is satisfied so long as the movant can demonstrate

5  "some articulated business justification" for selling the property. *In re Continental Airlines, Inc.*,

6  780 F.2d 1223, 1226 (5th Cir. 1986) (*citing In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.

7  1983)); *accord In re Walter*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988); *In re Curlew Valley Assocs.*,

8  14 B.R. 506, 513-514 (Bankr. D. Utah 1981).

9          The Trustee believes in his business judgment that the market value of the Assets can best

10  be determined by providing Mr. Marini notice of this Motion along with other parties in interest,

11  and allowing them and the Proposed Purchaser to compete in a public auction.  Potential bidders

12  are being made aware that the Assets consist of interests in Regenesis, inclusive of attendant rights

13  under the Operating Agreement.  This process is expected to result in a recovery of at least

14  $30,000 to the Estate that otherwise may not be possible.  The Trustee's external tax advisors at

15  Hahn Fife & Company have advised that the sale will not result in any tax liability to the Estate.[27]

16  Accordingly, a sound business purpose justifies the sale.

17      B.    Accurate And Reasonable Notice Of The Sale Was Provided

18          Bankruptcy Rule 2002(a) states that interested parties must be given "21 days' notice by

19  mail" of the proposed sale of property of the estate other than in the ordinary course of business.

20  Bankruptcy Rule 2002(a).  The hearing on this matter has been scheduled for November 6, 2018,

21  which is 21 days after the filing of this Motion.  Notice of the hearing on the Motion is being filed

22  and served concurrently herewith.  The noticed parties include Mr. Marini, who has indicated his

23  intention to overbid, and other parties in interest, and each noticed party is receiving a full copy of

24  the moving papers.  Thus, the Trustee has given accurate and reasonable notice of the sale under

25  the FRBP and under Local Rule 6004-1(c).

26

27  _____

[27]      Daff Decl., ¶9.

28

9

1      C.      The Price To Be Paid Is Adequate, Fair, And Reasonable

2          Bankruptcy courts have wide latitude to approve sales of property outside the ordinary

3    course of business. *In re Ancor Exploration Co.*, 30 B.R. 802 (N.D. Okla. 1983). The debtor's

4    duty with respect to the sale of the property of the estate is to obtain the highest price or the

5    maximum benefit for the estate. *In re Wilde Horse Enterprises*, 136 B.R. 830, 841 (Bankr. C.D.

6    Cal. 1991) ("In any sale of estate assets, the ultimate purpose is to obtain the highest price for the

7    property sold."). An auction sale is generally considered to establish sufficient value for the assets

8    being sold. *See, e.g., In re Abbott Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986)

9    ("Generally speaking, an auction may be sufficient to establish that one has paid "value" for the

10   assets of a bankrupt."). Here, Mr. Marini and other parties in interest are receiving notice of the

11   proposed sale and their right to overbid, confirming that the price paid for the Assets at auction

12   will be sufficient value as a matter of law.

13     D.      The Sale Is Being Proposed In Good Faith

14         A Section 363 Sale must be proposed in "good faith." *In re Wilde Horse Enterprises, Inc.*,

15   136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). "'Good faith' encompasses fair value, and further

16   speaks to the integrity of the transaction. Typical 'bad faith' or misconduct, would include

17   collusion between the seller and buyer, or any attempt to take unfair advantage of other potential

18   purchasers. And, with respect to making such determination, the court and creditors must be

19   provided with sufficient information to allow them to take a position on the proposed sale." *Id.* at

20   842 (internal citations omitted).

21         As set forth above, the ultimate sale price of the Assets will be determined at a public

22   auction. The auction will be conducted in accordance with bid procedures approved by this Court,

23   and will establish a fair market value for the Assets. Additionally, to the best of the Trustee's

24   knowledge, the Trustee and Mr. Hearst have not had any prior personal or business relationship

25   prior to negotiations over the APA, which negotiations were completed at arm's length and in

26   good faith.[28] Even if the Proposed Purchaser were classified as a statutory insider under the

27   _____

[28]      Daff Decl., ¶7.

28

1    Bankruptcy Code, there has been no collusion or attempt to take unfair advantage of any other

2    party – public notice of the sale of the Assets is being given pursuant to Local Rule 6004(f), and

3    Mr. Marini and other parties in interest are being served with a full copy of these moving papers,

4    and will have the opportunity to overbid.  Accordingly, the sale has been proposed in good faith.

5    6.    <u>THE COURT SHOULD APPROVE THE PROPOSED SALE OF THE ASSETS FREE</u>

6    <u>AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS</u>

7    The Trustee seeks authority to complete the sale of the Assets free and clear of all liens,

8    claims, and interests.  The Court may approve a sale of estate property "free and clear of any

9    interest in such property of an entity" if any one of the following five conditions is met:

10    i.    Non-bankruptcy law permits a sale of such property free and clear of such interest;

11    ii.    Such entity consents;

12    iii.    Such interest is a lien and the price at which such property is to be sold is greater

13    than the aggregate value of all liens on the property;

14    iv.    Such interest is in bona fide dispute; or

15    v.    Such entity could be compelled, in a legal or equitable proceeding, to accept money

16    satisfaction of such interest.

17    11 U.S.C. § 363(f).  Satisfaction of any one of the foregoing conditions is sufficient to allow a

18    debtor in possession to sell property of the estate free and clear of liens.  *See In re Gerwer*, 898

19    F.2d 730 (9th Cir. 1990).

20    Here, there are no known liens, claims, or interests against the Assets.[29]  Therefore, sale of

21    the Assets free and clear is appropriate, at minimum, due to consent of all outstanding lienholders

22    (none) and the fact that the sale price ($30,000) is greater than the aggregate value of all liens ($0).

23    In any event, any valid liens, claims, or interests against the Assets would attach to the sale

24    proceeds with the same force and effect.

25    ///

26    ///

27    _____

[29]    Daff Decl., ¶8.

28

11

7.      DETERMINATION OF GOOD FAITH PURCHASER PURSUANT TO § 363(m)

11 U.S.C. § 363(m) authorizes the Court to make a finding that a buyer is a good faith purchaser. Although the Bankruptcy Code does not define "good faith," Courts have provided guidance as to the appropriate facts to consider. *See In re Pine Coast Enterprise Ltd.*, 147 B.R. 30, 33 (Bankr.N.D. Ill. 1992) ("The requirement that a purchaser act in good faith speaks to the integrity of its conduct in the course of the sale proceeding."); *see also In re Filtercorp, Inc.*, 163 F.3d 570, 577 (9th Cir. 1998) ("[a] good faith buyer is one who buys 'in good faith' and 'for value.' Lack of good faith is [typically] shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."). Here, the parties to the APA, who did not have any prior business or personal relationship, have negotiated at arm's length and in good faith to arrive at a fair sale price, subject to overbid at a public auction. Regardless of whether the Proposed Purchaser (or any other winning bidder) is a statutory insider under the Bankruptcy Code, there is no collusion involved with Proposed Purchaser's bid – the proposed overbid procedures ensure that the Assets will be sold for fair market value to the highest bidder at public auction, following public notice. *See In re Filtercorp*, 163 F.3d 570, 577 (9th Cir. 1998) (affirming good faith finding as to insiders where there was "no evidence of collusion" and party challenging sale "was given time and opportunity to construct his own bid.") In re Filtercorp Inc., 163 F.3d 570, 577 (9th Cir. 1998). The Trustee will provide further evidence in support of a good faith finding as to the winning bidder at the hearing on the Motion. As such, the Trustee requests that the Court make a finding that the Proposed Purchaser (or any other winning bidder) is a good faith purchaser of the Assets within the meaning of 11 U.S.C. § 363(m).

8.      COMPLIANCE WITH BANKRUPTCY RULE 6004(F)(1) AND U.S. TRUSTEE
        GUIDELINES

In compliance with Bankruptcy Rule 6004(f)(1), and applicable guidelines issued by the Office of the United States Trustee, upon entry of an order granting the Motion, a description of the Assets, the name of the ultimate purchaser, and the price received will be filed with the clerk of this Court and submitted to the United States Trustee.

/ / /

12

1262371 v2-iManDB-902101/0095

9.      THE COURT SHOULD PERMIT IMMEDIATE RELIEF

Bankruptcy Rule 6004(h) provides that "an order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6004(h).  The Trustee requests that the Court enter an order waiving the provisions of Bankruptcy Rule 6004(h), such that the sale of the Assets may be effectuated immediately upon entry of an order granting this Motion to avoid jeopardizing the sale, and to allow the sale proceeds to be distributed at soonest opportunity.

10.     CONCLUSION

Based on the foregoing, the Trustee respectfully requests that the Court enter an Order: (1) authorizing the sale of the Assets (as defined above), outside the ordinary course of business, free and clear of any liens, claims, and interests, and without commission, to the Proposed Purchaser, for $30,000 upon the terms and conditions set forth in the APA, and subject to overbid; (2) approving the overbid procedures set forth herein; (3) waiving the 14-day stay set forth in Bankruptcy Rule 6004(h); (4) finding that the Proposed Purchaser (or other successful bidder) is a good faith purchaser of the Assets within the meaning of Bankruptcy Code Section 363(m); and (5) granting such other and further relief as may be appropriate.

DATED:  October 16, 2018

Respectfully Submitted,

BROWN RUDNICK LLP

By: _____
    ARJUN SIVAKUMAR
    Attorneys for Chapter 7 Trustee
    CHARLES W. DAFF

1262371 v2-iManDB-902101/0095

**DECLARATION OF CHARLES W. DAFF**

I, CHARLES W. DAFF, hereby declare as follows:

1.  I am the duly appointed, qualified and acting Chapter 7 Trustee (the "Trustee") for the Bankruptcy Estate of Aloha Power, LLC.

2.  I have personal knowledge of the matters discussed below, except as to those stated on information and belief and as to those, I am informed and believe them to be true. If called as a witness, I would and could competently testify to the matters stated herein.

3.  This Declaration is submitted in support of the attached Motion To Sell Limited Liability Company Membership Interests In Regenesis Power, LLC: (1) Outside The Ordinary Course Of Business, (2) Subject To Overbid; (3) Free And Clear Of All Liens, Claims, And Interests; And (4) With Determination Of Good Faith Purchaser (the "Motion"). Unless otherwise stated, capitalized terms shall have the same meaning as in the Motion.

4.  Subject to court approval, I have agreed to the terms of the APA, a true and correct copy of which proposed APA is attached here as Exhibit "1."

5.  I have received an offer from Mr. Hearst to purchase the Assets for $30,000. I am aware that Mr. Marini believes that the Assets are worth more than $30,000, and intends to attend the hearing on the Motion and overbid. I have determined that the market value of the Assets can best be determined by selling the Assets subject to overbid, with public notice of the sale given pursuant to the procedures set forth in Local Bankruptcy Rule 6004(f).

6.  In my business judgment, I believe that the proposed sale of the Assets to Mr. Hearst or a successful overbidder on the terms and conditions set forth in the APA is fair and reasonable and in the best interest of the Estate and should be approved.

7.  To the best of my knowledge, I have not had any prior business or personal relationship with Mr. Hearst prior to our negotiation of the APA, which was conducted at arm's length and in good faith by and through our respective counsel.

8.  I am informed and believe that there are no known liens, claims, or interests against the Assets.

/ / /

1262371 v2-iManDB·902101/0095

1    9.    I have been advised by my external tax advisor, Hahn Fife and Company, that there

2  are no anticipated tax consequences to the Estate from the sale of the Assets.

3    10.    I have reviewed the docket in the Chancery Court Action, and I understand that the

4  Chancery Court has stayed further proceedings in the Chancery Court Action at the request of the

5  parties thereto.

6    I declare under penalty of perjury under the laws of the United States that the foregoing is

7  true and correct to the best of my knowledge, information and belief.

8    Executed October 16, 2018, at Santa Ana, California.

9

10    _____

11    CHARLES W. DAFF

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### REQUEST FOR JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, Charles W. Daff, Chapter 7 Trustee for Aloha Power, LLC, respectfully requests this Court take judicial notice of the following documents in connection with the attached Motion To Sell Limited Liability Company Membership Interests In Regenesis Power, LLC: (1) Outside The Ordinary Course Of Business, (2) Subject To Overbid; (3) Free And Clear Of All Liens, Claims, And Interests; And (4) With Determination Of Good Faith Purchaser ("Motion"):[30]

| EXHIBIT NO. | CONTENTS |
|---|---|
| 2 | Involuntary Bankruptcy Petition [Docket No. 1 in the Bankruptcy Case.] |
| 3 | Declaration of Dennis Marini in support of Alleged Debtor's Second Trial Brief [Docket No. 36 in the Bankruptcy Case.] |
| 4 | Order for Relief [Docket No. 37 in the Bankruptcy Case.] |
| 5 | Order Denying Motion To Dismiss [Docket No. 39 in the Bankruptcy Case.] |
| 6 | Excerpts of Transcript of Proceedings Recorded November 3, 2017 [Docket No. 57 in the Bankruptcy Case.] |
| 7 | Judgment in Los Angeles Superior Court Case No. BC419175 |
| 8 | Notice of Appointment of Chapter 7 Trustee [Docket No. 49 in the Bankruptcy Case.] |
| 9 | First Amended Verified Complaint For Inspection Of Books and Records (exhibit 2A omitted) [Docket No. 1 in Chancery Court Action.] |

/ / /

/ / /

/ / /

/ / /

---

[30] Unless otherwise set forth herein, capitalized terms shall have the same meaning as in the Motion.

1262371 v2-iManDB-902101/0095

| 10 | Letter Opinion [Docket No. 53 in Chancery Court Action.] |
|---|---|

DATED: October 16, 2018

Respectfully Submitted,

BROWN RUDNICK LLP

By: _____
ARJUN SIVAKUMAR
Attorneys for Chapter 7 Trustee,
CHARLES W. DAFF

17

EXHIBIT "1"

## ASSET PURCHASE AGREEMENT

1. <u>PARTIES</u>: The parties to this Asset Purchase Agreement ("Agreement") are: (1) William R. Hearst (the "Buyer"), and (2) Charles W. Daff, the Chapter 7 Trustee for the bankruptcy estate of Aloha Power, LLC (the "Trustee") (collectively, the Buyer and the Trustee are hereafter referred to as the "Parties").

2. <u>RECITALS</u>: This Agreement is made with the reference to the following facts:

   a. On March 16, 2017 several creditors of Aloha Power, LLC (the "Debtor") filed a petition (the "Petition") for an Order declaring Debtor to be a debtor under Chapter 7 of the Bankruptcy Code (the "Petition Date"). After a contested trial, the Court granted the Petition, and an Order for Relief was entered on November 3, 2017. The case is pending before the United States Bankruptcy Court for the Central District of California (the "Court") and is styled *In re Aloha Power, LLC*, Case No. 6:17-BK-12061-WJ.

   b. On the Petition Date, the assets of the Debtor's bankruptcy estate included limited liability company membership units ("Units") in Regenesis Power, LLC, a Delaware limited liability company. According to the most recent records, the Debtor owned 2,174,900 Units, constituting 21.749% of total issued and outstanding Units, on the Petition Date. The Parties acknowledge that the Debtor has disputed past corporate actions that resulted in changes in the number of Units owned by the Debtor and the percentage of outstanding Units owned by the Debtor; notwithstanding the precise number of Units and the percentage of outstanding Units owned by Debtor, however, all Units owned by the Debtor on the Petition Date (the "Assets") are being sold to Buyer pursuant to this Agreement.

   c. Subject to Court approval and overbids, the Trustee wishes to sell to the Buyer, and the Buyer wishes to purchase, all of the Trustee's rights, title, and interest in the Assets for $30,000 subject to overbid, free and clear of any existing liens, if any.

3. <u>DESCRIPTION OF PROPERTY TO BE SOLD</u>: Subject to the terms and conditions of this Agreement, the Trustee shall sell, assign, transfer, and deliver to Buyer all of Trustee's interest in the Assets. Without limiting the foregoing, the Assets shall include all rights of the Debtor as a member of Regenesis Power, LLC under its Operating Agreement and applicable law.

4. <u>PAYMENT</u>: The Buyer shall pay the sum of $30,000 made payable to "Charles W. Daff, Chapter 7 Trustee" (the "Payment") and deliver it to the Trustee c/o counsel for the Trustee, Cathrine M. Castaldi, Esq., Brown Rudnick, at 2211 Michelson Drive, 7th Floor, Irvine, CA 92612. The Payment shall be delivered in the form of a check concurrent with the execution of this Agreement.

5. <u>APPROVAL BY THE COURT</u>: The effectiveness of this Agreement shall be subject to the Court's approval. The Trustee shall file a motion for an order approving this Agreement. If this Agreement is not approved, the Trustee shall refund any funds paid by the Buyer.

6. <u>REPRESENTATIONS</u>: The Trustee's sale of the Assets shall be on an "as is" basis, without any warranties, representations, or recourse. Neither the Trustee nor the Debtor's bankruptcy estate shall be responsible for any costs or fees in connection with the Assets. The Buyer shall be responsible for all costs, fees, and expenses related to the Assets, including but not limited to any taxes resulting from the sale of the Assets.

7. <u>TERMINATION OF AGREEMENT</u>: If the Court refuses to approve this Agreement, then the Parties agree that this Agreement shall terminate and be of no further force or effect.

8. MISCELLANEOUS:

   a. The Court shall retain exclusive jurisdiction over any dispute that arises from this Agreement. This Agreement shall be deemed to have been executed and delivered within the state of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with, and governed by, the laws of the state of California.

   b. This Agreement is the entire Agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and discussions. This Agreement may be amended only by an agreement in writing.

   c. Each party has cooperated in the drafting and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against any party.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

    d.  This Agreement may be executed in counterparts (including facsimiles), and when each party has signed and delivered at least one such counterparty, each counterpart shall be deemed an original, and when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to all Parties.

7/25     This Agreement consisting of three (3) pages, is made and entered into on and as of July ___, 2018 in the State of California and is effective as of this date.

"Trustee"

Charles W. Daff, solely in his capacity as Chapter 7 Trustee of the bankruptcy estate of Aloha Power, LLC

"Buyer"

William R. Hearst

Error! Unknown document property name.

EXHIBIT "2"

| Fill in this information to identify the case: |
|---|

United States Bankruptcy Court for the:

__Central__    District of __California__
                              (State)

Case number (If known): _____    Chapter __7__



FILED

MAR 1 6 2017

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

☐ Check if this is an
   amended filing

## Official Form 205

# Involuntary Petition Against a Non-Individual                    12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

| Part 1: | Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed |
|---|---|

1. **Chapter of the Bankruptcy Code**

   Check one:

   ☒ Chapter 7

   ☐ Chapter 11

| Part 2: | Identify the Debtor |
|---|---|

2. **Debtor's name**

   Aloha Power, LLC, a Delaware limited liability company

3. **Other names you know the debtor has used in the last 8 years**

   Include any assumed names, trade names, or doing business as names.

4. **Debtor's federal Employer Identification Number (EIN)**

   ☐ Unknown

   _2_ _0_ – _5_ _5_ _3_ _5_ _9_ _2_ _7_
   EIN

5. **Debtor's address**

   **Principal place of business**

   P.O. Box 1
   Number    Street

   Morongo Valley    CA    92256
   City    State    ZIP Code

   San Bernardino
   County

   **Mailing address, if different**

   Number    Street

   P.O. Box 1150
   P.O. Box

   Kula    HI    96790
   City    State    ZIP Code

   **Location of principal assets, if different from principal place of business**

   Number    Street

   City    State    ZIP Code

---

Official Form 205              Involuntary Petition Against a Non-Individual              page 1

Case 6:17-bk-12061-WJ   Doc 1   Filed 03/16/17   Entered 03/16/17 14:39:13   Desc
Main Document     Page 2 of 6

| Debtor | Aloha Power, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**8.** Debtor's website (URL) _____

---

**7. Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other type of debtor. Specify: _____

---

**8. Type of debtor's business**

*Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the types of business listed.

☐ Unknown type of business.

---

**9. To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

☒ No

☐ Yes. Debtor _____     Relationship _____

District _____ Date filed _____     Case number, if known _____
MM / DD / YYYY

Debtor _____     Relationship _____

District _____ Date filed _____     Case number, if known _____
MM / DD / YYYY

---

**Part 3:     Report About the Case**

**10. Venue**

*Check one:*

☒ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.

☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

---

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

☒ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

---

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

☒ No

☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

---

Official Form 205                     Involuntary Petition Against a Non-Individual                     page 2

Debtor    Aloha Power, LLC                                          Case number (if known)
         Name

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| Regenesis Power, LLC | Judgment | $ 247,432 |
| William Foster | Judgment | $ 203,968 |
| William Hearst | Judgment | $ 564,155 |
| | Total of petitioners' claims | $ 1,015,555 |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

**Part 4:    Request for Relief**

**WARNING** — Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**

Name and mailing address of petitioner

Regenesis Power, LLC
Name

865 Laurel Street
Number    Street

San Carlos                     CA         94070
City                           State      ZIP Code

Name and mailing address of petitioner's representative, if any

Steven J. Shapero
Name

5950 Canoga Avenue, Suite 404
Number    Street

Woodland Hills                 CA         91367
City                           State      ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    03/14/2017
               MM / DD / YYYY

✗   _Sti Shapero, Atty._
Signature of petitioner or representative, including representative's title

**Attorneys**

Steven J. Shapero
Printed name

Shapero & Shapero
Firm name, if any

5950 Canoga Avenue, Suite 404
Number    Street

Woodland Hills                 CA         91367
City                           State      ZIP Code

Contact phone   (818) 710-1200   Email sshapero@shaperoandshapero.com

Bar number   90282

State    California

✗   _Sti Shapero_
Signature of attorney

Date signed    03/14/2017
               MM / DD / YYYY

Debtor    Aloha Power, LLC                                    Case number (if known)
          Name

**Name and mailing address of petitioner**

William Foster
Name

643 Camino de la Luz, LR1
Number    Street

Santa Fe                    NM        87505
City                        State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Steven J. Shapero
Name

5950 Canoga Avenue, Suite 404
Number    Street

Woodland Hills              CA        91367
City                        State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  03/14/2017
             MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

---

Steven J. Shapero
Printed name

Shapero & Shapero
Firm name, if any

5950 Canoga Avenue, Suite 404
Number    Street

Woodland Hills              CA        91367
City                        State     ZIP Code

Contact phone  (818) 710-1200   Email sshapero@shaperoandshapero.com

Bar number    90282

State         California

X _____
Signature of attorney

Date signed   03/14/2017
              MM / DD / YYYY

---

**Name and mailing address of petitioner**

William Hearst c/o Edward E. Sawyer
Name

260 Crandon Blvd., 32 PMB 400
Number    Street

Key Biscayne                FL        33149
City                        State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Steven J. Shapero
Name

5950 Canoga Avenue, Suite 404
Number    Street

Woodland Hills              CA        91367
City                        State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  03/14/2017
             MM / DD / YYYY

X _____
Signature of petitioner or representative, including representative's title

---

Steven J. Shapero
Printed name

Shapero & Shapero
Firm name, if any

5950 Canoga Avenue, Suite 404
Number    Street

Woodland Hills              CA        91367
City                        State     ZIP Code

Contact phone  (818) 710-1200   Email sshapero@shaperoandshapero.com

Bar number    90282

State         California

X _____
Signature of attorney

Date signed   03/14/2017
              MM / DD / YYYY

---

Official Form 205                Involuntary Petition Against a Non-Individual                page 4

Page 26

CORPORATE OWNERSHIP STATEMENT

Pursuant to Bankruptcy Rules 1010(b) and 7007.1, Petitioners submit this Corporate Ownership Statement.

The direct and indirect corporate owners of 10% or more of the equity interests of Petitioner Regenesis Power, LLC and their percentage ownerships are the following:

| | |
|---|---|
| Harvest, LLC, a Delaware limited liability company | 25.75 % |
| Wallace Williams, LLC, a California limited liability company | 25.75 % |
| Aloha Power, LLC, a Delaware limited liability company | 17.24 % |

None of Harvest, LLC, Wallace Williams, LLC nor Aloha Power, LLC have any direct or indirect corporate equity owners.

SHAPERO & SHAPERO


Steven J. Shapero
Attorney for Petitioners

-1-

CORPORATE OWNERSHIP STATEMENT

Pursuant to Bankruptcy Rules 1010(b) and 7007.1, Petitioners submit this Corporate Ownership Statement.

The direct and indirect corporate owners of 10% or more of the equity interests of Petitioner Regenesis Power, LLC and their percentage ownerships are the following:

| | |
|---|---|
| Harvest, LLC, a Delaware limited liability company | 25.75 % |
| Wallace Williams, LLC, a California limited liability company | 25.75 % |
| Aloha Power, LLC, a Delaware limited liability company | 17.24 % |

None of Harvest, LLC, Wallace Williams, LLC nor Aloha Power, LLC have any direct or indirect corporate equity owners.

SHAPERO & SHAPERO

Steven J. Shapero
Attorney for Petitioners

-1-

EXHIBIT "3"

## DECLARATION OF DENNIS MARINI

I, Dennis Marini, hereby declare as follows:

1. I am the owner and principal of Aloha Power Company, LLC ("Alleged Debtor"), a Delaware limited liability company and the alleged debtor in the above-captioned involuntary bankruptcy case. I am over the age of 18 years. I have personal knowledge of the following facts, except to those which are based on information and belief, and if called upon to testify I could and would testify competently thereto.

2. I make this declaration in support of Alleged Debtor's second trial brief.

3. Alleged Debtor is a founding member and partial owner of petitioning creditor Regenesis Power, LLC ("Regenesis"). Petitioning creditor William Foster ("Foster") is a partial owner of Regenesis through his limited liability company, Wallace Williams, LLC ("Wallace"), which is a member of Regenesis. Petitioning creditor William R. Hearst II ("Hearst") is a partial owner of Regenesis through his limited liability company, Harvest, LLC ("Harvest"), which is also a member of Regenesis. Hereinafter, Regenesis, Foster, and Hearst will be collectively referred to as "Petitioning Creditors."

4. In 2009, Alleged Debtor and I had jointly filed a lawsuit against Regenesis, Foster, Wallace, Hearst, and Harvest in Los Angeles Superior Court, case number BC419175, alleging causes of action for, *inter alia*, intentional misrepresentation, conversion, false promise, and breach of fiduciary duty.

5. Attached hereto as Exhibit "1" is a true and correct copy of the Judgment on Jury Trial entered in Los Angeles Superior Court case number BC419175.

6. Alleged Debtor contends that Petitioning Creditors refused to foreclose on Alleged Debtor's transferable interest in Regenesis because an evaluation of Regenesis' books and records would have revealed that Foster and Hearst were diverting Regenesis assets to other entities without permission of Alleged Debtor and in breach of their fiduciary duties and obligations to Alleged Debtor pursuant to the Regenesis operating agreement.

DECLARATION

7. Petitioning Creditors have refused to allow Alleged Debtor to inspect the Regenesis books and records despite multiple requests over at least six years, so Alleged Debtor filed a lawsuit in the Delaware Chancery Court (the "Delaware Case"), case number 12697-VCMR, seeking inspection of Regenesis' books and records. Trial in that case has completed, but the Delaware court has not entered judgment as of the date I make this declaration.

8. Attached hereto as Exhibit "5" is a true and correct copy of the First Amended Verified Complaint For Inspection of Books and Records that Alleged Debtor filed in Delaware Chancery Court initiating case number 12697-VCMR.

9. Petitioning Creditors filed this case in the middle of the Delaware Case.

10. Alleged Debtor's only asset is its ownership interest in Regenesis, and its only debt is to Petitioning Creditors. Alleged Debtor is not in need of a breathing spell, debt readjustment, or reorganization.

11. Alleged Debtor contends that its interest in Regenesis is worth at least $5 million and may fully offset the alleged claims of Petitioning Creditors. Alleged Debtor's estimate is based on the fact that Regenesis was previously valued as being worth $60 million. Alleged Debtor also contends an inspection of Regenesis' books and records will show it is owed commissions and distributions.

12. Pursuant to the Regenesis operating agreement, upon the bankruptcy of a member the insolvent member loses all voting or approval rights and the other members have a right to purchase the insolvent member's membership interest. A true and correct copy of an excerpt of the Regenesis operating agreement is attached hereto as Exhibit "6."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in San Bernardino, California.

Dated: October 20, 2017

Dennis Marini

DECLARATION

EXHIBIT "4"



**FILED & ENTERED**

NOV 03 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gooch    DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>ALOHA POWER LLC, a Delaware limited liability company,<br><br>Debtor. | Case No.: 6:17-bk-12061-WJ<br><br>CHAPTER 7<br><br>**ORDER FOR RELIEF IN INVOLUNTARY CASE**<br><br><u>Trial</u>:<br>Date:  November 3, 2017<br>Time:  10:00 a.m.<br>Place:  United States Bankruptcy Court<br>          Courtroom 304<br>          3420 Twelfth Street<br>          Riverside, CA 92501 |

- 1 -

1    On November 3, 2017, the Court held the trial in this involuntary bankruptcy case.  For the

2    reasons set forth on the record, the Court hereby ORDERS, ADJUDGES and DECREES:

3    1.    The court hereby enters judgment in favor of the petitioning creditors and against

4    the debtor.  Pursuant to 11 U.S.C. § 303, an order for relief under chapter 7 of Title 11 of the

5    United States Bankruptcy Code is hereby entered against the debtor.

6    IT IS SO ORDERED.

7    ###

Date: November 3, 2017

Wayne Johnson
United States Bankruptcy Judge

- 2 -

EXHIBIT "5"

**FILED & ENTERED**

**NOV 03 2017**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gooch      DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re: | Case No.: 6:17-bk-12061-WJ |
| ALOHA POWER LLC, a Delaware limited liability company,<br><br>　　　　　Debtor. | CHAPTER 7<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br><u>Trial</u>:<br>Date:   November 3, 2017<br>Time:   10:00 a.m.<br>Place:   United States Bankruptcy Court<br>　　　　Courtroom 304<br>　　　　3420 Twelfth Street<br>　　　　Riverside, CA 92501 |

- 1 -

1    On November 3, 2017, the Court held the trial in this involuntary bankruptcy case.

2    Pursuant to a separate order, the court has granted the involuntary petition and entered an order for

3    relief against the debtor.  Therefore, for the reasons stated on the record, the Court hereby

4    ORDERS, ADJUDGES and DECREES:

5        1.    The Court hereby denies the motion of the debtor to dismiss entitled "Alleged

6    Debtor's Motion To Dismiss The Involuntary Petition" [docket #15].

7    IT IS SO ORDERED.

8                                    ###

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    Date: November 3, 2017

28

Wayne Johnson
United States Bankruptcy Judge

- 2 -

EXHIBIT "6"

1              UNITED STATES BANKRUPTCY COURT

2         CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE

3                       --oOo--

4   In Re:                      )   Case No. 6:17-bk-12061-WJ
                                )
5   ALOHA POWER, LLC, *a Delaware* )   Chapter 7
    *Limited Liability Company,*   )
6                               )   Riverside, California
    Debtor,                     )   Friday, November 3, 2017
7                               )   10:00 A.M.
    ----------------------------)
8
                                    HEARING RE: ALLEGED
9                                   DEBTOR'S MOTION TO DISMISS
                                    THE INVOLUNTARY PETITION
10
                                    TRIAL RE: INVOLUNTARY
11                                  BANKRUPTCY CASE

12               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE WAYNE JOHNSON
13           UNITED STATES BANKRUPTCY JUDGE

14  APPEARANCES:

15  For Debtor:              TODD TUROCI, ESQ.
                             The Turoci Firm
16                           3845 Tenth Street
                             Riverside, California 92501
17

    For Petitioning          STEVEN J. SHAPERO, ESQ.
18  Creditors:               Shapero & Shapero
                             5950 Canoga Avenue
19                           Suite #404
                             Woodland Hills, California 91367
20

    Court Recorder:          Yvonne Carter
21                           U.S. Bankruptcy Court
                             Central District of California
22                           3420 Twelfth Street
                             Riverside, California 92501-3819
23                           (855) 460-9641

24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.

P 888.272.0022  F 818.343.7119        BENHYATT        www.benhyatt.com
                                       Certified Deposition Reporters

```
 1   Court Transcriptionist:    Ruth Ann Hager, C.E.T.**D-641
                                Ben Hyatt Certified Deposition
 2                                 Reporters
                                17835 Ventura Boulevard
 3                              Suite #310
                                Encino, California  91316
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P 888.272.0022 F 818.343.7119        BENHYATT        www.benhyatt.com
                                     Certified Deposition Reporters

Page                                                              61

1    refutation of the existence of final judgments.  The

2    charging order against the transferable interest has not

3    gotten us anything and it won't get us anything.  The

4    evidence shows that Mr. Marini is constantly making demands

5    on us and nothing apparently will persuade him that there's

6    nothing there.  The Ninth Circuit has generally stated that

7    motivation does not come into the analysis of an

8    involuntary, but even if it did there's no bad faith and

9    there's no adequate state law remedy that we have because

10   only transferrable interests can be executed on.

11              So it's not a matter of being able to collect our

12   debt in some other way.  We know that there's not going to

13   be any money available.  We just want to stop the costs

14   that are being imposed on us.  With that, I'll submit.

15              THE COURT:  Thank you, sir.  Thank you,

16   gentlemen, for your fine efforts today on this lovely

17   Friday.  I appreciate your efforts coming down.

18              The Court finds in favor of the petitioning

19   creditors.  The involuntary petition is granted.  The order

20   for relief will be entered promptly.  The reason for the

21   ruling is based on the following findings of fact and

22   conclusions of law.

23              The tale of this involuntary petition began

24   several decades ago when Dennis Marini; Aloha Power, LLC,

25   the debtor; Regenesis Power, LLC; William Foster; William

P 888.272.0022  F 818.343.7119        www.benhyatt.com

Page                                                          62

1   Hearst and others were involved in the solar power business
2   of Regenesis Power, LLC.   For some unknown period of time
3   Dennis Marini was involved with Regenesis Power, LLC, and
4   apparently was unsatisfied with certain unspecified
5   behavior of the petitioning creditors and commenced a
6   lawsuit in state court in 2009 against the petitioning
7   creditors.   That lawsuit is *Marini, Regenesis, Inc., Aloha*
8   *Power Company, LLC, Inc., plaintiffs, vs. Regenesis Power,*
9   *LLC, William Foster, Wallace Williams, LLC, William Hearst,*
10  *Harvest, LLC, John Polumbo* and others, case number BC-
11  419175.   The case was filed in 2009 and the debtor and
12  Mr. Marini lost that lawsuit completely.   Judgment was
13  entered against them.   The judgment on jury verdict has
14  been attached as Exhibit 11 to the plaintiff's trial binder
15  and as set forth on pages 9 and 10 of that judgment the
16  state court awarded attorney's fees and costs in favor of
17  the petitioning creditors as follows.
18          Regenesis Power was awarded $174,450 in fees;
19  $3,918 in costs.   William Foster was awarded $165,899.69 in
20  fees.   He was also awarded $5,116.54 in costs.   William
21  Hearst was awarded $292,441 in fees and costs of $9,405.
22  In total, the state court on the initial jury verdict
23  awarded $632,790.69 in fees in favor of the petitioning
24  creditors, who again were defendants in the state court
25  action.   The state court also awarded $18,439.54 in costs,



P 888.272.0022  F 818.343.7119     BENHYATT     www.benhyatt.com
                                   Certified Deposition Reporters

Page                                                        63

1   for a total of about $650,000.

2          Following entry of that verdict -- the verdict

3   was entered on December 14, 2011.  There were appeals and

4   again the debtor and Mr. Marini lost the appeals.  As a

5   consequence, the judgment is final.  There is no further --

6   there are no further pending appeals since 2014.

7          After the appeals, the state court awarded

8   additional attorney's fees in favor of the petitioning

9   creditors for prosecuting the appeals -- or for defending

10  the appeals, I should say.  Regenesis Power was awarded

11  another $68,460 in attorney's fees and costs.  William

12  Foster was awarded another $32,512.50 in attorney's fees

13  and costs.  William Hearst was awarded another $258,770.50

14  in attorney's fees and costs.  The three petitioning

15  creditors were awarded in total $359,743 in attorney's fees

16  and costs.

17         As set forth in the order of the appellate court

18  marked as Exhibit 5 in the plaintiff's -- correction -- as

19  set forth in Exhibit 10 of the state court's order entered

20  on June 19, 2014, the amounts I just articulated appear on

21  pages 4 and 5 and also at page 2.  The Exhibit 5 I just

22  referenced to was the appellate court decision affirming

23  the lower court's jury verdict that I articulated earlier.

24         As a consequence the debtor Aloha Power and

25  Mr. Marini were entirely unsuccessful.  They failed at



P 888.272.0022  F 818.343.7119          BENHYATT          www.benhyatt.com
                                        Certified Deposition Reporters

Page                                                                64

1    every stage in the state court and attorney's fees and

2    costs were awarded against both of them at every stage in

3    state court.  Those findings are final.  There are no

4    further appeals.

5            The total amount awarded to the three petitioning

6    creditors is 1.01 million dollars and the amounts closely

7    approximate the amounts listed on paragraph 13 of the

8    involuntary petition and the amended involuntary petition

9    filed on May 10, 2017, is docket number 9 in this case.

10           Mr. Marini testified at trial.  He is the -- he

11   has been described as the primary owner of the debtor,

12   Aloha Power, LLC.  He testified at trial that Aloha Power

13   has not made any payments on account of any of these

14   amounts.  Mr. Marini is personally liable for these amounts

15   and he also testified at trial that he has not paid any

16   payments on these judgments, so these final judgments are

17   entirely unsatisfied.

18           Mr. Marini also admitted under testimony that

19   that the debtor has no business.  Its only asset is an

20   ownership interest in Regenesis.  Mr. Marini also testified

21   that Aloha Power has not received any money, revenue or

22   earnings in 2017, 2016, 2015 or 2014.  He also acknowledged

23   he has no knowledge of any prospects of the debtor

24   receiving any money.  He testified Aloha Power has no other

25   creditors other than the petitioning creditors.  He also



P 888.272.0022  F 818.343.7119                    www.benhyatt.com
BENHYATT
Certified Deposition Reporters

Page                                                                    65

1   stated that Aloha Power, the debtor has never made any

2   payments to anyone ever.

3          Therefore, it is abundantly evident that

4   303(b)(2) has been satisfied.  Under Section 303(b)(2) an

5   involuntary petition may be commenced if there are fewer

6   than 12 creditors, which based on Mr. Marini's testimony

7   there are clearly less than 12 creditors of Aloha Power.

8   There are only the petitioning creditors and each of them

9   is owed far more than $15,775 and in the aggregate they're

10  owed over a million dollars, as I previously have

11  indicated.

12         The Court may order the granting of the petition

13  under 303(h)(1) if the Court finds the debtor is generally

14  not paying such debtor's debts as such debts become due.

15  That is clearly true in this case.  The debtor is not

16  generally paying such debtor's debts as such debts become

17  due.  The debtor has owed for well over three years over a

18  million dollars and hasn't -- to the three petitioning

19  creditors has not paid a cent to those creditors and those

20  are final judgments which have not been satisfied and not

21  set aside on appeal.

22         Those debts are not subject to a *bona fide*

23  dispute.  There has been no evidence at trial that the

24  debts are subject to a *bona fide* dispute.  As a consequence

25  to Section 303(h)(1) it is satisfied and entry of an

P 888.272.0022  F 818.343.7119     BENHYATT
                                  Certified Deposition Reporters    www.benhyatt.com

Page                                                      66

1  involuntary petition is appropriate.

2           There was testimony at trial that in state court

3  prior to the filing of the involuntary petition, the

4  petitioning creditors obtained a charging order against the

5  only asset of the debtor which is a membership interest in

6  Regenesis Power, LLC.  The testimony at trial was that

7  there was no foreclosure of that interest and Mr. Marini

8  admitted on the stand that Aloha Power has never paid

9  anything on account of the charging order.  So the evidence

10 is undisputed at trial that the petitioning creditors have

11 received nothing as a result of obtaining the charging

12 order.  Mr. Foster, a manager of Regenesis Power, LLC and a

13 governing member, confirmed that as well that the

14 petitioning creditors have not received anything on account

15 of the charging order.

16          Two remaining issues were raised by the debtor at

17 trial.  First, the debtor invited the Court to speculate

18 that the charging order may in and of itself have value

19 that may one day satisfy the judgment.  The Court rejects

20 that argument because, one, it is speculative.  The debtor

21 never presented any evidence that the charging order will

22 ever produce any value of any kind or any payments of any

23 kind to the petitioning creditors and the evidence at trial

24 was to the contrary.  Mr. Foster testified that Regenesis

25 is not generating income, has no prospects for generating



Page                                                                67

1   income.  Its only subsidiaries are non-operating.  They're

2   not generating any cash and have no prospects for

3   generating cash.  This testimony by Mr. Foster was

4   unrebutted and Mr. Foster also testified that Regenesis

5   owes creditors approximately eight million dollars.  He

6   also testified that he recently bought debt owed by

7   Regenesis to another individual, Mr. Taylor, for -- with a

8   face amount of $560,000 for an actual payment of between

9   1500 to $3,000, which was consistent with Mr. Foster's

10  testimony that the debt owed by Regenesis was worthless

11  because Regenesis owes eight million dollars and does not

12  have assets or funds to pay its debts.

13          So all the evidence at trial was unrebutted that

14  Regenesis is not generating income and that therefore the

15  charging order -- is not generating income and does not

16  have net assets and therefore the charging order against

17  Aloha Power's membership interest in Regenesis will not

18  produce any benefit for the petitioning creditors.

19          Lest the record appear muddy on appeal the Court

20  will note that counsel for the debtor asked Mr. Foster two

21  hypothetical questions, which were just that.  They were

22  hypothetical questions and Mr. Foster's responses were in

23  response to those hypothetical questions.  They were not

24  contrary testimony to what he testified at trial.

25  Specifically, Mr. Turoci asked Mr. Foster at one point that

P 888.272.0022  F 818.343.7119         www.benhyatt.com

Page                                                                    68

1    if Regenesis is worthless then the debtor's membership

2    interest in Regenesis would be valueless and Mr. Foster

3    acknowledged to that hypothetical question, "Correct."

4    Mr. Turoci's follow-up question was, "Hypothetically, if

5    Regenesis was worth a billion dollars then the interest of

6    Aloha Power and Regenesis would be worth one point -- 180

7    million dollars?" And Mr. Foster acknowledged that that

8    would be the correct math in response to the hypothetical

9    question. Those were both hypothetical questions, which

10   probably could have been objected to on the basis of

11   improper hypotheticals. The point is the Court construes

12   them exactly as they are, hypotheticals. All of

13   Mr. Foster's testimony on point was that Regenesis does not

14   have any net value and therefore the charging order clearly

15   has not provided any evidence -- any benefit to the

16   petitioning creditors and there's no evidence that it ever

17   will.

18           The alleged debtor did not present any contrary

19   evidence of any kind. The alleged debtor did not conduct

20   discovery regarding Regenesis. The alleged debtor did not

21   submit any evidence of the value of Regenesis or the value

22   of the membership interest in Regener -- in Regenesis. So

23   all the evidence and if -- on that issue is in favor of the

24   petitioning creditors.

25           The last issue raised by the debtor relates to



P 888.272.0022  F 818.343.7119    BENHYATT    www.benhyatt.com
Certified Deposition Reporters

Page                                                              74

1  today?

2          MR. TUROCI:  No, Your Honor.  Thank you.

3          MR. SHAPERO:  No, Your Honor.  Thank you very

4  much.

5          THE COURT:  Thank you, counsel.

6          (Pause.)

7          Oh, I'm sorry.  Are we still on the record?

8  Matter #1.00., the debtor's motion to invol -- dismiss the

9  involuntary petition is denied.

10          MR. TUROCI:  I assumed.  Thank you, Your Honor.

11          THE COURT:  The Court will enter an order.

12  (End at 12:53 p.m.)

13                  * * * * * * * *

14          I certify that the foregoing is a correct

15  transcript from the electronic sound recording of the

16  proceedings in the above-entitled matter.

17

18  ⟨signature⟩

19  _____        Date:  1/5/2018

20  RUTH ANN HAGER, C.E.T.**D-641

21

22

23

24

25



P 888.272.0022  F 818.343.7119                    www.benhyatt.com
BENHYATT
Certified Deposition Reporters

EXHIBIT "7"

45 ORIGINAL

FILED
LOS ANGELES SUPERIOR COURT

RECEIVED
DEC 1 4 2011
DEPT. 45

DEC 1 4 2011
JOHN A. CLARKE, CLERK
BY D. HARO, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY LOS ANGELES

| | |
|---|---|
| DENNIS MARINI, an individual; REGENESIS INC., a Nevada Corporation; ALOHA POWER COMPANY, LLC, a Delaware limited liability company, | Case No.: BC419175  Dept 45 |
| Plaintiffs, | JUDGMENT ON JURY VERDICT |
| vs. | |
| REGENESIS POWER, LLC, a Delaware limited liability company; WILLIAM FOSTER, an individual; WALLACE WILLIAMS, LLC, a limited liability company; WILLIAM RANDOLPH HEARST II, an individual; HARVEST, LLC, a Delaware limited liability company; JOHN POLUMBO, an individual; and Does 1 through 100, inclusive | |
| Defendants. | |

On November 14, 2011, in Department 45 of the above-entitled court, the above-entitled matter came on regularly for trial, the Honorable Mel Red Recana, Judge, presiding. Appearing on behalf of Plaintiffs Dennis Marini, Regenesis, Inc., a Nevada corporation, and Aloha Power Company, LLC, a Delaware limited liability company, was The Law Offices of Douglas J. Pettibone, by Douglas J. Pettibone; appearing on behalf of Defendant Regenesis Power, LLC, a Delaware limited liability company, was Shapero, Shapero & Hurst, by Steven J. Shapero;

-1-

Judgment on Jury Verdict

1  appearing on behalf of Defendants William R. Hearst II and Harvest, LLC, a Delaware limited

2  liability company was Spolin, Silverman, Cohen & Bosserman, LLP by Gordon E. Bosserman;

3  appearing on behalf of Defendants Wallace Williams, LLC, a limited liability company and

4  William Foster was Marcus, Watanabe & Dave, by David M. Marcus.

5    A jury of twelve regular jurors and three alternates was duly impaneled and sworn; and

6  witnesses testified.

7    At the end of Plaintiffs' case, Defendants, and each of them, moved for non-suit on

8  Plaintiffs' causes of action.  The Motion was granted as to the causes of action for intentional

9  misrepresentation and conversion; the motion was denied, either with or without prejudice, as to

10  the remaining causes of action.

11    At the end of Defendants' case, the Court granted Defendants' motion for judgment as to

12  the allegations of alter ego between Wallace Williams, LLC and William Foster; and between

13  Harvest, LLC and William R. Hearst II.

14    The Court, having previously granted motions to strike, denied the Motions of Plaintiffs

15  to amend the Third Amended Complaint to conform to proof as to the Breach of Written

16  Contract cause of action and to allege a cause of action on behalf of Plaintiff Dennis Marini for

17  breach of oral contract.

18    After being duly instructed by the court, the jury deliberated and thereon duly returned

19  the following special verdicts:

20  "FALSE PROMISE I

21  We answer the questions submitted to us as follows:

22  1 Did WILLIAM RANDOLPH HEARST, II make a promise to Aloha Power, LLC that was

23  important to the transaction?

24  _____ Yes    X _____ No

25  If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, and

26  go to the next cause of action.

27  2 Did WILLIAM RANDOLPH HEARST, II intend to perform this promise when he made it?

28  _____ Yes    _____ No

-2-

Judgment on Jury Verdict

If your answer to question 2 is no, then answer question 3. If you answered yes, stop here, and go to the next cause of action.

3 Did WILLIAM RANDOLPH HEARST, II intend that Aloha Power, LLC rely on this promise?

_____ Yes _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, and go to the next cause of action.

4 Did Aloha Power, LLC reasonably rely on this promise?

_____ Yes _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, and go to the next cause of action.

5 Did WILLIAM RANDOLPH HEARST, II perform the promised act?

_____ Yes _____ No

If your answer to question 5 is no, then answer question 6. If you answered yes, stop here, and go to the next cause of action.

6 Was Aloha Power LLC's reliance on WILLIAM RANDOLPH HEARST, II's promise a substantial factor in causing harm to Aloha Power, LLC?

_____ Yes _____ No

If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, and go to the next cause of action.

7 What are Aloha Power, LLC's damages?

$_____

Signed:  Ray Collins
          Presiding Juror
Dated: December 2, 2011

-3-

Judgment on Jury Verdict

1    After all verdict forms have been signed, go to verdict II.

2    FALSE PROMISE II

3

4    We answer the questions submitted to us as follows:

5    1 Did WILLIAM FOSTER make a promise to ALOHA POWER, LLC that was important to the

6    transaction?

7    _____ Yes     X     No

8    If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, and

9    go to the next cause of action.

10    2 Did WILLIAM FOSTER intend to perform this promise when he made it?

11    _____ Yes    _____ No

12

13    If your answer to question 2 is no, then answer question 3. If you answered yes, stop here, and

14    go to the next cause of action.

15    3 Did WILLIAM FOSTER intend that ALOHA POWER, LLC rely on this promise?

16    _____ Yes    _____ No

17

18    If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, and

19    go to the next cause of action.

20    4 Did ALOHA POWER, LLC reasonably rely on this promise?

21    _____ Yes    _____ No

22    If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, and

23    go to the next cause of action.

24    5 Did WILLIAM FOSTER perform the promised act?

25    _____ Yes    _____ No

26

27    If your answer to question 5 is no, then answer question 6. If you answered yes, stop here, and

28    go to the next cause of action.

-4-

Judgment on Jury Verdict

6 Was ALOHA POWER, LLC'S reliance on WILLIAM FOSTER's promise a substantial factor in causing harm to ALOHA POWER, LLC?

_____ Yes _____ No

If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, and go to the next cause of action.

7 What are ALOHA POWER, LLC's damages?

$_____

Signed:  Ray Collins
          Presiding Juror
Dated: December 2, 2011

After it has been signed, please go to verdict III.

FALSE PROMISE II A

We answer the questions submitted to us as follows:

1 Did REGENESIS POWER, LLC make a promise to ALOHA POWER, LLC that was important to the transaction?

___X___ Yes _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, and go to the next cause of action.

2 Did REGENESIS POWER, LLC intend to perform this promise when it made it?

___X___ Yes _____ No

If your answer to question 2 is no, then answer question 3. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.

3 Did REGENESIS POWER, LLC intend that ALOHA POWER, LLC rely on this promise?

_____ Yes _____ No

-5-

Judgment on Jury Verdict

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4 Did ALOHA POWER, LLC reasonably rely on this promise?

_____ Yes _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5 Did REGENESIS POWER, LLC perform the promised act?

_____ Yes _____ No

If your answer to question 5 is no, then answer question 6. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.

6 Was ALOHA POWER, LLC'S reliance on REGENESIS POWER, LLC 's promise a substantial factor in causing harm to ALOHA POWER, LLC?

_____ Yes _____ No

If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7 What are ALOHA POWER, LLC 's damages?

$_____

Signed: Ray Collins
        Presiding Juror
Dated: December 2, 2011

After it has been signed, go to Verdict III.

FIDUCIARY DUTY III

We answer the questions submitted to us as follows:

1. Did Wallace Williams, LLC, a Limited Liability Company breach its fiduciary duty to ALOHA POWER, LLC?

_____ Yes ___X___ No

-6-

Judgment on Jury Verdict

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did ALOHA POWER, LLC suffer any damages as a result of the breach of fiduciary duty by Wallace Williams, LLC?

_____ Yes _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. What is the amount of damages legally caused to ALOHA POWER, LLC by the breach of fiduciary duty by Wallace Williams, LLC?

$_____

Signed:  Ray Collins
         Presiding Juror
Dated: December 2, 2011

Please go to verdict IV

FIDUCIARY DUTY IV

We answer the questions submitted to us as follows:

1. Did Harvest, LLC, a Limited Liability Company, breach its fiduciary duties to ALOHA POWER, LLC?

_____ Yes \_\_\_\_X\_\_\_\_ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did ALOHA POWER, LLC suffer any damages as a result of the breach of fiduciary duty by Harvest, LLC?

_____ Yes _____ No

-7-

Judgment on Jury Verdict

1  If your answer to question 3 is yes, then answer question 4. If you answered no, stop here,
2  answer no further questions, and have the presiding juror sign and date this form.

3  3. What is the amount of damages legally caused to ALOHA POWER, LLC by the breach of
4  fiduciary duty by Harvest, LLC?

5  $ _____

6  Signed: Ray Collins
7          Presiding Juror
8  Dated: December 2, 2011

9  Please go to verdict V.

10  PUNITIVE DAMAGES V

11  1. Did WALLACE WILLIAMS, LLC engage in conduct with malice, oppression or fraud?

12  _____ Yes ___X___ No
13

14  After all verdict forms have been signed, please go to VII

15  PUNITIVE DAMAGES VI

16  1. Did HARVEST, LLC engage in conduct with malice, oppression or fraud?

17  _____ Yes ___X___ No
18

19  After all verdict forms have been signed, please go to VII

20  PUNITIVE DAMAGES VII

21  1. Did WILLIAM FOSTER engage in conduct with malice, oppression or fraud?

22  ___X___ Yes _____ No

23  Signed: Ray Collins
24          Presiding Juror
25  Dated: December 2, 2011

26  After verdict have been signed, please go to VIII
27  PUNITIVE DAMAGES VIII
28
   1. Did REGENESIS POWER, LLC engage in conduct with malice, oppression or fraud?

-8-
Judgment on Jury Verdict

1   X_____ Yes _____ No

2   After all verdict forms has been signed, please go to IX

3   PUNITIVE DAMAGES IX

4   1. Did William Randolph Hearst, II engage in conduct with malice, oppression or fraud?

5
6   X_____ Yes _____ No

7   Signed: Ray Collins
            Presiding Juror
8   Dated: December 2, 2011

9
    After all verdict forms have been signed, notify the [clerk/bailiff/court attendant] that you are
10  ready to present your verdict in the courtroom."

11      The court polled the jury as to its verdicts as to punitive damages, and asked the jurors

12  their understanding of the term harm as used in the punitive damage instruction; the Court's

13  instructions and the response of the jurors is included in the record. The court instructed the jury

14  to further deliberate in light of its further instructions.

15
16      The jury returned and announced that it had not changed any of its verdicts.

17
18      It appearing that by reason of the special verdicts returned by the jury, Defendants are

19  entitled to judgment against Plaintiffs, and each of them;

20
21      NOW, THEREFORE, IT IS HEREBY ORDERED ADJUDGED AND DECREED that

22  Plaintiffs Dennis Marini, Regenesis, Inc. and Aloha Power Company, LLC take nothing by

23  reason of their Third Amended Complaint, that the Third Amended Complaint is dismissed with

24  prejudice and that judgment is hereby entered in favor of Defendants, and each of them, against

25  Dennis Marini, Regenesis, Inc. and Aloha Power Company, LLC.

26
27      IT IS FURTHER ADJUDGED, ORDERED AND DECREED that Defendant Regenesis

28  Power, LLC recover costs of suit from Plaintiffs Dennis Marini, Regenesis Power, LLC and

-9-

Judgment on Jury Verdict

1  Aloha Power Company, LLC costs of suit in the amount of $_____, and attorneys

2  fees pursuant to a motion for attorneys fees in the amount of $_____.

3

4      IT IS FURTHER ADJUDGED, ORDERED AND DECREED that Defendants William

5  R. Hearst II and Harvest, LLC recover costs of suit from Plaintiffs Dennis Marini, Regenesis

6  Power, LLC and Aloha Power Company, LLC costs of suit in the amount of $_____

7  and attorneys fees pursuant to a motion for attorneys fees in the amount of $_____

8

9      IT IS FURTHER ADJUDGED, ORDERED AND DECREED that Defendants Wallace

10  Williams, LLC and William Foster recover costs of suit from Plaintiffs Dennis Marini,

11  Regenesis Power, LLC and Aloha Power Company, LLC costs of suit in the amount of

12  $_____ and attorneys fees pursuant to a motion for attorneys fees in the amount of

13  $_____.

14

15  Dated:    DEC 14 2011

16

17                                      Judge of the Superior Court

18

19  Approved as to form:

20  Law Offices of Douglas J. Pettibone

21  By:_____

22      Douglas J. Pettibone
        Attorneys for Plaintiffs

23

24  SHAPERO, SHAPERO & HURST

25  By:_____

26      Steven J. Shapero
        Attorneys for Defendant Regenesis Power, LLC

27

28

                        -10-
                Judgment on Jury Verdict

1  SPOLIN, SILVERMAN, COHEN & BOSSERMAN

2  By:_____

3       Gordon E. Bosserman
        Attorneys for Defendants Harvest, LLC and
4       William R. Hearst II

5  MARCUS, WATANABE & DAVE

6

7  By:_____

8       David M. Marcus
        Attorneys for Defendants Wallace Williams, LLC and
9       William Foster

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

Judgment on Jury Verdict

1    Aloha Power Company, LLC costs of suit in the amount of $_____, and attorneys

2    fees pursuant to a motion for attorneys fees in the amount of $_____.

3

4         IT IS FURTHER ADJUDGED, ORDERED AND DECREED that Defendants William

5    R. Hearst II and Harvest, LLC recover costs of suit from Plaintiffs Dennis Marini, Regenesis

6    Power, LLC and Aloha Power Company, LLC costs of suit in the amount of $_____

7    and attorneys fees pursuant to a motion for attorneys fees in the amount of $_____

8

9         IT IS FURTHER ADJUDGED, ORDERED AND DECREED that Defendants Wallace

10   Williams, LLC and William Foster recover costs of suit from Plaintiffs Dennis Marini,

11   Regenesis Power, LLC and Aloha Power Company, LLC costs of suit in the amount of

12   $_____ and attorneys fees pursuant to a motion for attorneys fees in the amount of

13   $_____.

14

15   Dated:

16

17                                    _____
                                      Judge of the Superior Court

18   Approved as to form:

19

20   Law Offices of Douglas J. Pettibone

21   By: _____

22        Douglas J. Pettibone
          Attorneys for Plaintiffs

23

24   SHAPERO, SHAPERO & HURST

25   By: _____

26        Steven J. Shapero
          Attorneys for Defendant Regenesis Power, LLC

27

28

-10-

Judgment on Jury Verdict



1  SPOLIN, SILVERMAN, COHEN & BOSSERMAN

2  By:

3      Gordon E. Bosserman

4      Attorneys for Defendants Harvest, LLC and
       William R. Hearst II

5

6  MARCUS, WATANABE & DAVE

7  By:_____

8      David M. Marcus
       Attorneys for Defendants Wallace Williams, LLC and

9      William Foster

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

Judgment on Jury Verdict

1   SPOLIN, SILVERMAN, COHEN & BOSSERMAN

2   By:_____

3      Gordon E. Bosserman
       Attorneys for Defendants Harvest, LLC and

4      William R. Hearst II

5   MARCUS, WATANABE & DAVE

6

7   By:_____

8      David M. Marcus
       Attorneys for Defendants Wallace Williams, LLC and

9      William Foster

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

Judgment on Jury Verdict

EXHIBIT "8"



1   PETER C. ANDERSON
    UNITED STATES TRUSTEE
2   ABRAM S. FEUERSTEIN, SBN 133775
    ASSISTANT UNITED STATES TRUSTEE
    UNITED STATES DEPARTMENT OF JUSTICE
3   OFFICE OF THE UNITED STATES TRUSTEE
    3801 University Avenue, Suite 720
4   Riverside, CA 92501-3200
    Telephone:    (951) 276-6990
    Facsimile:    (951) 276-6973
5   Email:    Abram.S.Feuerstein@usdoj.gov

6

7

8                UNITED STATES BANKRUPTCY COURT

9                CENTRAL DISTRICT OF CALIFORNIA

                      RIVERSIDE DIVISION

10

11  In re:                                Case No. 6:17-bk-12061-WJ

12  ALOHA POWER, LLC,                     CHAPTER 7

                                          NOTICE OF APPOINTMENT OF
13                                        TRUSTEE; ACCEPTANCE OF
                  Debtor.                 APPOINTMENT AS TRUSTEE

14

15

16

17

18

19

20

21

22

23

24

                              -1-

1    Pursuant to 11 U.S.C. §§ 701(a) (1) and 322, Charles Daff, is hereby appointed Trustee of

2   the bankruptcy case of ALOHA POWER, LLC.  This case is covered by the Chapter 7 blanket bond

3   on file with the Court.

4   Dated: November 21, 2017                    PETER C. ANDERSON
                                                UNITED STATES TRUSTEE
5
6                                        By: _____
                                                Abram S. Feuerstein
7                                               Assistant U.S. Trustee

8

9       I, the undersigned, affirm that to the best of my knowledge and belief, I am disinterested

10   within the meaning of U.S.C. §101(14), and on this basis, I hereby accept my appointment as

11   Trustee in the above case. I will immediately notify the United States Trustee if I become aware of

12   any facts to the contrary.

13

14   Dated: __11/21/17__                      _____
15                                               Charles Daff
                                                Trustee
16

17

18

19

20

21

22

23

24

-2-

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

2107 N. Broadway Suite 308, Santa Ana, CA 92708

A true and correct copy of the foregoing document entitled (specify): **Notice of Appointment of Trustee; Acceptance of Appointment as Trustee with Proof of Service** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 21, 2017 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Steven J Shapero**    sshapero@shaperoandshapero.com
- **Todd L Tnroci**    mail@theturocifirm.com
- **United States Trnstee (RS)**    ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY U.S. MAIL:**
On (date)   November 21, 2017   I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor: Aloha Power LLC, PO Box 1150, Kula, HI 96790
Hon. WAYNE E. JOHNSON, U.S. BANKRUPTCY COURT, 3420 TWELFTH STREET, SUITE 384, RIVERSIDE, CA 92501

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIOHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):**  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on   November 21, 2017   I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows:  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 21, 2017 | Charles Daff | |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

EXHIBIT "9"

EFiled: Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWAR

| | |
|---|---|
| Aloha Power Company, LLC, a Delaware limited liability company, *Plaintiff*, v. Regenesis Power LLC, a Delaware limited liability company, *Defendant*. | C.A. No.: 12697-VCMR |

### FIRST AMENDED VERIFIED COMPLAINT
### FOR INSPECTION OF BOOKS AND RECORDS

Plaintiff Aloha Power Company, LLC ("Plaintiff" or "Aloha"), by and through the undersigned counsel, alleges on personal knowledge of its managing member, Dennis Marini, as to himself and his own conduct and on information and belief as to all other matters, as and for its Verified Complaint for Inspection of Books and Records pursuant to 6 *Del. C.* § 18-305(f) against Defendant Regenesis Power LLC ("Regenesis" or the "Company"), as follows:

#### Nature of the Action

1.     Aloha, which is a founding member of Regenesis, brings this action to compel Regenesis to provide Aloha access to the Regenesis books and records pursuant to Section 18-305 of the Delaware Limited Liability Company Act ("Section 18-305") and the Regenesis Operating Agreement (as amended by the First and Second Amendments thereto, (the "Operating Agreement"), a true and

-1-

correct copy of which is attached hereto as Exhibit 5.  True and correct copies of

the First and Second Amendments to the Operating Agreement are attached hereto

as Exhibit 5-A.

## Parties

2.      Plaintiff Aloha is a Delaware limited liability company under the

management and control of Dennis Marini ("Marini").  Aloha was a founding

Member of Regenesis, which was formed in May 2006.  Aloha is a Member of

Regenesis at this time.  Section B of the Operating Agreement specifically

provides:

> B.  The parties hereto (hereinafter sometimes collectively
> referred to as the "Members," or individually as a "Member")
> have agreed to become Members of the Company.  The purpose
> of the Company is to develop, construct, own and operate solar
> electric generating processes and plants.  Further, the Company
> intends to hold membership interests in additional limited
> liability companies, which will implement the Company's
> purposes.

*See* Operating Agreement, Exhibit 5, at Section B.

3.      Defendant Regenesis Power LLC, a Delaware limited liability

company, was formed with the purpose:

> …to develop, construct, own and operate solar electric
> generating processes and plants.  Further, the Company intends
> to hold membership interests in additional limited liability
> companies, which will implement the Company's purposes.

-2-

*See* Operating Agreement, Exhibit 5, at § 2.6.

At its inception, the three Governing Members of Regenesis were Marini, Harvest,

LLC and Wallaee Williams LLC (the "Governing Members").  Pursuant to 6 *Del.*

*C.* § 18-105, Regenesis may be served through its registered agent in Delaware,

The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street,

Wilmington, DE 19801.

    4.    Non-party Harvest, LLC ("Harvest") is a Delaware limited liability

company under the management and control of non-Party William R. Hearst, II

("Hearst").[1]  Harvest is, on information and belief, presently a Governing Member

of Defendant Regenesis.  Hearst is an individual and sole member and manager of

Harvest.

    6.    Non-party Wallace Williams LLC ("WW") is a California limited

liability company under the management and control of non-party William Foster.

WW is, on information and belief, presently a Governing Member of Defendant

Regenesis.  Foster is an individual and sole member and manager of WW.[2]

---

[1] Upon information and belief, Harvest has transferred its assets and interest to
another Hearst controlled entity known as Sat Purush, LLC, a Delaware limited
liability company.

[2] Although not named defendants in this Action, Harvest, WW, Hearst and Foster
are interested parties as explained herein.

-3-

8.      Hearst and Foster purported to remove Marini as a Governing Member of Regenesis during a conference call of the Governing Members on August 3, 2009.

### **Factual Allegations**

9.      Regenesis and its Governing Members have frozen Aloha out and prevented it from obtaining basic information about Regenesis, its financial status, and the actions of its Governing Members.

10.      Despite several demands made by letters dated September 24, 2015, and December 7, 2015, (the "Demands") Regenesis and its Governing Members refuse to provide Aloha copies of the Operating Agreement, minutes of meetings, identities of current Members and their ownership percentages, income tax returns, financial and operating statements and general ledgers, and books and records relating to the internal affairs of the Company, as required by the Operating Agreement and 6 *Del. C.* § 18-305.  True and correct copies of the demand letters are attached hereto as Exhibits 1, 1-A, 2, 2-A, and 3.

11.      The Regenesis Operating Agreement (in its form last known to Aloha) provides, in Article 8, for the maintenance of certain minimum accounting and record keeping requirements and reporting to Members.

12.      Pursuant to Article 8, Regenesis is required to provide any Member a copy of the Operating Agreement upon request, but no copy has been provided in

-4-

response to Aloha's Demands. *See* Operating Agreement § 8.2.4 ("shall promptly

furnish to a Member a copy of any amendment to the Certificate or this

Agreement"); *See also* First Amendment to Operating Agreement § 8 adding the

following sentence to Operating Agreement § 5.3 ("The Governing Members or

their designee shall prepare and distribute to all Members minutes of all

meetings."). The Operating Agreement further requires other data be provided

merely "for purposes reasonably related to the interest of that Person as a Member"

of Regenesis. *See* Operating Agreement § 8.2.1 and § 8.2.2.

13.    Subsection 8.2 of the Operating Agreement provides that "for

purposes reasonably related to the interest of that Person as a Member" the

information required to be maintained by Section 8.1 of the Operating Agreement

shall be either provided to the requesting Member or made available for inspection

and copying by the Member as follows:

**8.2  Delivery to Members and Inspection**
8.2.1  Upon the written request of any Member or Economic
Interest Owner for purposes reasonably related to the interest of
that Person as a Member or Economic Interest Owner, the
Governing Members shall promptly deliver to the requesting
Member or Economic Interest Owner, at the expense of the
Company, a copy of the information required to be maintained
by clauses (a), (b) and (d) of Section 8.1, and a copy of this
Agreement.

8.2.2  Each Member and Economic Interest Owner has the
right, upon reasonable request for purposes reasonably related

-5-

to the interest of the Person as Member, Governing Members or Economic Interest Owner, to:

(a) inspect and copy during normal business hours any of the Company records described in (a) through (g) of Section 8.1; and

(b) obtain from the Governing Members, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

8.2.3  Any request, inspection or copying by a Member or Economic Interest Owner under this Section 8.2 may be made by that Person or that Person's agent or attorney.

8.2.4  The Governing Members shall promptly furnish to a Member a copy of any amendment to the Certificate or this Agreement executed by the Governing Members pursuant to a power of attorney from the Member.

14.    Operating Agreement Section 8.1 specifically provides that the

Defendant shall maintain:

**8.1 Books and Records.**  The Company shall keep, at the principal place of business of the Company full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities, and the internal affairs of the Company for at least the current and past four fiscal years.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes.  The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.  The Company shall maintain at its principal office in California all of the following:

(a)    a current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account, Number of Units and Percentage Interest of each Member and Economic Interest Owner;

(b)    a current list of the full name and business or residence address of the Members;

(c)    a copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

(d)    copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(e)    a copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)    copies of the financial statements, operating statements and general ledgers of the Company, if any, for the six most recent Fiscal Years; and

(g)    the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

15.    Plaintiff stated in its Demands the following proper purposes: (1) to permit Aloha to identify other current Members in the Company; (2) to evaluate

-7-

and determine the value of Aloha's Membership Interest; and (3) to assess Aloha's

potential tax liabilities related to its Membership Interest.

16.    Additional proper purposes for the Demands are to permit Aloha to

understand and assess whether Regenesis, through the actions of its now

Governing Members and Officers, has acted to accomplish the stated purpose of

Regenesis as it relates to: (1) the development, construction, ownership and

operation of solar electric generating processes and plants and the purpose of

Regenesis as it relates to holding membership interests in additional limited

liability companies which would implement Regenesis's purposes, as set forth in

Section B of the Operating Agreement; (2) developing, producing and marketing

solar electric generating processes and to developing, constructing and owning and

operating solar electric generating facilities as required in Section 2.6(a) of the

Operating Agreement or whether such opportunities have been diverted from

Regenesis and whether Regenesis would be entitled to seek a constructive trust on

the diverted opportunity or such other legal remedies as might be available and

proper; (3) acquiring, owning and managing ownership interests in companies

producing and operating solar electric generating processes and plants as required

in Section 2.6(b) of the Operating Agreement or whether such opportunities have

been diverted from Regenesis and whether Regenesis would be entitled to seek a

constructive trust on the diverted opportunity or such other legal remedies as might

-8-

be available and proper; and (4) engaging in such other activities related to the business described in Sections 2.6(a) and 2.6(b) as may have been necessary, advisable or appropriate as required in Section 2.6(c) of the Operating Agreement or whether such opportunities have been diverted from Regenesis and whether Regenesis would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

17.    A final proper purpose of the Demands was and is to permit Aloha to assess its Membership Interest in Regenesis, to understand and evaluate any purported dilution of Aloha's Membership Interest, to understand and evaluate the means or mechanisms by which any purported dilution of Aloha's Membership Interest was purported to be accomplished, and the means or mechanisms by which the Governing Members and Members contend there was a Super Majority in Interest of the Non-Governing Members and Governing Members sufficient to purportedly remove Dennis Marini as a Governing Member of the Company.

18.    Sections 2.6(a) through (d) of the Operating Agreement specifically provide as follows:

> **2.6 Purpose of Company**.  The purpose of the Company is to engage in the following:
>
> (a)  To develop, produce and market solar electric generating processes and develop, construct and own and operate solar electric generating facilities;

(b)  to acquire, own and manage ownership interests in
companies producing and operating solar electric generating
processes and plants;

(c)  to engage in such other activities related to the foregoing
business as may be necessary, advisable, or appropriate, as
approved by the Governing Members to further the foregoing
business; and

(d)  to engage in any other activities permitted under applicable law
which activities are approved by the Governing Members.

19.    The last K-1 received by Aloha from Regenesis was for tax year 2012

and reflected that Aloha had a 17.24% share of profit, loss, and capital and that

Aloha had an ending capital account balance of more than $1,000,000.  The K-1

received by Aloha from Regenesis for tax year 2010 reflected that Aloha had an

18.98% share of profit, loss, and capital and that Aloha had a beginning capital

account balance of more than $1,500,000.  The K-1 received by Aloha from

Regenesis for tax year 2008 reflected that Aloha had a 23.333% share of profit,

loss and capital.  The K-1s for 2008 and 2010 state that Regenesis was reporting

for one tax pass through entity, S&P Farms Solar Irrigation, LLC.  No forms K-1

have been received for tax years 2013 through 2015, despite the Demands.

-10-

## Couut 1

### (Inspeetion of Books and Reeords Under 6 *Del C.* § 18-305
### and the Regenesis Power LLC Operating Agreement)

20.     Plaintiff repeats and incorporates here by reference each of the

allegations set forth above.

21.     Section 18-305 of the Delaware Limited Liability Company Act

grants each member of a Delaware limited liability company the right, under

prescribed circumstanees, to information and data concerning the limited liability

company.  Section 18-305 also provides that the limited liability company

agreement may govern the information and documents to be provided members.

Here, both Section 18-305 and the Operating Agreement merely require the

purpose be reasonably related to the member's interest as a member of the limited

liability company.

22.     Plaintiff Aloha Power Company, LLC needs information and data

from Regenesis for the enumerated purposes set forth in the above paragraphs

which reasonably relate to Aloha's Membership 1nterest in Regenesis Power LLC.

23.     Consistent with Operating Agreement Section 8.2 and 6 *Del. C.* § 18-

305(e), the Demands were made by written requests to Regenesis.  *See* Exhibits 1,

1-A, 2, 2-A, and 3.  Regenesis, through its counsel, declined to provide copies of

-11-

the requested books and records and also declined to permit Aloha to inspect books and records at the Regenesis offices.

24.    Consistent with the Operating Agreement Section 8.2.3 and 6 *Del. C.* § 18-305(e), Dennis Marini, the Managing Member of Aloha Power Company, LLC, designated Brad Beers as the attorney-in-fact for Aloha Power Company, LLC. *See* Exhibit 4 attached hereto.

25.    The documents requested in the Demands by Aloha from Regenesis were itemized and included, as authorized in the Operating Agreement, as amended:

a.  Section 8.1(e) – a copy of this Agreement [the Operating Agreement] and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

b.  Section 8.1(a) – a current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account, Number of Units and Percentage Interest of each Member and Economic Interest Owner;

c.  Section 8.1(b) – a current list of the full name and business or residence address of the Members;

d.  Section 8.1(d) – copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

-12-

e.  Section 8.1(f) – copies of the financial statements, operating statements and general ledgers of the Company, if any, for the six most recent Fiscal Years;

f.  Section 8.1(g) – the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years; and

g.  Section 5.3 (See Section 8 of the First Amendment to Operating Agreement)  -- the minutes of all meetings.

26.      Plaintiff is entitled to receive copies of the books and records demanded in the Demands and herein.

27.      Plaintiff lacks an adequate remedy at law.

28.      Section 11.18 of the Operating Agreement provides that Aloha, as the prevailing party in this dispute, "shall be entitled to recover [its] reasonable actual fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable actual attorneys' fees and expenses."

### Snmmary of Exhibits

| Exhibit | Deseription |
|---------|-------------|
| 1 | Demand Letter – 9/24/2015 – Section 5.3 for minutes |
| 1-A | Demand Letter – 12/7/2015 – Section 5.3 for minutes |
| 2 | Demand Letter – 9/24/2015 – Sections 8.1(a), (b), and (d) for Operating Agreement and related documents |

-13-

| 2-A | Demand Letter – 12/7/2015 – Sections 8.1(a), (b), and (d) for Operating Agreement and related documents |
| 3 | Demand Letter – 9/24/2015 – Sections 8.1(f) and (g) for financial related documents |
| 4 | Attorney-in-faet letter of 9/24/2015 |
| 5 | Operating Agreement (unsigned, but in form known to Aloha) |
| 5-A | Operating Agreement – First and Second Amendments |

## Prayer for Relief

Wherefore, Plaintiff Aloha Power Company, LLC, respectfully prays that the Court enter an order:

a. Entering judgment in favor of Plaintiff and against Defendant Regenesis Power LLC;

b. Ordering Regenesis Power LLC to provide Plaintiff the books and records sought;

c. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, eosts and expenses; and

d. Awarding sueh other and further relief as the Court deems just and proper.

-14-

Dated: October 7, 2016

PINCKNEY, WEIDINGER, URBAN
& JOYCE LLC

*/s/ Seton C. Mangine*
Joanne P. Pinckney (DE No. 3344)
Seton C. Mangine (DE No. 5574)
Catherine B. Read (DE No. 3929)
3711 Kennett Pike, Suite 210
Greenville, DE  19807
Phone: 302-504-1497
Facsimile: (302) 442-7046
Email:      jpinckney@pwujlaw.com
            smangine@pwujlaw.com
            cread@pwujlaw.com

*Attorneys for Plaintiff*

Brad Beers, Esq. (*pro hac vice* to be filed)
BEERS LAW FIRM
The Historic Plaza Hotel Building
5020 Montrose Blvd., Suite 700
Houston, Texas  77006
713-654-0700
713-654-9898 facsimile

-15-

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 1

# BEERS LAW FIRM

BeersLaw.net

**Brad Beers**
5020 Montrose Blvd., Suite 700
Houston, Texas 77006

713-654-0700 Telephone
713-654-9898 Facsimile

September 24, 2015

Regenesis Power LLC                                 By CMRRR 7014 0510 0000 0079 6631
c/o Marshall Taylor
DLA Piper
550 South Hope Street, Suite 2300
Los Angeles, California 90071

Re:  Regenesis Power LLC and Aloha Power Company, LLC
     Section 5.3 demand for copies of minutes

Dear Sirs:

This is a demand for copies of all minutes of all meetings of Regenesis Power LLC since
October 1, 2006. Section 5.3 of the Operating Agreement for Regenesis Power LLC, as
amended as of October 1, 2006 (the "First Amendment"), provides as follows:

> The Governing Members or their designee shall prepare and distribute to all
> Members minutes of all meetings.

Because the Operating Agreement does not set a specific response period, demand is made that
copies be provided within ten days.

This request includes, without limitation, the meeting that is purported to have taken place on
August 3, 2009.

If you contend there has been no meeting since October 1, 2006, please confirm that in writing to
me.

Sincerely,

Brad Beers
Attorney in fact for
Aloha Power Company, LLC

BB/oe
cc: Dennis Marini
    William R. Hearst II (Governing Member)(CMRRR 7014 0510 0000 0091 3793)
    Harvest, LLC (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Sat Purush, LLC. (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)

> **Aloha Exhibit 1**
> Aloha Power Company, LLC
> v
> Regenesis Power, LLC et al

Regenesis Power LLC
September 24, 2015
Page 2

Edward E. Sawyer **(CMRRR 7014 0510 0000 0091 3809)**
William Foster (Governing Member) **(CMRRR 7014 0510 0000 0091 3816)**
Wallace Williams LLC (c/o William Foster) **(CMRRR 7014 0510 0000 0091 3816)**
SunSource LLC (c/o John Polumbo) **(CMRRR 7014 0510 0000 0091 3823)**
Robert L. Young **(CMRRR 7014 0510 0000 0078 4782)**
Steven Edwards **(CMRRR 7014 0510 0000 0091 3830)**
Michael Doman **(CMRRR 7014 0510 0000 0091 3847)**
Marshall M. Taylor **(CMRRR 7014 0510 0000 0091 3854)**
William H. Taylor II **(CMRRR 7014 0510 0000 0091 3861)**
Gerald Greenberg **(CMRRR 7014 0510 0000 0091 3878)**
PTT Associates, LLC (c/o Allen J. Potts)**(CMRRR 7014 0510 0000 0091 3885)**
Stanley Hausner **(CMRRR 7014 0510 0000 0091 3892)**
Irena Schwaderer **(CMRRR 7014 0510 0000 0091 3908)**
Robert J. Silverman **(CMRRR 7014 0510 0000 0091 3915)**

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 1A

# BEERS LAW FIRM

BeersLaw.net

**Brad Beers**
5020 Montrose Blvd., Suite 700
Houston, Texas 77006

713-654-0700 Telephone
713-654-9898 Facsimile

December 7, 2015

Regenesis Power LLC                                           By CMRRR 7015 0640 0007 3730 1008
c/o Marshall Taylor
DLA Piper
550 South Hope Street, Suite 2300
Los Angeles, California 90071

Re:   Regenesis Power LLC and Aloha Power Company, LLC
        Section 5.3 demand for copies of minutes

Dear Sirs:

By letter of September 24, 2015, written demand was made for copies of meetings of minutes of
all meetings, which are required to be maintained under Section 5.3 of the Operating Agreement
for Regenesis Power LLC, as amended as of October 1, 2006 (the "First Amendment").

You provided no minutes in response.

This is one last effort to obtain the data from Regenesis, without the need to file a lawsuit to
enforce the rights of Aloha Power Company, LLC, to receive the requested documents and
records.

I look forward to the prompt delivery of the requested information.

Sincerely,

*Brad Beers*

Brad Beers
Attorney in fact for
Aloha Power Company, LLC

BB/oe
cc: Dennis Marini
        William R. Hearst II (Governing Member)(CMRRR 7015 0640 0007 3730 1015)
        Harvest, LLC (c/o William R. Hearst II) (CMRRR 7015 0640 0007 3730 1022)
        Sat Purush, LLC. (c/o William R. Hearst II) (CMRRR 7015 0640 0007 3730 1039)
        Edward E. Sawyer (CMRRR 7015 0640 0007 3730 1046)
        William Foster (Governing Member) (CMRRR 7015 0640 0007 3730 1053)
        Wallace Williams LLC (c/o William Foster) (CMRRR 7015 0640 0007 3730 1060)

---

**Aloha Exhibit 1-A**
Aloha Power Company, LLC
v
Regenesis Power, LLC et al

---

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 2

# BEERS LAW FIRM

BeersLaw.net

**Brad Beers**
5020 Montrose Blvd., Suite 700                                        713-654-0700 Telephone
Houston, Texas 77006                                                     713-654-9898 Facsimile

September 24, 2015

Regenesis Power LLC                                  **By CMRRR 7014 0510 0000 0079 6631**
c/o Marshall Taylor
DLA Piper
550 South Hope Street, Suite 2300
Los Angeles, California 90071

Re:  Regenesis Power LLC and Aloha Power Company, LLC
      Request for copies of Subsection 8.1(a), (b) and (d) documents

Dear Sirs:

This is a written request by Aloha Power Company, LLC, as a Member of Regenesis Power
LLC, for copies of the information required to be maintained pursuant to Sub-section 8.1(a), (b),
and (d) of the Operating Agreement along with a copy of the Operating Agreement and all
amendments you contend have been made to the Operating Agreement. This request is made
pursuant to Section 8.2.1 of the Operating Agreement. Request is made that you promptly
deliver copies of the requested information. *See* Section 8.2.1.

The purposes of this request are for the Member to assess its Membership Interest in the
Company, any purported dilution of the Member's Membership Interest, the means or
mechanisms by which any purported dilution of the Member's Membership Interest was
purported to be accomplished, and the means or mechanisms by which the Governing Members
and Members contend there was a Super Majority in Interest of the Non-Governing Members
and Governing Members sufficient to purportedly remove Dennis Marini as a Governing
Member of the Company.

The purposes of the request are also for the Member to identify other Members in the Company,
to evaluate and determine the value of the Member's Membership Interest, and to assess the
Member's potential tax liabilities related to its Membership Interest.

The purposes of the request are also for the Member to understand and assess whether the
Company, through the actions of its Governing Members and Officers, have acted to accomplish
the purpose of the Company as it relates to the development, construction, ownership and
operation of solar electric generating processes and plants and the purpose of the Company as it
relates to holding membership interests in additional limited liability companies which would
implement the Company's purposes, as set forth in Section B of the Operating Agreement.

The purposes of the request are also for the Member to understand and assess whether the
Company, through the actions of its Governing Members and Officers, has acted to accomplish

Aloha Exhibit 2
Aloha Power Company, LLC
v
Regenesis Power, LLC et al

Regenesis Power LLC
September 24, 2015
Page 2

the purpose of the Company as it relates to developing, producing and marketing solar electric generating processes and to developing, constructing and owning and operating solar electric generating facilities as required in Section 2.6(a) of the Operating Agreement or whether such opportunities have been diverted from the Company and whether the Company would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

The purposes of this request are also for the Member to understand and assess whether the Company, through the actions of its Governing Members and Officers, has acted to accomplish the purpose of the Company as it relates to acquiring, owning and managing ownership interests in companies producing and operating solar electric generating processes and plants as required in Section 2.6(b) of the Operating Agreement or whether such opportunities have been diverted from the Company and whether the Company would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

The purposes of the request are also for the Member to understand and assess whether the Company, through the actions of its Governing Members and Officers, has acted to accomplish the purposes of the Company as it relates to engaging in such other activities related to the business described in Sections 2.6(a) and 2.6(b) as may have been necessary, advisable or appropriate as required in Section 2.6(c) of the Operating Agreement or whether such opportunities have been diverted from the Company and whether the Company would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

The specific subsections of Section 8.1 for which information is requested are set forth here for your convenience:

> (a) a current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account, Number of Units and Percentage Interest of each Member and Economic Interest Owner;

> (b) a current list of the full name and business or residence address of the Members;

> (d) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

Since the deadline for filing the 2014 federal tax return passed earlier this month, we would expect the tax returns to include 2009 through 2014, inclusive.

Regenesis Power LLC
September 24, 2015
Page 3

Finally, Section 8.2.1 of the Operating Agreement states that the "Governing Members shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company," the requested information.

I look forward to the prompt delivery of the requested information.

Sincerely,

Brad Beers
Attorney in fact for
Aloha Power Company, LLC

BB/oe
cc: Dennis Marini
    William R. Hearst II (Governing Member)(CMRRR 7014 0510 0000 0091 3793)
    Harvest, LLC (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Sat Purush, LLC. (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Edward E. Sawyer (CMRRR 7014 0510 0000 0091 3809)
    William Foster (Governing Member) (CMRRR 7014 0510 0000 0091 3816)
    Wallace Williams LLC (c/o William Foster) (CMRRR 7014 0510 0000 0091 3816)
    SunSource LLC (c/o John Polumbo) (CMRRR 7014 0510 0000 0091 3823)
    Robert L. Young (CMRRR 7014 0510 0000 0078 4782)
    Steven Edwards (CMRRR 7014 0510 0000 0091 3830)
    Michael Doman (CMRRR 7014 0510 0000 0091 3847)
    Marshall M. Taylor (CMRRR 7014 0510 0000 0091 3854)
    William H. Taylor II (CMRRR 7014 0510 0000 0091 3861)
    Gerald Greenberg (CMRRR 7014 0510 0000 0091 3878)
    PTT Associates, LLC (c/o Allen J. Potts)(CMRRR 7014 0510 0000 0091 3885)
    Stanley Hausner (CMRRR 7014 0510 0000 0091 3892)
    Irena Schwaderer (CMRRR 7014 0510 0000 0091 3908)
    Robert J. Silverman (CMRRR 7014 0510 0000 0091 3915)

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 3

# BEERS LAW FIRM

BeersLaw.net

**Brad Beers**
5020 Montrose Blvd., Suite 700                                                          713-654-0700 Telephone
Houston, Texas 77006                                                                        713-654-9898 Facsimile

September 24, 2015

Regenesis Power LLC                              **By CMRRR 7014 0510 0000 0079 6631**
c/o Marshall Taylor
DLA Piper
550 South Hope Street, Suite 2300
Los Angeles, California 90071

Re:  Regenesis Power LLC and Aloha Power Company, LLC
     Request to inspect and copy Subsection 8.1(f) and 8.1(g) records

Dear Sirs:

This is a written request by Aloha Power Company, LLC, as a Member of Regenesis Power
LLC, to inspect and copy the information required to be maintained pursuant to Sub-sections
8.1(f) and (g) of the Operating Agreement. This request is made pursuant to Section 8.2.2(a) of
the Operating Agreement. We are available to conduct the inspection and make copies during
normal business hours at the principal office of the Company in California on any of the
following dates: October 1, 2, 5, 8, or 9, 2015.

The purposes of this request are for the Member to assess its Membership Interest in the
Company, any purported dilution of the Member's Membership Interest, the means or
mechanisms by which any purported dilution of the Member's Membership Interest was
purported to be accomplished, and the means or mechanisms by which the Governing Members
and Members contend there was a Super Majority in Interest of the Non-Governing Members
and Governing Members sufficient to purportedly remove Dennis Marini as a Governing
Member of the Company.

The purposes of the request are also for the Member to identify other Members in the Company,
to evaluate and determine the value of the Member's Membership Interest, and to assess the
Member's potential tax liabilities related to its Membership Interest.

The purposes of the request are also for the Member to understand and assess whether the
Company, through the actions of its Governing Members and Officers, have acted to accomplish
the purpose of the Company as it relates to the development, construction, ownership and
operation of solar electric generating processes and plants and the purpose of the Company as it
relates to holding membership interests in additional limited liability companies which would
implement the Company's purposes, as set forth in Section B of the Operating Agreement.

The purposes of the request are also for the Member to understand and assess whether the
Company, through the actions of its Governing Members and Officers, has acted to accomplish

```
Aloha Exhibit 3
Aloha Power Company, LLC
           v
Regenesis Power, LLC et al
```

Regenesis Power LLC
September 24, 2015
Page 2

the purpose of the Company as it relates to developing, producing and marketing solar electric generating processes and to developing, constructing and owning and operating solar electric generating facilities as required in Section 2.6(a) of the Operating Agreement or whether such opportunities have been diverted from the Company and whether the Company would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

The purposes of this request are also for the Member to understand and assess whether the Company, through the actions of its Governing Members and Officers, has acted to accomplish the purpose of the Company as it relates to acquiring, owning and managing ownership interests in companies producing and operating solar electric generating processes and plants as required in Section 2.6(b) of the Operating Agreement or whether such opportunities have been diverted from the Company and whether the Company would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

The purposes of the request are also for the Member to understand and assess whether the Company, through the actions of its Governing Members and Officers, has acted to accomplish the purposes of the Company as it relates to engaging in such other activities related to the business described in Sections 2.6(a) and 2.6(b) as may have been necessary, advisable or appropriate as required in Section 2.6(c) of the Operating Agreement or whether such opportunities have been diverted from the Company and whether the Company would be entitled to seek a constructive trust on the diverted opportunity or such other legal remedies as might be available and proper.

The specific subsections of Section 8.1 for which information is requested are set forth here for your convenience:

> (f) copies of the financial statements, operating statements and general ledgers of the Company, if any, for the six most recent Fiscal Years; and

> (g) the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

More specifically, the Operating Agreement, at Section 8.1, regarding Books and Records, provides a list of data the Company "shall keep" at the principal place of business:

> 8.1 Books and Records. The Company shall keep, at the principal place of business of the Company full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities, and the internal affairs of the Company for at least the current and past four fiscal years. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting

Regenesis Power LLC
September 24, 2015
Page 3

methods followed for federal income tax purposes.  The books and records of the
Company shall reflect all of the Company transactions and shall be appropriate
and adequate for the Company's business.  The Company shall maintain at its
principal office in California all of the following:…

Section 8.2.3 of the Operating Agreement provides "[a]ny request, inspection or copying by a
Member or Economic Interest Owner under this Section 8.2 may be made by that Person or that
Person's agent or attorney."  I, as the attorney for Aloha Power Company, LLC, along with
Dennis Marini, as the managing member of Aloha Power Company, LLC, will be doing the
inspecting and copying.

Even though the Operating Agreement makes provision for minimum retention periods for
certain records, demand is made that Regenesis Power LLC and its Governing Members and its
Members preserve and retain all records and documents pertaining in any manner, directly or
indirectly, to the Company, the communications by and/or between and/or among the Governing
Members, Officers, employees, contractors, Members, investors, potential investors, customers,
potential customers, and the agents and representatives for the Company.  In other words, this is
a demand that you implement a litigation hold for all of the communications and records of the
Company and its Governing Members and Members, that computer hard drives and backup data
be preserved and maintained, and that no data be purged, deleted, destroyed, or otherwise
compromised or "lost" due to "accidents" or "mistakes."

Please confirm as quickly as possible which dates we can inspect and copy the requested
Company records so that flight arrangements can be made.

Sincerely,

Brad Beers
Attorney in fact for
Aloha Power Company, LLC

BB/oe
cc: Dennis Marini
    William R. Hearst II (Governing Member)(CMRRR 7014 0510 0000 0091 3793)
    Harvest, LLC (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Sat Purush, LLC. (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Edward E. Sawyer (CMRRR 7014 0510 0000 0091 3809)
    William Foster (Governing Member) (CMRRR 7014 0510 0000 0091 3816)
    Wallace Williams LLC (c/o William Foster) (CMRRR 7014 0510 0000 0091 3816)
    SunSource LLC (c/o John Polumbo) (CMRRR 7014 0510 0000 0091 3823)
    Robert L. Young (CMRRR 7014 0510 0000 0078 4782)

Regenesis Power LLC
September 24, 2015
Page 4

Steven Edwards (CMRRR 7014 0510 0000 0091 3830)
Michael Doman (CMRRR 7014 0510 0000 0091 3847)
Marshall M. Taylor (CMRRR 7014 0510 0000 0091 3854)
William H. Taylor II (CMRRR 7014 0510 0000 0091 3861)
Gerald Greenberg (CMRRR 7014 0510 0000 0091 3878)
PTT Associates, LLC (c/o Allen J. Potts)(CMRRR 7014 0510 0000 0091 3885)
Stanley Hausner (CMRRR 7014 0510 0000 0091 3892)
Irena Schwaderer (CMRRR 7014 0510 0000 0091 3908)
Robert J. Silverman (CMRRR 7014 0510 0000 0091 3915)

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 4

# BEERS LAW FIRM

BeersLaw.net

**Brad Beers**
5020 Montrose Blvd., Suite 700                                              713-654-0700 Telephone
Houston, Texas 77006                                                        713-654-9898 Facsimile

September 24, 2015

Regenesis Power LLC                              **By CMRRR 7014 0510 0000 0079 6631**
c/o Marshall Taylor
DLA Piper
550 South Hope Street, Suite 2300
Los Angeles, California 90071

Re:   Regenesis Power LLC, and Aloha Power Company, LLC
      Section 11.13 designation

Dear Sirs:

Pursuant to Section 11.13 of the Operating Agreement for Regenesis Power LLC, please take
notice that Aloha Power Company, LLC is designating the following substitute addresses
(Exhibit C to the Operating Agreement as amended from time to time) for giving notices to
Aloha Power Company, LLC:

| Aloha Power: | With copy to: |
|---|---|
| Dennis Marini | Brad Beers |
| P.O. Box 1150 | Beers Law Firm |
| Kula | 5020 Montrose Blvd., Suite 700 |
| Maui, Hawaii 96790 | Houston, Texas 77006 |

Dennis Marini, as managing member of Aloha Power Company, LLC, has signed below
confirming my status as attorney for Aloha and confirming the Section 11.13 change.

Sincerely,

Brad Beers
Attorney in fact for
Aloha Power Company, LLC
BB/oe

Confirmed:

_____
Dennis Marini

Aloha Exhibit 4
Aloha Power Company, LLC
v
Regenesis Power, LLC et al

Regenesis Power LLC
September 24, 2015
Page 2


Managing Member
Aloha Power Company, LLC

BB/oe
cc: Dennis Marini
    William R. Hearst II (Governing Member)(CMRRR 7014 0510 0000 0091 3793)
    Harvest, LLC (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Sat Purush, LLC. (c/o William R. Hearst II) (CMRRR 7014 0510 0000 0091 3793)
    Edward E. Sawyer (CMRRR 7014 0510 0000 0091 3809)
    William Foster (Governing Member) (CMRRR 7014 0510 0000 0091 3816)
    Wallace Williams LLC (c/o William Foster) (CMRRR 7014 0510 0000 0091 3816)
    SunSource LLC (c/o John Polumbo) (CMRRR 7014 0510 0000 0091 3823)
    Robert L. Young (CMRRR 7014 0510 0000 0078 4782)
    Steven Edwards (CMRRR 7014 0510 0000 0091 3830)
    Michael Doman (CMRRR 7014 0510 0000 0091 3847)
    Marshall M. Taylor (CMRRR 7014 0510 0000 0091 3854)
    William H. Taylor II (CMRRR 7014 0510 0000 0091 3861)
    Gerald Greenberg (CMRRR 7014 0510 0000 0091 3878)
    PTT Associates, LLC (c/o Allen J. Potts)(CMRRR 7014 0510 0000 0091 3885)
    Stanley Hausner (CMRRR 7014 0510 0000 0091 3892)
    Irena Schwaderer (CMRRR 7014 0510 0000 0091 3908)
    Robert J. Silverman (CMRRR 7014 0510 0000 0091 3915)

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 5

**OPERATING AGREEMENT**
**FOR**
**REGENESIS POWER LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

This Operating Agreement (the "Agreement"), is made as of June 1, 2006, by and among ALOHA POWER COMPANY, LLC, a Delaware limited liability company ("Aloha"), HARVEST, LLC, a Delaware limited liability company, ("Harvest"), WALLACE WILLIAMS LLC, a limited liability company, ("WW") and the other parties now or hereafter executing this Agreement, with reference to the following facts:

     A.    The Certificate of Formation for Regenesis Power LLC (the "Company"), a limited liability company under the laws of the State of Delaware, was filed with the Delaware Secretary of State on May 4, 2006;

     B.    The parties hereto (hereinafter sometimes collectively referred to as the "Members," or individually as a "Member") have agreed to become Members of the Company. The purpose of the Company is to develop, construct, own and operate solar electric generating processes and plants. Further, the Company intends to hold membership interests in additional limited liability companies, which will implement the Company's purposes.

     C.    The Members intend to admit additional members from time to time upon the terms and conditions set forth herein and to raise additional capital for the Company.

     D.    As provided herein, the Company will have two classes of membership, Class A and Class B.

NOW, THEREFORE, the Members hereby set forth the operating agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1

## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

     1.1    "Act" shall mean the Delaware Limited Liability Company Act, Title 6 of the Annotated Delaware Code Section 18-101 et ceq., as the same may be amended from time to time.

     1.2    "Additional Capital Contribution" shall mean any contribution of capital by a Member other than pursuant to Section 3.1 hereof.

**Aloha Exhibit 5**
Aloha Power Company, LLC
v
Regenesis Power, LLC et al

1.3 "Adjusted Balance" shall mean the Capital Account balance of a Member, increased by any Company Minimum Gain or Company Minimum Gain attributable to Member Nonrecourse Debt allocable to such Member under Treasury Regulations Section 1.704-2.

1.4 "Affiliate" shall mean, with respect to any Person, (i) any member of the Immediate Family of such Person or (ii) any Entity that directly or indirectly (aa) controls, is controlled by, or is under common control with and (bb) owns at least fifty percent (50%) of each class of beneficial interest of, has at least fifty percent (50%) of each class of beneficial interest therein owned by, or has at least fifty percent (50%) of each class of beneficial interest therein owned by a party that also owns at least fifty percent (50%) of each class of beneficial interest in such Person. For purposes of this definition, the term "controls," is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.5 "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.6 "Aloha" shall mean Aloha Power Company, LLC, a Delaware limited liability company, under the management and control of Dennis Marini.

1.7 "Annual Capital Budget" shall mean the annual capital budget and any amendments thereto approved by the Company.

1.8 "Annual Operating Budget" shall mean the annual operating budget approved by the Company.

1.9 "Annual Plan" shall mean the annual business plan adopted from time to time by the Company.

1.10 "Assignee" shall mean any Person (a) to whom a Member (or assignee thereof) Transfers all or any part of its interest in the Company, and (b) which has not been admitted to the Company as a Substitute Member pursuant to Section 7.4 of this Agreement.

1.11 "Bankruptcy" of a Person shall be deemed to have occurred when (a) the Person commences a voluntary proceeding seeking liquidation, reorganization or other relief under any bankruptcy, insolvency or other similar law now or hereafter in effect, (b) the Person is adjudged as bankrupt or insolvent, or a final and nonappealable order for relief under any bankruptcy, insolvency or similar law now or hereafter in effect has been entered against the Person, (c) the Person executes and delivers a general assignment for the benefit of the Person's creditors, (d) the Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in any proceeding of the nature described in clause (b) above, (e) the Person seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator for the Person or for all or any substantial part of the Person's properties, (f) any proceeding seeking liquidation, reorganization or other relief under any bankruptcy, insolvency or other similar law now or hereafter in effect has not been dismissed within 90 days

LOSA2\261481.14
362049-20

after the commencement thereof, (g) the appointment without the Person's consent or acquiescence of a trustee, receiver or liquidator has not been vacated or stayed within 90 days of such appointment, or (h) any appointment referred to in clause (g) is not vacated within 90 days after the expiration of any such stay.

1.12   "Book Gain" or "Book Loss" shall mean the gain or loss recognized by the Company for book purposes in any Fiscal Year or other period by reason of a sale or other disposition of any Company asset. Such Book Gain or Book Loss shall be computed by reference to the Book Value of such asset as of the date of such sale or other disposition, rather than by reference to the tax basis of such asset as of such date, and each and every reference herein to "gain" or "loss" shall be deemed to refer to Book Gain or Book Loss, rather than to tax gain or tax loss, unless the context manifestly requires otherwise.

1.13   "Book Value" of an asset shall mean, as of any particular date, the value at which the asset is properly reflected on the books of the Company as of such date. The Book Value of all Company assets shall be adjusted to equal their respective fair market values, as determined in accordance with Section 7.15.1 (with the Member treated as the seller and the Company as the buyer), as of the following times:  (i) the acquisition of an additional Company interest by any new or existing Member, in exchange for more than a de minimus Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimus amount of Company property or money as consideration for an interest in the Company; and (iii) the termination of the Company for federal income tax purposes pursuant to Code Section 708(b)(1)(B).

1.14   "Capital Account" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.15   "Capital Contribution" shall mean the total value of cash and fair market value (net of liabilities to which the property is subject at the time of contribution) of property contributed.

1.16   "Class A Member" shall mean (i) Aloha, Harvest and WW (ii) any other party admitted as, or converted to, a "Class A Member" and (iii) the successors and permitted assigns of each of them.

1.17   "Class B Member" shall mean (i) Marshall M. Taylor, individually and as a Trustee, Michael Doman and Gerry Greenberg (collectively, the "Class B Members"), (ii) any other party admitted as, or converted to, a "Class B Member" and (iii) the successors and permitted assigns of each of them.

1.18   "Certificate" shall mean the Certification of Formation for the Company originally filed with the Delaware Secretary of State on May 4, 2006, as amended from time to time.

1.19   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

3

1.20    "Company" shall mean REGENESIS POWER LLC, a Delaware limited liability company.

1.21    "Company Minimum Gain" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d).

1.22    "Deceased Member" is defined in Section 7.13.

1.23    "Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be that amount which bears the same relationship to the Book Value of such asset as the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes bears to its adjusted tax basis. If such asset has a zero adjusted tax basis, Depreciation may be determined under any reasonable method selected by the Governing Members.

1.24    "Disability" shall mean the earlier to occur of (a) when an individual is unable to perform his or her duties and responsibilities for a period of six (6) or more continuous months, as evidenced by a certification from his or her attending physician, (b) when an individual is declared incompetent by a court of competent jurisdiction, or (c) when an individual has a court-appointed guardian or conservator of his or her person or his or her estate.

1.25    "Distributable Cash" shall mean the amount of cash which the Governing Members reasonably deem available for distribution to the Members and Economic Interest Owners, taking into account all Company debts, liabilities and obligations of the Company then due and amounts which the Governing Members reasonably deem necessary to place into reserves with respect to the Company's business.

1.26    "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or any right to information concerning the business and affairs of Company.

1.27    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member. This term shall include any Person(s) to whom a Member (or assignee thereof) Transfers all or any part of its interest in the Company and which has not been admitted to the Company as a Substitute Member pursuant to Section 7.4 of this Agreement.

1.28    "Employment Agreement" shall mean an Employment Agreement dated between the Company and a designated individual.

1.29    "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, real estate investment trust or association or other entity.

4

1.30   "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

1.31   "Foster" shall mean William Foster, an individual, and a member and manager of WW.

1.32   "Governing Members" shall mean initially Harvest, Marini and WW or any successors thereto appointed pursuant to Section 5.7, and such other Class A Members as may be admitted from time to time and designated as a "Governing Member."

1.33   "Harvest" shall mean Harvest, LLC, a Delaware limited liability company, under the management and control of Hearst.

1.34   "Hearst" shall mean William R. Hearst II, an individual and member and manager of Harvest.

1.35   "Immediate Family" with respect to a Person which is an individual means, and is limited to, such individual's current spouse, parents, parents-in-law, grandparents, children, siblings, and grandchildren, or a trust or estate, all of the beneficiaries of which consist of such individual and/or members of such Person's Immediate Family.

1.36   "Insolvent Member" is defined in Section 7.12.

1.37   "Lender Approval" shall mean the required approval of any lender under any loan agreement between the Company and such lender.

1.38   "Major Decisions" shall mean those decisions which require the approval or consent of the Governing Members pursuant to Section 5.4 below.

1.39   "Majority in Interest" shall mean more than fifty percent (50%) of the Units held by the applicable group of Members.

1.40   "Marini" shall mean Dennis Marini, an individual, and member and manager of Aloha.

1.41   "Member" shall mean each of the parties who execute a counterpart of this Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

1.42   "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.43   "Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member

LOSA2\261481.14
362049-20

Nonrecourse Debt as set forth and determined in the manner of Treasury Regulations Section 1.704-2(i)(2).

1.44   "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

1.45   "Net Capital Contribution" means with respect to a Capital Contribution, the amount of such Capital Contribution minus, without duplication, the liabilities of the Member making the Capital Contribution that are assumed by the Company in connection with such Capital Contribution or which are secured by any property contributed by such Member to the Company in connection with such Capital Contribution.

1.46   "Net Profits" and "Net Losses" shall mean, for each Fiscal Year, and/or other period an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss),with the following adjustments:

(a)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss;

(b)   Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv), shall be subtracted from such taxable income or loss;

(c)   In lieu of the depreciation, amortization or other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(d)   Book Gain or Book Loss shall be taken into account in lieu of any tax gain or tax loss recognized by the Company;

(e)   Any item of income, gain, loss or deduction that is required to be allocated specially to the Members under Section 6.2 hereof shall not be taken into account in computing such Net Profit or Net Loss; and

(f)   If the Book Value of Company assets is adjusted to equal fair market value in the definition of Book Value in Section 1.13 hereof, then Net Profit or Net Loss shall include the amount of any increase or decrease in such Book Values attributable to such adjustment.

1.47   "Non-Governing Members" shall mean all of the Members of the Company other than the Governing Members.

6

    1.48·  "Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

    1.49  "Operating LLC's" shall mean limited liability companies, limited partnerships or other legal entities owned, wholly or partially, directly or indirectly, by the Company or formed or to be formed by the Company for the purpose of developing, owning and operating solar generating processes and plants or providing management services to other Operating LLC's or any other purpose approved by the Governing Members of the Company.

    1.50  "Percentage Interest" shall mean as to a Member holding one or more Units (except for Units with respect to which another Person owns the Economic Interest), or an Economic Interest Owner holding the Economic Interest with respect to one or more Units, its interest in the Company as determined by dividing the Units owned, or with respect to which all of the Economic Interest is owned, by such Member or Economic Interest Owner, respectively, by the total number of Units of the Company then outstanding.

    1.51  "Person" shall mean an individual or an Entity.

    1.52  "Pledges" is defined in Section 7.10.

    1.53  "Qualified Appraiser" shall mean an MAI appraiser with not less than ten (10) years experience appraising commercial properties in the jurisdictions in which the property or properties to be appraised are located.

    1.54  "Real Property" shall mean all fee interests in real property and buildings, improvements and structures owned by the Company or an Operating LLC together with all easements, rights of way, privileges, appurtenances and other rights pertaining thereto.

    1.55  "Regenesis CIS" shall mean Regenesis CIS Power, LLC, a limited liability company, an Operating LLC to be formed by the Company.

    1.56  "Regenesis CIS Agreement" shall mean the Operating Agreement, as amended from time to time, of Regenesis CIS.

    1.57  "Regenesis CIS Membership Interest" shall mean the Company's membership interest in Regenesis CIS.

    1.58  "Regenesis Concentrated" shall mean Regenesis Concentrated Solar Projects, LLC, a limited liability company, an Operating LLC to be formed by the Company.

    1.59  "Regenesis Concentrated Agreement" shall mean the Operating Agreement, as amended from time to time, of Regenesis Concentrated.

    1.60  "Regulations" or "Treasury Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

7

1.61    "Required Distribution" is defined in Section 5.4(b).

1.62    "Responsible Party" is defined in Section 10.1.8.

1.63    "Significant Employee" shall mean any employee or independent contractor of the Company (including any employee that is leased to the Company and any other person devoting a majority of such person's working time performing services to the Company), whose aggregate annual base salary from the Company is equal to or greater than $100,000 or whose total aggregate annual compensation from the Company is, or could reasonably be anticipated to he, equal to or greater than $150,000.

1.64    "Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership or other entity of which a majority of (i) the voting power of the voting equity securities or (ii) the outstanding equity interests is owned, directly or indirectly, by such Person.

1.65    "Substitute Member" shall mean any Person (a) to whom a Member (or assignee thereof) Transfers all or any part of its interest in the Company, and (b) which has been admitted to the Company as a Substitute Member pursuant to this Agreement.

1.66    "Super Majority In Interest" shall mean more than sixty percent (60%) of the Units held by the applicable group of Members.

1.67    "Tax Matters Partner" shall mean WW or his successor as designated pursuant to Section 8.7.

1.68    "Terminated Member" is defined in Section 7.14.

1.69    "Terminating Capital Transaction" shall mean any sale or other disposition of all or substantially all of the assets of the Company or a related series of transactions that, taken together, result in the sale or other disposition of all or substantially all of the assets of the Company.

1.70    "Transfer" shall mean, with respect to any Membership Interest or Economic Interest in the Company, any direct or indirect sale, conveyance, exchange, assignment, pledge, encumbrance, gift, bequest, hypothecation or other transfer or disposition by any other means of any portion of such interest, whether for value or no value and whether voluntary or involuntary (including, without limitation, by operation of law), or an agreement to do any of the foregoing unless such agreement is, by its terms, contingent on the receipt of the requisite consents to such Transfer under this Agreement. The term "Transfer" shall also mean, where appropriate, the verb effecting any of the foregoing.

1.71    "Unit" shall mean, with respect to a Membership Interest, a fractional, undivided share of such Membership Interest issued pursuant to Articles 3 or 4 of this Agreement. A Membership Interest may include a fractional Unit.

LOSA2261481.14
362049-20

1.72   "WW" shall mean Wallace Williams LLC, a limited liability company, under the management and control of Foster.

## ARTICLE 2

## ORGANIZATIONAL MATTERS

2.1   Formation.  Pursuant to the Act, the Members formed a Delaware limited liability company under the laws of the State of Delaware by filing the Certificate with the Delaware Secretary of State and entering into this Agreement.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2   Name.  The name of the Company shall be "REGENESIS POWER LLC."  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Governing Members deem appropriate or advisable. The Governing Members shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Governing Members consider appropriate or advisable.

2.3   Term.  The term of the Company shall be from May 5, 2006 through May 30, 2056, unless the Company is earlier dissolved in accordance with either the provisions of this Agreement or the Act or unless extended by the Governing Members.

2.4   Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of Delaware.  The principal office of the Company shall be c/o Marshall M. Taylor, 550 South Hope Street, Suite 2300, Los Angeles, California 90071, or such other place as the Governing Members may determine.  The Company also may have such offices, anywhere as the Governing Members from time to time may determine.  The registered agent shall be as stated in the Articles or as otherwise determined by the Governing Members.

2.5   Addresses of the Members and the Governing Members.  The respective addresses of the Members and the Governing Members are set forth on Exhibit C.

2.6   Purpose of Company.  The purpose of the Company is to engage in the following:

(a)   To develop, produce and market solar electric generating processes and develop, construct and own and operate solar electric generating facilities;

(b)   to acquire, own and manage ownership interests in companies producing and operating solar electric generating processes and plants;

(c)   to engage in such other activities related to the foregoing business as may be necessary, advisable, or appropriate, as approved by the Governing Members to further the foregoing business; and

9

LOSA2\261481.14
362049-20

(d)     to engage in any other activities permitted under applicable law which activities are approved by the Governing Members.

## ARTICLE 3

## CAPITAL CONTRIBUTIONS

3.1     Initial Capital Contributions and Units.  The Members' initial Capital Contributions and the number of Units acquired by each Member are set forth on Exhibit "A" hereto and made a part hereof by this reference.

3.2     Additional Capital Contributions.  No Member shall be permitted (unless with the consent of the Governing Members) or required to make any Additional Capital Contribution to the Company.

3.3     No Withdrawal of Capital.  Except as expressly contemplated by this Agreement, no Member shall have the right to withdraw all or any part of a Capital Contribution or to demand and receive property of the Company or any distribution in return for a Capital Contribution or payment for a dissenting interest.

3.4     Capital Accounts.  The Company shall establish an individual Capital Account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).  For purposes of this Agreement, a Member who has more than one Unit in the Company shall have a single Capital Account that reflects all such Units.  Such Capital Account shall initially be as set forth on Exhibit "B" and shall thereafter be adjusted in accordance with the following provisions:

3.4.1     To each Member's Capital Account there shall be credited the amount of any additional money contributed by such Member to the Company, the fair value (as determined by the such Member and the Governing Members or, in the absence of agreement, by three (3) Qualified Appraisers selected pursuant to the mechanism set forth in Section 7.15 hereof (with the average of the two (2) closest, in amount, valuations to be binding)) of any property contributed by such Member to the Company (net of liabilities securing such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), such Member's allowable share of Net Profit and other items of Book Gain or income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities secured by property distributed to the Member).

3.4.2     To each Member's Capital Account there shall be debited the amount of cash and the fair value (as determined by the Members or, in absence of agreement, by three (3) Qualified Appraisers selected pursuant to the mechanism set forth in Section 7.15 hereof (with the average of the two (2) closest, in amount, valuations to be binding) of any Company property (net of any liabilities secured by such property) distributed to such Member pursuant to any provision of this Agreement (other than as guaranteed payments pursuant to Section 707(e) of the Code), such Member's allocable share of Net Loss and other items of Book Loss and deduction, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities secured by property contributed by the Member).

10

LOSA2\261481.14
362049-20

3.4.3    In the event the Book Value of the Company assets is adjusted as provided in the definition of Book Value in Article 1 hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the Net Profit or Net Loss allocated pursuant to Section 6.1 attributable to the respective amounts of such aggregate net adjustments to Book Value.

3.4.4    If the Company, with the Governing Members' approval, at any time distributes any of its assets in-kind to any Member, the Capital Account of each Member shall be adjusted to account for, as Net Profit or Net Loss, as the case may be, such Member's allocable share (as determined under Article 6 below) of the unrealized income, gain, loss or deduction (that has not been reflected in the Capital Accounts previously) that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values (taking into account Section 7701(g) of the Code), as reasonably determined by the Governing Members and a Majority in Interest of the Non-Governing Members or, in absence of agreement, by three (3) Qualified Appraisers selected pursuant to the mechanism set forth in Section 7.15 hereof (with the average of the two (2) closest, in amount, valuations to be binding), immediately prior to their distribution.

3.4.5    The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Governing Members shall determine that it is necessary to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Governing Members may make such modification, provided that it shall not have a material effect on the amounts distributable to any Member pursuant to Article 6 or upon the dissolution of the Company.

3.4.6    Upon a valid Transfer of a Member's interest in the Company in accordance with Article 7, such Member's Capital Account shall carry over to the new owner pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(1).

3.5    No Interest. No Member shall be entitled to receive any interest on his, her or its Capital Contributions.

3.6    Project Contribution. Prior to date hereof, Regenesis, Inc., an Affiliate of Marini, has made expenditures and worked on the development of several projects in Hawaii, including but not limited to, energy generating for Cosco stores, hotels on Lanai and Maui Electric Company. If elected by the Governing Members, such projects may be pursued by the Company, and Aloha and Marini shall cause to be assigned, and transferred to the Company, all right and interest in the projects and all development rights. Upon the earlier of (i) consummation of any of the projects, as evidenced by commencement of construction of an electric generator facility or (ii) commencement of construction of any other project of the Company, directly or indirectly, in which the Company receives a development fee, Regenesis, Inc. shall be reimbursed previously incurred expenses of $100,000.

## ARTICLE 4

## MEMBERS

4.1    Limited Liability. Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2    Admission of Additional Members. From time to time, the Governing Members may admit to the Company one or more additional Members by issuing one or more additional Units, subject to the following:

(a)    the additional Member shall make a Capital Contribution in such amount and on such terms as the Governing Members determine to be appropriate, including but not limited to the price per Unit and the number of additional Units to be issued; and

(b)    upon the issuance of the additional Units, the resulting Percentage Interests of all Members shall be recalculated based on the total number of Units then outstanding, shall be revised to reflect the additional Members, the additional Units and the Capital Accounts of all of the Members of the admission of the additional Members.

(c)    The Members recognize and agree that the admission of additional members will result in a dilution of their respective percentage interests in the Company and agree to execute such documents and instruments as may be required to acknowledge such dilution.

Notwithstanding the foregoing, the admission of Members as a result of a Transfer by a Member shall be governed by Article 7 and not the provisions of this Section 4.2.

4.3    Transactions With The Company. Subject to any limitations set forth in this Agreement, including, without limitation, the limitations set forth in Section 5.4, and with the prior approval of the non-interested Governing Members (or, in the absence thereof, a Majority in Interest of the Non-Governing Members) after full disclosure of the Member's involvement, a Member or its Affiliate may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.4    Remuneration To Members. Except as otherwise authorized in, or pursuant to, this Agreement (including, without limitation, Sections 5.6 or 5.8.4) or any employment agreement entered into between the Company and any Member or Affiliate of a Member or by specific resolution authorizing a salary or compensation executed by all of the disinterested Governing Members, no Member or Affiliate of a Member is entitled to remuneration for acting in the Company business.

4.5    Members Are Not Agents. Pursuant to Section 5.1, the management of the Company is vested in the Governing Members. No Member, acting solely in the capacity of a

12

LOSA2\261481.14
362049-20

Member (rather than in his, her or its capacity as a Governing Member or as an officer of the Company), is an agent of the Company nor can any Member in such capacity bind or execute any instrument on behalf of the Company.

    4.6    Voting Rights. Except as expressly provided in this Agreement or required by the Act, Members shall have no voting, approval or consent rights.

    4.7    Withdrawal of Members. Except as otherwise permitted by Article 7 hereof or pursuant to any other written agreement between a Member and the Company, no Member may withdraw or resign from the Company and any attempt to do so shall be invalid.

    4.8    New Classes of Members. No new class of Members shall be established unless unanimously approved by the Governing Members.

    4.9    Dilution. The Members anticipate that their respective membership interests will be diluted upon the occurrence of several events, including the following: (i) election of a President or a Chief Financial Officer; (ii) election of other officers and (iii) admission of a significant financial investor. In the event of the admission or election of officers, the percentage interest of the Class A Members will be diluted as determined by the Class A Members. Upon the admission of a significant financial investor, the interest of all Members will be proportionally diluted.

## ARTICLE 5

### MANAGEMENT AND OPERATION OF BUSINESS

    5.1    Powers of the Governing Members. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Company are exclusively vested in the Governing Members, and no other Member shall have any right to participate in or exercise control or management power over the business and affairs of the Company. Subject to the limitations set forth in this Agreement, the Governing Members' powers shall include, without limitation, the power to incur indebtedness, the power to enter into agreements and commitments of all kinds, the power to manage, acquire and dispose of Company assets, and all ancillary powers necessary or convenient as to the foregoing. It is the intention of the Members, subject to the express provisions of this Agreement, that the Governing Members' powers be as broad as the Act may now or hereafter permit, and that any powers that may be conferred only by contract are deemed to be explicitly conferred hereby. Except as otherwise provided herein, any actions authorized by the Governing Members need not be so authorized in writing. Decisions by the Governing Members shall be made by a Majority in Interests of the Governing Members. The Governing Members may, by written resolution, delegate to one or more Governing Members the right to exercise power and authority granted to the Governing Members under this Agreement.

13

LOSA2\261481.14
362049-20

5.2    <u>Right to Rely on Governing Members</u>. No Person dealing with the Company shall be required to inquire into, or to obtain any other documentation as to, the authority of the Governing Members to take any action permitted under Section 5.1. Furthermore, any Person dealing with the Company may rely upon a certificate signed by the Governing Members as to the following:

(a)    the identity of the Governing Members or any Member;

(b)    the existence or nonexistence of any fact or facts that constitute a condition precedent to acts by the Governing Members or that are in any other manner germane to the affairs of the Company;

(c)    the Persons who are authorized to execute and deliver any instrument or document of the Company; or

(d)    any act or failure to act by the Company on any other matter whatsoever involving the Company or any Member (in its capacity as a Member).

5.3    <u>Meetings</u>. At any time, and from time to time, the Governing Members may, but shall not be required to, call meetings of the Members. Written notice of any such meeting shall be given to all Members not less than five (5) days nor more than forty-five (45) days prior to the date of such meeting. Each meeting of the Members shall be conducted by the Governing Members or any designee(s) thereof. Each Member may authorize any other Person (whether or not such other Person is a Member) to act for it or on its behalf on all matters in which the Member is entitled to participate. Each proxy must be signed by the Member or such Member's attorney-in-fact. All other provisions governing, or otherwise relating to, the holding of meetings of the Members, shall from time to time be established in the sole discretion of the Governing Members.

5.4    <u>Day-to-Day Operations and Actions Requiring Consent of the Governing Members</u>. The day-to-day operations of the Company shall be managed by the officers of the Company under the oversight of the Governing Members. Notwithstanding anything else to the contrary contained herein, the parties agree that the following actions fall outside the scope of the Company's day-to-day operations and that therefore the written consent of the Governing Members to such actions is required under the terms of this Agreement:

(a)    the entering into a purchase agreement for the acquisition of the properties or projects;

(b)    the making of distributions from Distributable Cash of the Company to the Members;

(c)    the incurrence or guaranteeing of indebtedness not contemplated in the applicable Annual Operating Budget or Annual Capital Budget of the Company;

(d)    the election, appointment or removal of officers of the Company;

14

LOSA2\261481.14
362049-20

(e)  the hiring or leasing of Significant Employees of or for the Company;

(f)  the determination of the compensation of officers of the Company;

(g)  the determination of the compensation of the Significant Employees of or for the Company;

(h)  subject to the requirements of Section 4.2, the issuance of Membership Interests;

(i)  the making of any material tax election affecting the Company.  The parties acknowledge that the Company is currently treated as a partnership for federal and state income tax purposes under applicable regulations and that any change in such treatment would constitute a material tax election;

(j)  in any calendar year, the disposal, sale, exchange or liquidation of a portion of the Operating LLC Membership Interest;

(k)  any act which would make it impossible to carry on the ordinary business of any of the Company's Operating LLC's;

(l)  the conduct of Company or Operating LLC business in any jurisdiction which has not adopted legislation recognizing limited liability companies as a business entity;

(m)  subject to Section 4.4, the approval of any employment contract with a term in excess of one year or including, without limitation, leasing an employee in a manner that obligates the Company or Operating LLC to compensate such employee for more than one (1) year; and

(n)  subject to Section 5.5, the exercise of any right of the Company as a Member of the Operating LLC, including, without limitation, consent rights, voting rights and transfer rights.

Notwithstanding the foregoing, the Governing Members may at any time in writing elect to reduce the number and/or scope of actions (including any actions described in this Section 5.4) requiring the written consent of the Governing Members under this Agreement.

5.5   Consent Rights of Members.

5.5.1   Except as otherwise expressly provided in this Agreement, or required by any non-waivable provision of the Act or other applicable law, no Non-Governing Member shall (a) have any right to vote on or consent to any other matter, act, decision or document involving the Company or its business, or (b) take part in the day-to-day management, or the operation or control, of the business and affairs of the Company.  Except to the extent expressly delegated by the Governing Members (including any Members who are officers chosen pursuant to Section 5.8), no Non-Governing Member or other Person shall be an agent for the Company or have any

15

right, power or authority to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

    5.5.2  Notwithstanding anything to the contrary in this Agreement, the following Company actions shall require the consent of a Majority in Interest of the Members, provided that such consent shall be deemed satisfied by the sole written consent of the Governing Members at any time the Governing Members directly or indirectly "control" (as defined in Section 1.4) more than 50% of the Units:

    (a)    the dissolution of the Company;

    (b)    the merger or consolidation of the Company or any Subsidiary with any other Person;

    (c)    the conversion of the Company into any other kind of Entity;

    (d)    any Terminating Capital Transaction;

    (e)    the alteration of the primary purpose of the Company as set forth in Section 2.6; and

    (f)    any act which would make it impossible to carry on the ordinary business of the Company.

    5.6    Compensation of Governing Members.  Except as may be otherwise agreed, the Governing Members shall not be entitled to receive any management fee for their services as Governing Members.  The Governing Members shall be entitled to reimbursement on a monthly basis from the Company for reasonable out-of-pocket costs and expenses incurred by him, in the reasonable discretion of the Governing Members, for or on behalf of the Company which should be reflected in the applicable budget (it being understood that such costs shall not include legal, accounting and appraisal and similar expenses that are incurred by the Governing Members for their own (and not for Company) purposes).

    5.7    Removal, Resignation and Replacement of Governing Members. A Governing Member may not be removed as a Governing Member at any time without his consent; provided that any Governing Member may be removed as a Governing Member at any time without such Governing Member's consent by a Super Majority in Interest of the Non-Governing Members and Governing Members.  Notwithstanding the foregoing, upon the Disability or Bankruptcy of a Governing Member, the other Governing Members and Non-Governing Members, by a Majority in Interest, excluding the interests of the affected Governing Member, shall have the right to remove a person as a Governing Member and to elect any Member or Affiliate of a Member as a new Governing Member, provided that if a Governing Member's Disability is thereafter terminated (as evidenced by certification of his attending physician, a court declaration or the termination of the conservatorship, as applicable) and, at such time, a Governing Member continues to hold directly or indirectly an interest in at least 10% of the Units, the affected Governing Member shall be reinstated as a Governing Member at his request and the replacement Governing Member shall be removed.  The Governing Member shall be

16

automatically removed upon death.  The Governing Member may resign at any time by giving written notice to the Members.  A vacancy in the position of a Governing Member because of death or resignation shall be filled by the election of a new Governing Member by a Majority in Interest of the Members.  The resignation, removal or death of a Governing Member who is also a Member shall not affect the Governing Member's rights as a Member and shall not constitute a withdrawal of a Member.  For the purposes of this Section, the death or removal of Hearst, Marini, or Foster as the manager (with the power to control) of Harvest, Aloha and WW, respectively, shall be deemed to be the death of a Governing Member and such affected Governing Member shall be automatically removed as a Governing Member but shall otherwise remain a Member of the Company.  Upon the vote of a Majority in Interest of the Governing Members, other Members may be elected as Governing Members.

    5.8    Officers of the Company.

        5.8.1    Appointment and Duties.  The officers of the Company shall be chosen by the Governing Members and shall include a President, Chief Operating Officer, one or more Vice Presidents, a Secretary and a Treasurer.  The Company may also have, at the discretion of the Governing Members, such other officers as are desired.  The officers of the Company shall be elected annually (being terminated if not so re-elected) by the Governing Members and shall hold office until their successors are chosen by the Governing Members.

        (a)    The President shall be the chief executive officer of the Company and shall, subject to the control of the Governing Members, have general supervision, direction and control of the day-to-day affairs of the Company and the Operating LLC's.  Unless limited by the Governing Members, the President shall have the general powers and duties of management usually vested in the office of President and Chief Executive Officer of corporations, and shall have such other powers and duties as may be prescribed by the Governing Members.

        (b)    In the absence or disability of the President, the Chief Operating Officer shall perform all duties of the President.  Unless limited by the Governing Members, the Chief Operating Officer shall have the general powers and duties of management usually vested in the office of Chief Operating Officer of corporations and shall have such other powers and duties as may be prescribed by the Governing Members.

        (c)    In the absence or disability of the President and Chief Operating Officer, the Vice Presidents in order of their rank as fixed by the Governing Members, or if not ranked, the Vice President designated by the Governing Members, shall perform all duties of the President.  The Vice Presidents shall have such other duties and have such other powers as from time to time may be prescribed for them by the Governing Members.

        (d)    The Secretary shall attend all meetings of the Members and record all votes and the minutes of all proceedings in a book to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the Members, and shall perform such other duties as may be prescribed by the Governing Members.

LOSA2\261481.14
362049-20

(e)      The Assistant Secretary, or if there is more than one, the Assistant Secretary designated by the Governing Members shall, in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Governing Members may from time to time prescribe.

(f)      The Treasurer shall be the Chief Financial Officer of the Company and shall have the custody of the funds and securities of the Company and the Operating LLC's and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and the Operating LLC's and shall deposit all moneys and other valuable effects in the name and to the credit of the Company and the Operating LLC's in such depositories as may be designated by the Governing Members. The Treasurer shall disburse the funds of the Company and the Operating LLC's as may be ordered by the Governing Members and shall render to the Governing Members at his request an account of all his or her transactions as Treasurer and of the financial condition of the Company and the Operating LLC's.

(g)      The Assistant Treasurer, or if there is more than one, the Assistant Treasurer designated by the Governing Members shall, in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Governing Members may from time to time prescribe.

5.8.3   Removal, Resignation and Filling of Vacancy of Officers. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Governing Members. Any officer may resign at any time by giving written notice to the Governing Members. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to that office or as otherwise agreed by the Governing Members.

5.8.4   Salaries of Officers. The salaries of all officers and agents of the Company shall be fixed by the Governing Members, subject to the provisions of any Employment Agreement.

5.8.5   Acts of Officers as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other Person, when signed by any two officers of the Company, acting together, is not invalidated as to the Company by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other Person that the signing officers had no authority to execute the same.

18

LOSA2\261481.14
362049-20

5.8.6    Signing Authority of Officers. Subject to Section 5.4 and any restrictions imposed by the Governing Members:

(a)    Any officer, acting alone, is authorized to endorse checks, drafts and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.

(b)    All checks, drafts and other instruments obligating the Company to pay money in an amount of less than $10,000 may be signed by any Governing Member or one officer, acting alone.

(c)    All checks, drafts and other instruments obligating the Company to pay money in an amount of $10,000 or more must be signed on behalf of the Company by any Governing Member or the President or any two officers acting together.

(d)    Any Governing Member or the President or any two of the Chief Operating Officer, Vice Presidents, Secretary and Treasurer, shall be authorized to sign contracts and obligations on behalf of the Company.

5.9    Estimation of Units. In the event the number of Units owned by each Member as of a specified date is relevant under any provision of this Agreement, and has not been determined as of such date, the Governing Members shall make a good faith estimate of the number of Units owned by each Member as of such date, and, upon completion of the final calculation of the number of Units actually owned by each Member on such date, (i) the Company shall distribute any additional amounts it may owe to the Members after giving effect to such final calculation, (ii) the Members shall, after giving effect to such final calculation, reimburse the Company any excess amounts paid to them, and (iii) the Governing Members shall take such other actions as are appropriate to reflect such final calculation. Notwithstanding the foregoing, where, under the terms of this Agreement, a vote, consent or approval is required by a specified number of Units or Percentage Interests, such determination shall be based on an actual calculation, rather than an estimate, and the Members shall cooperate in completing such calculations.

## ARTICLE 6

## ALLOCATIONS OF NET PROFITS

## AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profits and Net Losses.

6.1.1    Net Losses. Net Loss for each Fiscal Year or other period of the Company shall be allocated among the Members in proportion to their Percentage Interests. Notwithstanding the foregoing, if the amount of Loss that would otherwise be allocated to a Member would cause or increase a deficit balance in such Member's Capital Account in excess of the sum of (i) such Member's share of Company Minimum Gain and Company Minimum

19

LOSA2\261481.14
362049-20

Gain attributable to Member Nonrecourse Debt (such shares to be determined in accordance with Treasury Regulations Section 1.704-2(g) and (i)) plus (ii) such Member's remaining unconditional obligation, if any, to contribute capital to the Company pursuant to this Agreement, (an "Excess Deficit"), Loss equal to the amount thereof that would cause or increase such Excess Deficit shall instead be allocated to the Members to whom such Loss can be allocated without causing or increasing an Excess Deficit. For purposes of this Section 6.1.1, the Members' Capital Accounts shall be computed as of the last day of such fiscal year in the manner provided herein, but shall be reduced for the items described in Treasury Regulations Section 1.704-l(b)(2)(ii)(d)(4), (5), and (6).

6.1.2   _Net Profits_. Net Profits for each Fiscal Year or other period of the Company shall be allocated among the Members in proportion to their Percentage Interests.

6.2   _Special Allocations_.

6.2.1   _Minimum Gain Chargeback_. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2.1 shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2.1. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2.1 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section, 1.704-2(f) and shall be interpreted consistently therewith.

6.2.2   _Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt_. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2.2 shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2.2. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2.2 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

20

6.2.3    <u>Nonrecourse Deductions</u>. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(l)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

6.2.4    <u>Member Nonrecourse Deductions</u>. Notwithstanding Section 6.1, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

6.2.5    <u>Qualified Income Offset</u>. If any Member unexpectedly receives an adjustment, allocation, or distribution described in subparagraph (4), (5) or (6) of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, which adjustment, allocation or distribution creates or increases an Excess Deficit in such Member's Capital Account, then such Member shall be allocated items of "book" income and gain in an amount and manner sufficient to eliminate or to reduce, as quickly as possible, the Excess Deficit so created or increased. For purposes of this Section 6.2.5, Capital Accounts shall be adjusted hypothetically as provided for in Sections 1.704-l(b)(2)(ii)(d) of the Treasury Regulations. Any special allocations of items of income and gain pursuant to this Section 6.2.5 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article 6 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article 6 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2.5 if such unexpected adjustments, allocations, or distributions had not occurred. The Members intend that the provision set forth in this Section 6.2.5 shall constitute a "qualified income offset" as described in Section 1.704-1 (b)(2)(ii)(d) of the Treasury Regulations. Such section of the Treasury Regulations shall control in the case of any conflict between that section of the Treasury Regulations and this Section 6.2.5.

6.2.6    <u>Special Allocation Upon Liquidation</u>. With respect to the Fiscal Year in which occurs the final liquidation of the Company in accordance with Article 10 and notwithstanding any other provision of Section 6.1, items of Company income, gain, loss and deduction shall be specially allocated to the Members in such amounts and priorities as are necessary so that the Member's respective positive Capital Account balances (determined without taking into consideration amounts to be distributed to the Members pursuant to Section 9.5.1 shall, as closely as possible, equal the amounts to be distributed to them pursuant to Section 9.5.1.

6.3    <u>Code Section 704(c) Allocations</u>. Notwithstanding any other provision in this Article 6, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or with respect to property for which differences between book value and adjusted tax basis are created in accordance with the definition of Book Value in Section 1.13 hereof, shall, solely for tax purposes, be allocated among the Members in accordance with the Traditional Method as described in Section 1.704-3(b) of the Treasury Regulations so as to take account of

21

LOSA2\261481.14
362049-20

any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

      6.4    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Interest at the close of such day or any other appropriate method approved by the Governing Members and permitted under the Code. Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

      6.5    Distribution of Cash Flow and Assets.

      6.5.1    Cash Flow Distributions. Subject to applicable law, periodically, the Governing Members shall distribute Distributable Cash to the Members and Economic Interest Owners in accordance with their respective Percentage Interests. The Company anticipates retaining in the Company cash equal to the amount of depreciation allocated the Company from the Operating LLC for research and development and for investment in additional projects.

      6.5.2    Recipient of Distributions. All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company, the Governing Members nor any officer, in such capacity, shall incur any liability for making distributions in accordance with this Section 6.5.

      6.6    Form of Distribution. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

      6.7    Restriction on Distributions.

      6.7.1    Notwithstanding anything to the contrary in this Agreement, no distribution shall be made by the Company to the Members if after giving effect to the distribution:

22

LOSA2\261481.14
362049-20

    (a)    the Company would not be able to pay its debts as they become due in the usual course of business;

    (b)    the Company's total assets would be less than the sum of its total liabilities; or

    (c)    the Company is prohibited from making such distribution under the terms of any Company loan agreement and/or such distribution would cause an event of default by the Company under any loan agreement.

    6.8    Return of Distributions.  Except for distributions made in violation of the Act, this Agreement and/or any loan agreement entered into by the Company as borrower, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company to the extent the creditor is not satisfied by amounts paid pursuant to Section.  The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

    6.9    Obligations of Members to Report Allocations.  The Members are aware of the income tax consequences of the allocations made by this Article 6 and hereby agree to be bound by the provisions of this Article 6 in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE 7

## TRANSFER AND ASSIGNMENT OF INTERESTS

    7.1    Transfer and Assignment of Interests.  Except as expressly permitted under this Article 7, no Member or Economic Interest Owner shall be entitled to directly or indirectly Transfer all or any part of his, her or its Membership Interest except with the prior written consent of the Governing Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the Governing Members may determine in their sole discretion, and any required Lender approval.  After the consummation of any Transfer of any part of a Membership Interest or Economic Interest, the Membership Interest or Economic Interest, as applicable, so Transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions of this Agreement.

    7.2    Further Restrictions on Transfer of Interests.  Notwithstanding any contrary provision in this Agreement, unless waived in writing by the Governing Members (or if there are no disinterested Governing Members, a Majority in Interest of the Non-Governing Members), any otherwise permitted Transfer shall be null and void if:

23

LOSA2\261481.14
362049-20

(a)     such Transfer would, in the opinion of counsel to the Company, cause the Company to cease to be classified as a partnership for federal or state income tax purposes or result in a termination of the Company as a partnership for federal income tax purposes pursuant to Section 708(b)(1)(B) of the Code;

(b)     such Transfer requires the registration of such Membership Interest or Economic Interest pursuant to any applicable federal or state securities laws;

(c)     such Transfer causes the Company to become a "Publicly Traded Partnership," as such term is defined in Sections 469(k)(2) or 7704(b) of the Code;

(d)     such Transfer subjects the Company to regulation under the Investment Company Act of 1940, the Investment Advisers Act of 1940 or the Employee Retirement Income Security Act of 1974, each as amended;

(e)     such Transfer results in a violation of applicable laws;

(f)     such Transfer is made to any Person who lacks the legal right, power or capacity to own such Interest;

(g)     the Company does not receive written instruments (including, without limitation, copies of any instruments of Transfer) and such Assignee's consent to be bound by this Agreement as an Assignee that are in a form satisfactory to the Governing Members (as determined in the Governing Members' reasonable discretion); and

(h)     the Transfer results in an event of default by the Company under any loan document entered into by the Company or any Member related to any loan to the Company.

7.3     Rights of Assignees.  Until such time, if ever, a transferee of any permitted Transfer pursuant to this Article 7 is admitted to the Company as a Substitute Memher pursuant to Section 7.4 such transferee shall be an Economic Interest Owner only, and only shall receive, to the extent Transferred, the distributions and allocations of income, gain, loss, deduction, credit, or similar item to which the Member which Transferred its Membership Interest would be entitled, and (ii) such Economic Interest Owner shall not be entitled or enabled to exercise any other rights or powers of a Member, such other rights remaining with the transferring Member. In such a case, the transferring Member shall remain a Member even if it has Transferred its entire Economic Interest in the Company to an Economic Interest Owner.  In the event any Economic Interest Owner desires to make a further assignment of any Economic Interest in the Company, such Economic Interest Owner shall be subject to all of the provisions of this Agreement to the same extent and in the same manner as any Member desiring to make such an assignment.

7.4     Substitution of a Member.  A transferee of a Membership Interest shall have the right to become a Substitute Member only if (i) the requirements of (a)  Section 7.1 or, if applicable, Sections 7.8 or 7.15 and (b) Section 7.2 relating to consent of the Governing Members, securities, execution of an assignment and assumption agreement, and tax

24

LOSA2\261481.14
362049-20

requirements are met, and (ii) such Person pays any reasonable expenses of the Company in connection with such transfer and his, her or its admission as a new Member. The admission of a Substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

     7.5     Effective Date of Permitted Transfers. Any permitted Transfer of all or any portion of a Membership Interest (including an Economic Interest) shall be effective as of the date upon which the requirements of Sections 7.1, 7.2, 7.4, 7.8 and 7.15, as applicable, have been met. The Governing Members shall provide the Members with written notice of such Transfer as promptly as appropriate after the requirements of Sections 7.1, 7.2, 7.4, 7.8 and 7.15, as applicable, have been met. Any transferee of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

     7.6     No Effect to Transfers in Violation of Agreement; Economic Interest Owner's Limited Rights. Any Transfer of a Membership Interest in violation of this Article 7 shall be void. An Economic Interest Owner shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. A transferee of a mere Economic Interest in accordance with this Agreement shall only be entitled to become an Economic Interest Owner, and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

     7.7     Admissions, Withdrawals and Removals. No Person shall be admitted to the Company as a Member except in accordance with Section 4.2 (in the case of Persons obtaining an interest in the Company directly from the Company) or this Article 7. Except as otherwise specifically set forth in Sections 4.7, 5.7 or 7.9, no Member, including the Governing Members, shall be entitled to retire or withdraw from being a Member of the Company without the written consent of the non-interested Governing Members or, in the absence thereof, a Majority in Interest of the Non-Governing Members, which consents may be given or withheld in each Governing Members' or Member's, as the case may be, sole and absolute discretion. No admission, withdrawal or removal of a Member shall cause the dissolution of the Company, except as expressly required by the Act. Any purported admission, withdrawal or removal which is not in accordance with this Agreement shall be null and void.

     7.8     Permitted Transfers. Subject to compliance with Section 7.2 above, and without the prior written consent of the Governing Members as required by Section 7.1, the following Transfers shall be permitted:

          (a)     any individual member shall have the right to Transfer the entirety of his or her Membership Interest (but not less than 100% thereof) to Immediate Family for "estate planning purposes" or to a limited liability company, provided that the individual member shall be the manager or managing member of such limited liability company;

          (b)     the interests of a Member may be Transferred to another Member;

25

(c)    the interests of a Member which is a limited liability company may be indirectly transferred by transfers of interest in the Member provided that management and control of such Member shall remain with the manager or managing member of such Member as of the date of execution of this Agreement.

7.9    Withdrawal of Members.  If a Member has Transferred all of his, her, or its Membership Interest to an Assignee as permitted by this Agreement, then such Member shall withdraw from the Company if and when such Assignee has been admitted as a Substitute Member in accordance with this Agreement.  If a Member has Transferred all of his, her or its Membership Interest to the Company by redemption, including any Transfer pursuant to Section 7.8, such Member shall withdraw from the Company.

7.10    Pledge to Lender.  Notwithstanding anything to the contrary in this Agreement, each of the Members shall execute and deliver a pledge agreement under a loan agreement with the Company, if required thereunder, which shall become effective upon the execution and delivery of Pledges by all the Members, (the "Pledges") and each Pledge shall be a permitted Transfer.  Other than providing a Pledge, there shall not be any recourse against any Member for any liabilities of the Company and no Member shall be required to provide credit or collateral to or for the benefit of the Company.  The Governing Members, on behalf of the Company, shall acknowledge in writing that it has been notified of the Pledges.

7.11    Transfer Rights.

7.11.1    Right of First Refusal.  Subject to Section 7.2, each time a Member proposes to Transfer any part of his, her or its Membership Interest, other than pursuant to Sections 7.8, 7.12, 7.13 or 7.14 (the "Offered Interest"), such Member shall offer such Offered Interest first to the Company and then to the non-transferring Members on a pro rata basis in accordance with the following provisions:

(a)    Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to Transfer such Offered Interest, (ii) the name and address of the proposed transferee, (iii) the Offered Interest to be transferred, and (iv) the purchase price and material terms of payment for which the Member proposes to transfer such Offered Interest  (the "Offer").

(b)    The Company shall have the right and option, for a period ending thirty (30) calendar days after receipt of the notice described in Section 7.11.1(a) to elect to purchase all of the Offered Interest at the purchase price and upon the terms of the Offer, and the remaining Members, pro rata in accordance with their Membership Interests, shall then have the right and option, for a period of twenty (20) days thereafter, to elect to purchase all of the Offered Interest not elected to be purchased by the Company at the purchase price and upon the terms specified in the Offer.  The failure of any Member to submit a written notice to the Governing Members of his, her or its desire to purchase a portion of the Offered Interest within the applicable period shall constitute an election on the part of that Member not to purchase any of the Offered Interest.  In the event any Member elects to purchase none or less than all of his or her pro rata share of such

26

Offered Interest, then the other Members electing to purchase shall have the right, pro rata in accordance with the ratio of their Membership Interest, to elect to purchase the remaining part of the Offered Interest within a period of ten (10) days.  In the event that the Members collectively do not elect to purchase the entire Offered Interest, then it shall be deemed that the Members have elected not to purchase the Offered Interest.

(c)      If the Offer provides for the payment of non-cash consideration, the Company or the such purchasing Members, as applicable, each may elect to pay the consideration in cash equal to the good faith estimate of the value of the non-cash consideration offered as determined by the offering Member, the Governing Members and the purchasing Members, if they cannot agree, by appraisal in accordance with Section 7.15.

(d)      If the Company elects to purchase the Offered Interest, and the Company and the offering Member are unable to obtain any required Lender approval to such Transfer, then the Company shall make cash distributions to the remaining Members to enable the remaining Members, pro rata in accordance with their Membership interests, to purchase the Offered Interest.  Upon such election by the Company and receipt of the cash distributions from the Company, it shall be mandatory upon each of the remaining Members to complete such purchase of the Offered Interest.  In the event the Company is prohibited by any lender from making cash distributions for purposes of this Section 7.11.1(d), the election by the Company shall be void and the remaining Members shall then have the right to elect to purchase all of the Offered Interest in accordance with Section 7.11.1(b).  The Governing Members shall provide written notice of such prohibition to each Member in accordance with three (3) business days of the Company's receipt of the Member's decision, and the Company shall have no distribution obligations under this Section 7.11.1(d).

(e)      If the Company or the other Members elect not to purchase or obtain all of the Offered Interest, then the transferring Member may Transfer the Offered Interest to the proposed transferee, providing such Transfer (a) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Offered Interest, (b) is made on terms no less favorable to the transferring Member than as designated in the Offer, and (c) the requirements of Sections 7.1 and 7.2 relating to consent of the Governing Members, securities, assignment and assumption, and tax requirements and lender requirements are met.  If such Offered Interest is not so Transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent Transfer of such Offered Interest.

7.11.2  Bring-Along Rights.

(a)      If a majority of interest of the Class A Members at any time, or from time to time, propose to Transfer all of his, her or its Membership Interest, other than pursuant to Sections 7.8, 7.12, 7.13 or 7.14 to a third party ("Third Party"), after compliance with Section 7.11.1, then such Class A Members shall have the right (the "Bring-Along Right"), but not the obligation, to cause each of the other Members (the "Other

27

Members") to tender to the Third Party for purchase, on the same terms and conditions as apply to the transferring Class A Members in the transaction in which such Membership Interests are to be purchased, all Membership Interests held by such Other Members; provided, however, that in no event will the Other Members be compelled to tender their Membership Interests for consideration other than cash.

(b)     If any Class A Members elect to exercise their Bring-Along Right under this Section 7.11.2, then such Class A Members shall so notify the Company and the Other Members in writing (the "Bring-Along Notice"). Each Bring-Along Notice shall set forth (i) the name of the Third Party and the Membership Interests proposed to be transferred, (ii) the address of the Third Party, (iii) the proposed amount and form of consideration and terms and conditions of payment offered by the Third Party, and any other material terms pertaining to the Transfer (the "Third Party Terms"), and (iv) that the Third Party has been informed of the rights provided for in this Section 7.11.2 and has agreed to purchase Membership Interests in accordance with the terms hereof.  The Bring-Along Notice shall be given at least thirty (30) calendar days before the closing of the proposed Transfer.

(c)     Upon the giving of a Bring-Along Notice, each Other Member shall be entitled and obligated to sell the Membership Interests set forth therein to the Third Party on the Third Party Terms; provided, however, that neither the Class A Members nor any Other Members shall be obligated to consummate the sale of any Membership Interests if the Third Party does not purchase all Membership Interests which the Members are entitled to sell pursuant hereto.

(d)     At the Closing of any transfer pursuant to this Section 7.11.2, the Third Party shall remit to each Member the consideration for the total sales price of the Membership Interests of such Member sold pursuant hereto.

7.11.3 Tag-Along Rights.

(a)     If one or more Class A Members at any time, or from time to time, propose to Transfer all or any part of his, her or its Membership Interest, other than pursuant to Sections 7.8, 7.12, 7.13 or 7.14 to a Third Party, after compliance with Section 7.11.1, then each of the Other Members (collectively, the "Tag-Along Members") shall have the right (the "Tag-Along Right") to require the proposed purchaser to purchase from such Tag-Along Members the portion of the Membership Interests owned by such Tag-Along Members in proportion to the portion of the Class A Membership Interest being sold. Any Membership Interests purchased from Tag-Along Members pursuant to this Section 7.11.3 shall be paid for in cash, at the same price per Unit, and upon the same terms and conditions as such proposed Transfer by the Class A Member (the "Transfer Terms").

(b)     The Class A Members shall promptly notify the Tag-Along Members in the event the Class A Members propose to make a Transfer giving rise to the Tag-Along Right, and shall furnish the Tag-Along Members with the Transfer Terms and a copy of

28

LOSA2261481.14
362049-20

any written offer or agreement pertaining thereto. The Tag-Along Right may be exercised by any Tag-Along Members by delivery of a written notice to each Class A Member proposing to sell a Membership Interest (the "Tag-Along Notice") within thirty (30) business Days following its receipt of such notice from such Class A Member. The Tag-Along Notice shall state the Membership Interest that such Tag-Along Member proposes to include in such Transfer to the proposed purchaser. In the event that the proposed purchaser does not purchase the Membership Interests from the Tag-Along Members on the Transfer Terms, and subject to the same terms and conditions as are applicable to the Class A Members in such transaction, then the Class A Members shall not be permitted to sell any Membership Interests to the proposed purchaser in the proposed Transfer.

    7.12    <u>Bankruptcy or Insolvency of a Member</u>. Upon the Bankruptcy of a Member, the Company shall not be dissolved, and that Member (the "Insolvent Member") shall be treated as an Assignee and shall cease to have any interest as an active Member, and the Company first for a period of thirty (30) days after receipt of notice of such insolvency, and then the other Members, pro rata, may elect by notice to the Insolvent Member, for a period ending thirty (30) calendar days thereafter, to acquire the entire Membership Interest of the Insolvent Member as provided in Section 7.15, either directly or through their nominee(s), on a pro rata basis. If the Company and the other Members fail to make such election, the Company shall continue but the Insolvent Member and/or any successor shall be treated as an Assignee, not a Substituted Member, and neither the Insolvent Member nor any successor shall have any voting or approval rights.

    7.13    <u>Death of an Individual Member</u>. In the event of the death of an individual Member or of the Manager of Harvest, Aloha or WW (the "Deceased Member"), the Company shall not be dissolved. The Company first for a period of one hundred eighty (180) days after receipt of notice of such death and then the other Members, pro rata, may elect, by notice to the representative of the Deceased Member, for a period ending one hundred eighty (180) calendar days thereafter, to acquire the entire Membership Interest of the Deceased Member as provided in Section 7.15, either directly or through their nominee(s). If the Company and the other Members fail to make such election, such Deceased Member's legal representative or permitted successor pursuant to this Agreement shall succeed to all of the Membership rights with respect to such Membership Interest, including without limitation, any voting of approval rights of such Deceased Member and shall be substituted, as necessary, as a Member without any consent being required under Section 7.1 hereof; provided, however, such Deceased Member's legal representative or permitted successor shall not be a Governing Member unless elected by a Majority in Interest of the Members.

    7.14    <u>Dissolution or Termination of Member</u>. In the event of the dissolution or termination of a Member that is a corporation, partnership, limited liability company, or other legal entity or in the event that a Member's Employment Agreement (including an Employment Agreement with a manager or member of such Member) is terminated or such Member is no longer employed by the Company, (the "Terminated Member"), the Company shall not be dissolved and the Company first for a period of one hundred eighty (180) days after receipt of notice of such insolvency or other action and then the other Members, pro rata, may elect, by

29

notice to the Terminated Member (or representative), for a period ending one hundred eighty (180) calendar days thereafter, to acquire the entire Membership Interest of the Terminated Member as provided in Section 7.15, either directly or through their nominee(s). If the Company and the other Members fail to make such election, such Terminated Member's legal representative or permitted successor pursuant to this Agreement shall succeed to all of the Membership rights with respect to such Membership Interest, including without limitation, any voting of approval rights of such Terminated Member and shall be substituted, as necessary, as a Member without any consent being required under Section 7.1 hereof; provided, however, such Terminated Member's legal representative or permitted successor shall not be a Governing Member unless elected by a Majority in Interest of the Members.

    7.15   Purchase of Membership Interests. If the Company or one or more of the Members, directly or through their nominee(s), elect to put or acquire a Member's Membership Interest, as provided for in Sections 7.8, 7.12, 7.13 or 7.14, the parties shall immediately proceed to determine the purchase price of the Membership Interest under Section 7.15.1 subject in certain instances to the limitations set forth on Exhibit A attached hereto and made a part hereof. After the determination of the purchase price of the Membership Interest, if the Company or one or more of the Members, directly or through their nominee(s), elect to purchase, the Member whose Membership Interest is to be sold, or the person legally entitled to payment, shall be paid the amounts and on the terms and conditions as determined under Section 7.15.1 as full compensation for and in liquidation of that Member's Membership Interest.

    7.15.1  Valuation of Interests. For purchases under Sections 7.8, 7.12, 7.13 and 7.14 the purchase price of a Member's Membership Interest shall be an amount agreed on by the buyer and seller, and in the event they are unable to agree on a price within thirty (30) days after the election to put or acquire as set forth in Sections 7.8, 7.12, 7.13 and 7.14, the purchase price of the Membership Interest shall be determined by the following provisions (these provisions are intended to be appraisal procedures only and shall not be construed as any form of arbitration): Within fifteen (15) days after the earlier of the end of the thirty (30) day period set forth in Sections 7.8, 7.12, 7.13 and 7.14, or the date buyer and seller agree they are unable to agree on a price, the purchasing Company and/or Members, as the case may be, and the Member whose Membership Interest is to be sold either (a) shall jointly appoint a single Qualified Appraiser to determine the fair market value of the Company, whose said appraisal when rendered shall be binding and conclusive; or (b) failing this joint action, shall each separately designate a Qualified Appraiser and, within fifteen (15) days after their appointment, the two designated appraisers shall designate a third Qualified Appraiser. The purchase price for the Membership Interest in question shall equal the amount the Selling Member would receive if the Company's assets were sold at such fair market value and the Company liquidated pursuant to Article 9, with no discount for a minority interest or non-voting rights. Failure of either the purchasing Members, Company or the Member whose Membership Interest is being sold (or representative) to appoint an appraiser within the time allowed shall be deemed equivalent to appointing the appraiser appointed by the other party. The concurring determination of any two (2) of the three (3) Qualified Appraisers shall be binding upon the Members for purposes of this Section 7.15, or in case no two (2) of the Qualified Appraisers shall render a concurring determination, then the average of the two appraised values which are closest in amount shall be binding upon the Members.

LOSA2\261481.14
362049-20

For purposes of the foregoing, the term "fair market value" shall mean the highest price for cash which the assets of (a) the Company (including, without limitation, the assets of the Operating LLC's, as if the assets of the Operating LLC's were owned by the Company) or (b) where the context requires, the Real Property being appraised would bring in a competitive and open market under all conditions requisite to a fair sale with the buyer and seller each acting prudently and knowledgeably, and subtracting therefrom the costs and expenses of such a sale (not otherwise specifically allocated to the buyer or seller hereunder), including, without limitation, commissions and legal fees and assuming such price is not affected by undue stimulus and further assuming that:

      (a)    buyer and seller are typically motivated;

      (b)    the parties are well-informed or well-advised and are each acting in what it considers its own best interest;

      (c)    a reasonable time is allowed for exposure on the open market; and

      (d)    payment is made in cash or its equivalent.

      7.15.2 <u>Election by Company.</u> If the Company has made an election under Section 7.12, 7.13 or 7.14, but the Company and/or the Insolvent Members, the Deceased Members or the Terminated Members, as the case may be, are unable to obtain the consent of any lender to the acquisition of such Membership Interest under any loan document entered into by the Company, or a Member related to any loan to the Company, then the Company shall make cash distributions to the other Members to enable the other Members, pro rata in accordance with their Membership Interests, to purchase the Membership Interest of the Insolvent Member, the Deceased Member or the Terminated Member, as the case may be. Upon such election by the Company and the receipt of the cash distributions from the Company, it shall be mandatory upon each of the other Members to complete such purchase of the Membership Interest. In the event the Company is prohibited by any lender from making cash distributions for purposes of this Section 7.15.2, the election of the Company shall be void and each of the Members shall have the time period prescribed in the relevant Section to make an election to acquire the Membership Interest. The Governing Members shall provide written notice of such prohibition to each Member in accordance with Section 11.13 within three (3) business days of the Company's receipt of the lender's decision, and the Company shall have no distribution obligation under this Section 7.15.2.

      7.15.3 <u>Closing of Purchase.</u> The closing for the purchase of the Membership Interests shall take place at the principal place of business of the Company within thirty (30) days after the determination of the purchase price under Section 7.15.1 above. At the closing, the buyer(s) shall deliver to the seller(s) cash or a cashier's check in an amount equal to the purchase price established in accordance with Section 7.15.1 above and the seller(s) shall deliver to the buyer(s) an assignment of his, her or its Membership Interest free and clear of all liens, security interests and competing claims against such Membership Interest and shall deliver to the buyer(s) such instruments of transfer and such evidence of due authorization, execution

31

LOSA2\261481.14
362049-20

and delivery, and of the absence of any such liens, security interests or competing claims, as the buyer(s) shall reasonably request.

### 7.16 Buy/Sell.

(a) From and after five years from the date of this Agreement, each Governing Member shall be entitled to give a notice (a "Buy/Sell Notice") to the other Governing Members that it desires to exercise its rights under this Section 7.16 to sell its Interest to, or purchase the Membership Interest of, the other Governing Members; provided, however, that in the event the Company or Governing Member has received a purchase offer from a bona fide independent third party for the Company or Membership Interest, a Governing Member may not exercise its rights under this Section more than thirty (30) days after receiving notice of such offer.

(b) In the event a Buy/Sell Notice is delivered, the following terms shall have the following meanings with respect thereto for purposes of this Section 7.16:

(i) The term "Noticing Member" shall mean whichever Governing Member shall give the Buy/Sell Notice;

(ii) The term "Electing Member" shall mean the Governing Members other than the Noticing Member;

(iii) The term "Noticing Member's Interest" shall mean the Noticing Member's entire Membership Interest;

(iv) The term "Electing Members' Interest" shall mean the Electing Members' entire Membership Interest;

(v) The term "Buyer" shall mean the Member or Governing Members required pursuant to the applicable Option to buy the Membership Interest of the other Member or Governing Members under this Section;

(vi) The term "Seller" shall mean the Member or Governing Members required pursuant to the applicable Option to sell their Membership Interest to the other Member or Governing Members under this Section.

(c) The Buy/Sell Notice shall specify the price for all the Company's property as a going concern (the "Offer Price"), and the terms of the sale and payment, and shall contain an offer by the Noticing Member both (i) to buy the Electing Governing Members' combined Interests ("Option A"), and (ii) to sell to the Electing Governing Members the Noticing Member's Interest ("Option B"), in either case for an amount (the "Payment Amount") equal to the full amount which the Seller would receive (without consideration of any minority interest discount) if all the Company's property were sold to a third party for the Offer Price and the proceeds of sale distributed to the Members in accordance with Section 9 of the Operating Agreement.

32

LOSA2\261481.14
362049-20

(d)     The Electing Governing Members shall have a period of six (6) months after the giving of the Buy/Sell Notice in which to exercise Option A or Option B. If any Electing Member elects Option B, then any election of Option A by any other Electing Member shall be void; provided that such other Electing Member shall have 30 days to determine if it desires to also elect Option B. If there is more than one Electing Member which determines to exercise Option B, such Electing Governing Members shall agree upon the manner in which they will share in the purchase of the Noticing Governing Members' Interest or, if they cannot agree, shall share in the same percentages as their current sharing percentages for Net Income and Net Losses, adjusted pro rata to reflect the nonparticipation of any Member. If the Electing Governing Members shall fail to exercise either Option within said six (6) month period, the Electing Governing Members shall thereupon be deemed to have exercised Option A. If either Option A or Option B is properly exercised or deemed exercised as above provided, then the Noticing Member shall buy or sell, as the case may be, the Interest or interests in question, the closing to be held on a business day selected by the Buyer, which day shall be at least thirty (30) days and not more than six (6) months after the applicable Option is properly exercised or deemed exercised, at the principal office of the Membership. The terms of the purchase and sale shall be unconditional, except that the Seller shall be deemed to represent and warrant to the Buyer that its entire interest in the Membership is subject to no legal or equitable claims and upon demand shall deliver an instrument confirming such representation and warranty at the closing.

(e)     A purchase and sale hereunder shall be closed by the concurrent delivery by the Buyer to the Seller of the Payment Amount, in cash or other form of payment acceptable to the Seller in its sole and absolute discretion, and by the Seller to the Buyer of a simple assignment (without warranty, except as expressly provided above) to the Buyer of the purchased Interest; provided, however, that upon tender by the Buyer of the Payment Amount to the Seller, such assignment shall be made hereby, notwithstanding the Seller's failure to execute and deliver such a separate assignment and, if the Seller refuses such tender (which the Buyer may condition on delivery of such separate assignment), the Buyer may nonetheless close such purchase and sale by delivering the Payment Amount into escrow with irrevocable written instructions to the escrow holder to disburse such funds to the Seller upon the Seller's deposit into escrow, for delivery to the Buyer, of such separate assignment.

(f)     In the event that the Seller fails to deliver such assignment and/or such written instructions to the Buyer, upon tender of the Payment Amount by the Buyer, the Buyer shall also have the right to seek and obtain mandatory relief, as well as any damages to the Buyer from such default on the part of the Seller.

(g)     Notwithstanding any other provision of this Agreement, if the Buyer wrongfully fails to close such purchase and sale, the Seller shall have the right, by written notice to the Buyer, given within sixty (60) days after the last date for such closing, to treat the Buyer's failure as an election by the Buyer, as the Electing Member, of Option A, made as of the date of the Seller's notice; and the Seller shall then have all of the rights of the Buyer hereunder.

33

(h)     Upon close of a purchase and sale hereunder, the Buyer shall hereby assume (and indemnify the Seller from any further obligation or liability with respect to) all of the obligations and liabilities of the Company with respect to the Company except to the extent that such obligation or liability is the result of any wrongful act of the Seller.

(i)     Each Class B Member shall have the rights set forth in Section 7.11.3 to be included in any sale by a Governing Member of its interest and shall, if it has elected to sell, receive such amount as it would receive for a sale of all the Company's property (without consideration or deduction , for any minority interest or non-voting discount). Such election by a Class B Member shall be made within the time period specified in subpart (d) above by written notice to all Governing Members. The Noticing Member shall also have the right to include the interests of the Class B Members in the Buy/Sell Notice; provided, however, the Class B Members shall not have any right to buy the Noticing Member's Interest.

## ARTICLE 8

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1     Books and Records.  The Company shall keep, at the principal place of business of the Company full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities, and the internal affairs of the Company for at least the current and past four fiscal years.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes.  The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.  The Company shall maintain at its principal office in California all of the following:

(a)     a current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account, Number of Units and Percentage Interest of each Member and Economic Interest Owner;

(b)     a current list of the full name and business or residence address of the Members;

(c)     a copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

(d)     copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(e)     a copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

34

LOSA2\261481.14
362049-20

(f)    copies of the financial statements, operating statements and general ledgers of the Company, if any, for the six most recent Fiscal Years; and

(g)    the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

8.2    Delivery to Members and Inspection.

8.2.1    Upon the written request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Governing Members shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by clauses (a), (b) and (d) of Section 8.1, and a copy of this Agreement.

8.2.2    Each Member and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Governing Members or Economic Interest Owner, to:

(a)    inspect and copy during normal business hours any of the Company records described in (a) through (g) of Section 8.1; and

(b)    obtain from the Governing Members, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

8.2.3    Any request, inspection or copying by a Member or Economic Interest Owner under this Section 8.2 may be made by that Person or that Person's agent or attorney.

8.2.4    The Governing Members shall promptly furnish to a Member a copy of any amendment to the Certificate or this Agreement executed by the Governing Members pursuant to a power of attorney from the Member.

8.3    Financial Statements and Information.

8.3.1    The Governing Members shall cause the Company to cause financial statements prepared in accordance with generally accepted accounting principles to be sent to each of the Members not later than ninety (90) days (or such other period as the Governing Members shall select) after the close of the Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year. Such financial statements shall be accompanied by the report thereon, of the independent accountants engaged by the Company.

8.3.2    The Governing Members shall cause the Company to cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Governing Members shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days (or such other period as the Governing Members shall select) after the end of

35

LOSA2\261481.14
362049-20

each taxable year such information as is necessary to complete federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for that year. On or before November 15 of each year, the Governing Members shall provide each Member with the following: (i) a statement showing each Member's Capital Account as of the immediately preceding October 31; (ii) an estimate of each Member's taxable income for the current Fiscal Year; and (iii) each Member's share of allocated non-recourse debt.

8.3.3   Members (personally or through an appointed representative) may, for purposes reasonably related to their Membership Interests, examine and copy (at their own cost and expense) the books and records of the Company at all reasonable business hours.

8.4   Filings. The Company, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Governing Members, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Governing Members required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, the other Members may prepare, execute and file that document.

8.5   Bank Accounts. The Company shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company.

8.6   Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Governing Members. The Governing Members may rely upon the advice of his accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

8.7   Tax Matters for the Company Handled by Governing Members and Tax Matters Partner. The Governing Members shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. WW shall be the initial Tax Matters Partner. If for any reason the Tax Matters Partner can no longer serve in that capacity, of if the Governing Members otherwise deem appropriate, the Governing Members may designate a substitute Tax Matters Partner.

36

LOSA2\261481.14
362049-20

## ARTICLE 9

### DISSOLUTION AND WINDING UP

9.1    <u>Dissolution</u>. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)    upon the happening of any event of dissolution specified in this Agreement;

(b)    upon the entry of a decree of judicial dissolution;

(c)    upon the vote of all Members;

(d)    a Terminating Capital Transaction; or

(e)    May 30, 2056, unless extended by the Governing Members.

9.2    <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of any of the events specified in Section 9.1, the Governing Members, excluding any Governing Members that have wrongfully dissolved the Company or, if there are no Governing Members, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act.

9.3    <u>Winding Up</u>. Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Governing Members who have not suffered a Dissolution Event or Disability or wrongfully dissolved the Company or, if there is no such Governing Member, the Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.

9.4    <u>Distributions in Kind</u>. Unless otherwise agreed by all of the Members, all of the assets of the Company shall be sold and the proceeds thereof distributed pursuant to this Article 9. Any distribution of assets shall be distributed to all of the Members and Economic Interest Owners, pro rata according to their Percentage Interests. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article 6, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market

37

value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Members overseeing the liquidation provided that, if any Member objects, such value shall be determined by a Qualified Appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Members overseeing the liquidation and the objecting Member. If agreement as to selection of the Qualified Appraiser is not reached, then an appraisal shall be made pursuant to the process described in Section 7.15 hereof.

     9.5    Order of Payment of Liabilities Upon Dissolution.

        9.5.1   Priority of Payment. The assets of the Company will be distributed in liquidation in the following order:

        (a)    to creditors by the payment or provision for payment of the debts and liabilities of the Company (including any loans that may have been made by any Member or Affiliate) and the expenses of liquidation;

        (b)    to the setting up of any reserves that are reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

        (c)    to Members and Economic Interest Owners in proportion to the Percentage Interest of each Member.

        9.5.2   Adequate Provision for Debts. The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

        (a)    payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Governing Members to be adequate at the time of any distribution of the assets pursuant to this Section; and

        (b)    the amount of the debt or liability has been deposited as provided by law.

     This Section 9.5.2 shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

     9.6    Deficit Restoration Requirement. No Member shall have any obligation to contribute amounts to the Company in respect of any deficit balance in their respective Capital Account.

     9.7    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member and Economic Interest Owner shall only be entitled to look solely at the assets of Company for the return of his, her or its positive Capital Account balance and, except as provided in Article 10, shall have no recourse to any Member or

LOSA2\261481.14
362049-20

Economic Interest Owner for his, her or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise).

    <u>9.8</u>   <u>Certificate of Cancellation</u>. The Governing Members or other Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

    <u>9.9</u>   <u>No Action for Dissolution</u>. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment upon liquidation of the Economic Interests. Accordingly, except where the Governing Members have failed to liquidate the Company as required by this Article 9, each Member hereby waives and renounces his, her or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member.

**ARTICLE 10**

**INDEMNIFICATION AND INSURANCE**

    <u>10.1</u>   <u>Indemnification and Liability</u>.

    10.1.1 The Company shall indemnify and hold harmless the Governing Members, the other Members, the permitted (i.e., parties who acquired their Economic Interests in compliance with the provisions of this Agreement) Economic Interest Owners, the respective Affiliates and Operating LLC's of any of the foregoing (when acting on behalf of the Company), and all members, partners, shareholders, officers and directors of any of the foregoing, in each case, acting in such capacity (individually, an "Indemnitee") to the full extent permitted by law from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts (collectively "Losses") arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative (collectively "Proceedings"), in which the Indemnitee may be involved, or threatened to be involved as a party or otherwise, relating to the performance or nonperformance of any act concerning the activities of the Company, to the extent the Indemnitee's conduct did not constitute (a) gross negligence or willful misconduct or (b) a knowing violation of the criminal law or (c) a willful breach of this Agreement. The termination of an action, suit or proceeding by judgment, order, settlement, or upon a plea of nolo contendere or its equivalent shall not, in and of itself, create a presumption or otherwise constitute evidence that the Indemnitee acted in a manner contrary to that specified in clauses (a), (b) or (c) above.

39

LOSA2\261481.14
362049-20

10.1.2  Each officer of the Company acting in such capacity shall be considered an Indemnitee hereunder and shall be indemnified to the extent permitted by law from and against any and all Losses arising from any Proceedings in which any such officer, acting in such capacity, may be involved, or threatened to be involved as a party or otherwise, relating to the performance or nonperformance of any act concerning the activities of the Company if (a) such officer acted in good faith and in a manner it believed to be in, or not contrary to, the best interests of the Company, but only to the extent (b) such officer's conduct did not constitute gross negligence or willful misconduct or a knowing violation of the criminal law or a willful breach of this Agreement.  The termination of an action, suit, or proceeding by judgment, order, settlement, or upon a plea of nolo contendere or its equivalent shall not, in and of itself, create a presumption or otherwise constitute evidence that such officer acted in a manner contrary to that specified in clauses (a) and (b) above.

10.1.3  Expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to this Section 10.1 shall be advanced by the Company (including the advance of legal fees as incurred) prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of a written commitment by or on behalf of the Indemnitee to repay such amount if it shall be determined that such Indemnitee is not entitled to be indemnified as authorized in this Section 10.1.

10.1.4  Any indemnification provided hereunder shall be satisfied solely out of the assets of the Company, as an expense of the Company.  No Member or Economic Interest Owner shall be subject to personal liability by reason of these indemnification provisions other than any repayment obligation of such party pursuant to Section 10.1 hereof.

10.1.5  The provisions of this Section 10.1 are for the benefit of the Indemnitees only and shall not be deemed to create any rights for the benefit of any other Person.

10.1.6  Neither the Governing Members, nor their Affiliates nor the members, partners, shareholders, officers, directors, employees or agents of any of the foregoing, in each case, acting in such capacity shall be liable to the Company or to a Member or Economic Interest Owner for any losses sustained or liabilities incurred as a result of any act or omission of the Governing Members or any such other Person to the extent the conduct of the Governing Members or such other Person did not constitute (a)  willful misconduct or (b) a knowing violation of the criminal law or (c) a willful breach of this Agreement.

10.1.7  No officer of the Company acting in such capacity shall be liable to the Company or to a Member or Economic Interest Owner for any losses sustained or liabilities incurred as a result of any act or omission of such officer if (a) the act or failure to act of such officer was in good faith and in a manner such officer believed to be in, or not contrary to, the best interests of the Company, but only to the extent (b) such officer's conduct did not constitute willful misconduct or a knowing violation of the criminal law.

10.1.8  To the extent that any officer of the Company, Governing Members, Member, Economic Interest Owner, any of the respective Affiliates or Subsidiaries of any of the foregoing, or any member, partner, officer or director of any of the foregoing (each, a

40

LOSA2\261481.14
362049-20

"Responsible Party") has, at law or in equity, duties (including, without limitation, fiduciary duties) to the Company, any Member or other Person bound by the terms of this Agreement, such Responsible Parties acting in accordance with this Agreement shall not be liable to the Company, any Member, any Economic Interest Owner or any such other Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties (other than fiduciary duties) of a Responsible Party otherwise existing at law or in equity, are agreed by all parties hereto to replace such other duties (other than fiduciary duties) to the greatest extent permitted under applicable law.

        10.1.9  Whenever a Responsible Party is required or permitted to make a decision, take or approve an action, or omit to do any of the foregoing: (a) in its discretion under a similar grant of authority or latitude, or without an express standard of behavior including, without limitation, standards such as "reasonable" or "good faith"), then such Responsible Party shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to consider any other interests or factors whatsoever, or (b) with an express standard of behavior (including, without limitation, standards such as "reasonable" or "good faith"), then such Responsible Party shall comply with such express standard but shall not be subject to any other, different or additional standard imposed by this Agreement or otherwise applicable law.

    10.2   Insurance. The Company shall have the power, but not the obligation, to purchase and maintain insurance on behalf of any Person who is or was a Governing Member or an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law. The Company shall maintain general liability insurance, property insurance, and such other insurance, in such forms and amounts, as the Governing Members deem appropriate.

## ARTICLE 11

## MISCELLANEOUS

    11.1   Investment Representations. The Members and Economic Interest Owners, if any, understand (a) that the Membership Interests and Economic Interests evidenced by this Agreement have not been registered under any Federal or State securities laws (the "Securities Acts") because the Company has and is issuing and intends to issue, all Membership Interests and Economic Interests in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering, (b) that the Company has relied upon the fact that the Membership Interests and Economic Interests are to be held by each Member or Economic Interest for investment, and (c) that exemption from registrations under the Securities Acts may not be available if the Membership Interests and Economic Interests were acquired by a Member or an Economic Interest Owner with a view to distribution.

41

LOSA2\261481.14
362049-20

Accordingly, each Member and Economic Interest Owner hereby confirms to the Company that such Member and Economic Interest Owner is acquiring the Membership Interests and Economic Interests for such own Member's and Economic Interest Owner's account, for investment and not with a view to the resale or distribution thereof. Each Member and Economic Interest Owner agrees not to transfer, sell or offer for sale all or any portion of the Membership Interests or Economic Interests unless there is an effective registration or other qualification relating thereto under any applicable Securities Acts or unless the holder of Membership Interests or Economic Interests delivers to the Governing Members an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such Transfer, offer or sale. Each Member and Economic Interest Owner understands that the Company is under no obligation to register the Membership Interests or Economic Interests or to assist such Member or Economic Interest Owner in complying with any exemption from registration under the Securities Acts if such Member or Economic Interest Owner should at a later date, wish to dispose of the Membership Interest or Economic Interest. Furthermore, each Member realizes that the Membership Interests and Economic Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member or Economic Interest Owner is not an "affiliate" of the Company and the Membership Interest or Economic Interest has been beneficially owned and fully paid for by such Member or Economic Interest Owner for at least three years.

11.2    **Complete Agreement.** This Agreement and the other agreements entered into concurrently herewith constitute the complete and exclusive statement of agreement among the Members and Governing Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Governing Members or any of them.

11.3    **Binding Effect.** Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

11.4    **Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any other third person any right of subrogation or action over or against any party to this Agreement.

11.5    **Pronouns; Statutory References.** All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

42

LOSA2\261481.14
362049-20

11.6    Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

11.7    Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, her or its counsel.

11.8    References to this Agreement. Numbered or lettered articles, sections, subsections and paragraphs herein contained refer to articles, sections, subsections and paragraphs of this Agreement unless otherwise expressly stated.

11.9    Including. The word "including" shall be deemed followed by the words "without limitation" unless already followed by words of similar effect.

11.10    Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

11.11    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, such provisions shall be deemed deleted to the extent of its invalidity but the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

11.12    Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

11.13    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address set forth in Exhibit C. Notices shall be hand delivered or delivered by nationally recognized overnight courier or by United States mail, certified or registered, return receipt requested. Any party may, at any time by giving fifteen (15) days' prior written notice to the other parties, designate any other address in the continental United States in substitution of the foregoing address to which such notice will be given. The addresses of the parties are set forth on Exhibit C.

A notice that is intended to initiate a response period shall be effective to do so only if it specifies such response period and the section of this Agreement containing such response period.

11.14    Amendments. Any amendments to this Agreement shall not be effective unless in writing and signed by the Governing Members and all other Members affected by such amendment.

43

LOSA2\261481.14
362049-20

11.15  Reliance on Authority of Person Signing Agreement.  If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

11.16  No Interest in Company Property; Waiver of Action for Partition.  No Member or Economic Interest Owner has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

11.17  Multiple Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  A faxed signature or electronic signature shall be binding as if an original.

11.18  Attorney Fees.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable actual fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable actual attorneys' fees and expenses.

11.19  Time is of the Essence.  All dates and times in this Agreement are of the essence.

11.20  Remedies Cumulative.  Subject to any limitations set forth in this Agreement, the remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

11.21  Including.  Wherever in this Agreement the word "including" appears, it shall be deemed followed by the words "without limitation" unless already followed by words of similar meaning.

11.22  Governing Law.  This Agreement shall be governed by the laws of the State of Delaware (other than with respect to choice of law).

44

LOSA2\261481.14
362049-20

IN WITNESS WHEREOF, all of the Members of Regenesis Power LLC, a Delaware limited liability company, have executed this Agreement, effective as of the date written above.

**CLASS A**

**MEMBER**:   Aloha Power Company, LLC,
               a Delaware limited liability company

By: _____
Name: Dennis Marini
Title: Managing Member

**MEMBER**:   Harvest, LLC
               a Delaware limited liability company

By: _____
Name: William R. Hearst II
Its:   Managing Member

**MEMBER**:   Wallace Williams LLC
               a limited liability company

By: _____
Name: William Foster
Its:   Manager

**CLASS B**

**MEMBER**:   Michael Doman

_____
Name: Michael Doman

**MEMBER**:   Gerald Greenberg

_____
Name: Gerald Greenberg

45

**MEMBER**:    Marshall M. Taylor
individually and as a Trustee

_____

Name: Marshall M. Taylor


**MEMBER**:    Investor


_____

Name:

LOSA2\261481.14
362049-20

## EXHIBIT "A"

### CAPITAL AND NUMBER OF UNITS HELD BY EACH MEMBER

| NAME | % | UNITS HELD | CAPITAL | MEMBER CLASS |
|---|---|---|---|---|
| Aloha LLC[1] | 29.333 | 2,933,333 | | A |
| Harvest LLC[1] | 29.333 | 2,933,333 | $200,000 | A |
| Wallace Williams LLC[1] | 29.333 | 2,933,333 | | A |
| Michael Doman | 5.0** | 500,000 | | B |
| Marshall M. Taylor, Individually and as a Trustee | 1.5 | 150,001 | $100,000 | B |
| Investor Entity | 4.5 | 450,000 | | |
| Gerald Greenberg | 1.0 | 100,000 | | B |

A.    <u>Dilution Provisions.</u>

1.    Pursuant to Section 4.9, all Members are subject to dilution upon investment by a financial member/investor, as hereinafter set forth.

2.    All Members will be diluted proportionately with respect to a financial investor unless the Governing Members elect to allocate the dilution among Members in another agreed-upon ratio.

3.    The Governing Members expect to hire additional key executives, including a President, Chief Operating Officer and Chief Financial Officer.  It is anticipated that

---

[1]  Subject to dilution pursuant to Section 4.9
**  Subject to vesting restriction

Exhibit A-1

such executives shall become Class A Members with an interest of up to 15%. Such dilution shall be allocated between all Class A Members.

      B.    <u>Vesting Restrictions</u>. The Units held by Michael Doman are subject to certain restrictions, as hereinafter set forth in below, which are dependent upon, in part, the continued employment by the Company of Michael Doman.

      1.    All of the Units held by Michael Doman will be subject to the restrictions as hereinafter described. For each year of continued employment, on each anniversary of the date of this Agreement, 125,000 Units will no longer be subject to any restriction except as provided in the Operating Agreement.

      2.    The restrictions applicable to the Units shall be that, under Section 7.14 of the Operating Agreement, in lieu of the Valuation determined under Section 7.15 of the Operating Agreement, the valuation of the Units subject to the restrictions shall be solely and exclusively limited to the Capital Account of the Member applicable to such Units. The Members acknowledge, agree and accept that such limitation in value and payment to the amount of the Capital Account may be more or less than the value determined under Section 7.15 and the Members agree to such risk and limitation. Notwithstanding the above, this limitation shall not be applicable in the event of a sale of the Company.

      C.    <u>Consulting Agreement/Commission</u>. Within thirty (30) days after the admission of a financial investor in the Company, the Company shall enter into a three-year consulting agreement with Aloha for Aloha to provide the services of Dennis Marini to the Company with compensation of $4,000 per month plus health insurance coverage from the date of execution of the Consulting Agreement. In the event that a financial investor contributes more than $2,500,000 to the Company, the consulting fee shall be increased to $120,000 per year, payable at the rate of $10,000 per month. Upon the admission of a financial investor in the Company, which invests in excess of $1,000,000, Aloha shall be paid a commission of 1½% of the amount of the investment, provided that for aggregate investment in the Company over $200,000,000, the commission shall be reduced to 1%.

Exhibit A-2

LOSA2\261481.14
362049-20

**EXHIBIT "B"**

**CAPITAL ACCOUNTS (§3.4)**

Exhibit B-1

LOSA2\261481.14
362049-20

# EXHIBIT "C"

## NOTICE ADDRESS

<u>CLASS A</u>:

| | |
|---|---|
| Aloha Power: | Dennis Marini<br>P.O. Box 1150<br>Kula<br>Maui, Hawaii  96790 |
| With copy to: | Gary Jones<br>475 Southwestridge Circle<br>Anaheim Hills, California  92807 |
| Harvest, LLC: | William R. Hearst II<br>1135 Makawao Avenue<br>P.M.B. #333<br>Makawao, Hawaii  96768 |
| With Copy to: | Edward E. Sawyer, Esq.<br>White & Case LLP<br>200 South Biscayne Blvd.<br>Suite 4900<br>Miami, Florida 33131 |
| Wallace Williams LLC: | Wallace Williams<br>c/o William Foster<br>228 Hamilton Ave., 3rd Floor<br>Palo Alto, California 94301 |
| With Copy to: | James Foster<br>813 Pheasant Run Court North<br>Brentwood, Tennessee  37027 |

<u>CLASS B</u>:

Michael Doman:        _____
                      _____
                      _____
                      _____

Exhibit C-1

LOSA2\261481.14
362049-20

Marshall M. Taylor:     Marshall M. Taylor
                    285 Bellefontaine St.
                    Pasadena, California  91105

With Copy to:      William H. Taylor III
                    802 Pinesap
                    Houston, Texas  77079-4519

Gerald Greenberg:     Gerald Greenberg
                    P.O. Box 4034
                    Malibu, California 90264

Investor              _____
                    _____
                    _____
                    _____

With a Copy to:     _____
                    _____
                    _____
                    _____

Exhibit C-2

LOSA2\261481.14
362049-20

**OPERATING AGREEMENT**

**FOR**

**REGENESIS POWER LLC,**

**A DELAWARE LIMITED LIABILITY COMPANY**

LOSA20261481.14
362049-20

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| 1.1 | "Act" | 1 |
| 1.2 | "Additional Capital Contribution" | 1 |
| 1.3 | "Adjusted Balance" | 2 |
| 1.4 | "Affiliate" | 2 |
| 1.5 | "Agreement" | 2 |
| 1.6 | "Aloha" | 2 |
| 1.7 | "Annual Capital Budget" | 2 |
| 1.8 | "Annual Operating Budget" | 2 |
| 1.9 | "Annual Plan" | 2 |
| 1.10 | "Assignee" | 2 |
| 1.11 | "Bankruptcy" | 2 |
| 1.12 | "Book Gain" | 3 |
| 1.13 | "Book Value" | 3 |
| 1.14 | "Capital Account" | 3 |
| 1.15 | "Capital Contribution" | 3 |
| 1.16 | "Class A Member" | 3 |
| 1.17 | "Class B Member" | 3 |
| 1.18 | "Certificate" | 3 |
| 1.19 | "Code" | 3 |
| 1.20 | "Company" | 4 |
| 1.21 | "Company Minimum Gain" | 4 |
| 1.22 | "Deceased Member" | 4 |
| 1.23 | "Depreciation" | 4 |
| 1.24 | "Disability" | 4 |
| 1.25 | "Distributable Cash" | 4 |
| 1.26 | "Economic Interest" | 4 |
| 1.27 | "Economic Interest Owner" | 4 |
| 1.28 | "Employment Agreement" | 4 |
| 1.29 | "Entity" | 4 |
| 1.30 | "Fiscal Year" | 5 |
| 1.31 | "Foster" | 5 |

**TABLE OF CONTENTS**
(continued)

Page

1.32   "Governing Members" .................................................................................... 5

1.33   "Harvest" ......................................................................................................... 5

1.34   "Hearst" ........................................................................................................... 5

1.35   "Immediate Family" ......................................................................................... 5

1.36   "Insolvent Member" ......................................................................................... 5

1.37   "Lender Approval" ............................................................................................ 5

1.38   "Major Decisions" ........................................................................................... 5

1.39   "Majority in Interest" ....................................................................................... 5

1.40   "Marini" ........................................................................................................... 5

1.41   "Member" ......................................................................................................... 5

1.42   "Member Nonrecourse Debt" ........................................................................... 5

1.43   "Member Nonrecourse Deductions" ................................................................ 5

1.44   "Membership Interest" ..................................................................................... 6

1.45   "Net Capital Contribution" .............................................................................. 6

1.46   "Net Profits" ..................................................................................................... 6

1.47   "Non-Governing Members" .............................................................................. 6

1.48   "Nonrecourse Liability" ................................................................................... 7

1.49   "Operating LLC's" ........................................................................................... 7

1.50   "Percentage Interest" ....................................................................................... 7

1.51   "Person" ........................................................................................................... 7

1.52   "Pledges" .......................................................................................................... 7

1.53   "Qualified Appraiser" ...................................................................................... 7

1.54   "Real Property" ................................................................................................ 7

1.55   "Regenesis CIS Development" ......................................................................... 7

1.56   "Regenesis Development Agreement" .............................................................. 7

1.57   "Regenesis Development Membership Interest" .............................................. 7

1.58   "Regenesis CS Projects" .................................................................................. 7

1.59   "Regenesis Project Agreement" ....................................................................... 7

1.60   "Regulations" ................................................................................................... 7

1.61   "Required Distribution" ................................................................................... 8

1.62   "Responsible Party" ......................................................................................... 8

1.63   "Significant Employee" .................................................................................... 8

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| 1.64 | "Subsidiary" | 8 |
| 1.65 | "Substitute Member" | 8 |
| 1.66 | "Tax Matters Partner" | 8 |
| 1.67 | "Terminated Member" | 8 |
| 1.68 | "Terminating Capital Transaction" | 8 |
| 1.69 | "Transfer" | 8 |
| 1.70 | "Unit" | 8 |
| 1.71 | "WW" | 8 |
| ARTICLE 2 | ORGANIZATIONAL MATTERS | 9 |
| 2.1 | Formation | 9 |
| 2.2 | Name | 9 |
| 2.3 | Term | 9 |
| 2.4 | Office and Agent | 9 |
| 2.5 | Addresses of the Members and the Governing Members | 9 |
| 2.6 | Purpose of Company | 9 |
| ARTICLE 3 | CAPITAL CONTRIBUTIONS | 10 |
| 3.1 | Initial Capital Contributions and Units | 10 |
| 3.2 | Additional Capital Contributions | 10 |
| 3.3 | No Withdrawal of Capital | 10 |
| 3.4 | Capital Accounts | 10 |
| 3.5 | No Interest | 11 |
| 3.6 | Project Contribution | 11 |
| ARTICLE 4 | MEMBERS | 12 |
| 4.1 | Limited Liability | 12 |
| 4.2 | Admission of Additional Members | 12 |
| 4.3 | Transactions With The Company | 12 |
| 4.4 | Remuneration To Members | 12 |
| 4.5 | Members Are Not Agents | 12 |
| 4.6 | Voting Rights | 13 |
| 4.7 | Withdrawal of Members | 13 |
| 4.8 | New Classes of Members | 13 |
| 4.9 | Dilution | 13 |

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE 5    MANAGEMENT AND OPERATION OF BUSINESS ............................... 13

5.1    Powers of the Governing Members ..................................................... 13

5.2    Right to Rely on Governing Members.................................................. 13

5.3    Meetings.............................................................................................. 14

5.4    Day-to-Day Operations and Actions Requiring Consent of the Governing
Members ............................................................................................. 14

5.5    Consent Rights of Members................................................................. 15

5.6    Compensation of Governing Members................................................ 16

5.7    Removal, Resignation and Replacement of Governing Members....... 16

5.8    Officers of the Company..................................................................... 17

5.9    Estimation of Units ............................................................................. 19

ARTICLE 6    ALLOCATIONS OF NET PROFITS AND NET LOSSES AND
DISTRIBUTIONS .......................................................................... 19

6.1    Allocations of Net Profits and Net Losses .......................................... 19

6.2    Special Allocations ............................................................................. 20

6.3    Code Section 704(c) Allocations ........................................................ 21

6.4    Allocation of Net Profits and Losses and Distributions in Respect of a
Transferred Interest............................................................................ 22

6.5    Distribution of Cash Flow and Assets ................................................ 22

6.6    Form of Distribution ........................................................................... 22

6.7    Restriction on Distributions ................................................................ 22

6.8    Return of Distributions ....................................................................... 23

6.9    Obligations of Members to Report Allocations .................................. 23

ARTICLE 7    TRANSFER AND ASSIGNMENT OF INTERESTS ........................ 23

7.1    Transfer and Assignment of Interests ................................................. 23

7.2    Further Restrictions on Transfer of Interests ..................................... 23

7.3    Rights of Assignees............................................................................. 24

7.4    Substitution of a Member.................................................................... 24

7.5    Effective Date of Permitted Transfers ................................................ 25

7.6    No Effect to Transfers in Violation of Agreement; Economic Interest
Owner's Limited Rights...................................................................... 25

7.7    Admissions, Withdrawals and Removals ............................................ 25

7.8    Permitted Transfers............................................................................. 25

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| 7.9 | Withdrawal of Members | 26 |
| 7.10 | Pledge to Lender | 26 |
| 7.11 | Transfer Rights | 26 |
| 7.12 | Bankruptcy or Insolvency of a Member | 29 |
| 7.13 | Death of an Individual Member | 29 |
| 7.14 | Dissolution or Termination of Member. | 29 |
| 7.15 | Purchase of Membership Interests | 30 |
| 7.16 | Buy/Sell | 32 |
| ARTICLE 8 | ACCOUNTING, RECORDS, REPORTING BY MEMBERS | 34 |
| 8.1 | Books and Records | 34 |
| 8.2 | Delivery to Members and Inspection | 35 |
| 8.3 | Financial Statements and Information | 35 |
| 8.4 | Filings | 36 |
| 8.5 | Bank Accounts | 36 |
| 8.6 | Accounting Decisions and Reliance on Others | 36 |
| 8.7 | Tax Matters for the Company Handled by Governing Members and Tax Matters Partner | 36 |
| ARTICLE 9 | DISSOLUTION AND WINDING UP | 37 |
| 9.1 | Dissolution | 37 |
| 9.2 | Certificate of Dissolution | 37 |
| 9.3 | Winding Up | 37 |
| 9.4 | Distributions in Kind | 37 |
| 9.5 | Order of Payment of Liabilities Upon Dissolution | 38 |
| 9.6 | Deficit Restoration Requirement | 38 |
| 9.7 | Limitations on Payments Made in Dissolution | 38 |
| 9.8 | Certificate of Cancellation | 39 |
| 9.9 | No Action for Dissolution | 39 |
| ARTICLE 10 | INDEMNIFICATION AND INSURANCE | 39 |
| 10.1 | Indemnification and Liability | 39 |
| 10.2 | Insurance | 41 |
| ARTICLE 11 | MISCELLANEOUS | 41 |
| 11.1 | Investment Representations | 41 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 11.2 | Complete Agreement | 42 |
| 11.3 | Binding Effect | 42 |
| 11.4 | Parties in Interest | 42 |
| 11.5 | Pronouns; Statutory References | 42 |
| 11.6 | Headings | 43 |
| 11.7 | Interpretation | 43 |
| 11.8 | References to this Agreement | 43 |
| 11.9 | Including | 43 |
| 11.10 | Exhibits | 43 |
| 11.11 | Severability | 43 |
| 11.12 | Additional Documents and Acts | 43 |
| 11.13 | Notices | 43 |
| 11.14 | Amendments | 43 |
| 11.15 | Reliance on Authority of Person Signing Agreement | 44 |
| 11.16 | No Interest in Company Property; Waiver of Action for Partition | 44 |
| 11.17 | Multiple Counterparts | 44 |
| 11.18 | Attorney Fees | 44 |
| 11.19 | Time is of the Essence | 44 |
| 11.20 | Remedies Cumulative | 44 |
| 11.21 | Including | 44 |
| 11.22 | Governing Law | 44 |

LOSA2\261481.14
362049- 20

vi

EFiled:  Oct 07 2016 05:19PM EDT
Transaction ID 59666826
Case No. 12697-VCMR

# EXHIBIT 5A

**ADMISSION OF MEMBERS AND**
**FIRST AMENDMENT TO**
**OPERATING AGREEMENT FOR**
**REGENESIS POWER LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

This Admission of Members and First Amendment to Operating Agreement (the "Agreement"), is made as of October ∠, 2006, by and among ALOHA POWER COMPANY, LLC, a Delaware limited liability company ("Aloha"), HARVEST, LLC, a Delaware limited liability company, ("Harvest"), WALLACE WILLIAMS LLC, a limited liability company, ("WW") and the other parties now or hereafter executing this Agreement, with reference to the following facts:

    A.    The Certificate of Formation for Regenesis Power LLC (the "Company"), a limited liability company under the laws of the State of Delaware, was filed with the Delaware Secretary of State on May 4, 2006;

    B.    The Operating Agreement (the "Operating Agreement") for the Company was executed as of June 1, 2006.

    C.    The Governing Members have decided to admit John Polumbo ("Polumbo") as a Governing Member and a Class A Member and PTT Associates, LLC, a California limited liability company ("PTT"), as a Class B Member of the Company.

    D.    The Operating Agreement provides for a reallocation of Units to new Members and for dilution of existing Members.

    E.    The parties hereto are all of the Members of the Company.

    F.    The parties desire to amend the Operating Agreement as hereinafter set forth effective as of the date first set forth above.

    G.    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

NOW, THEREFORE, the Members hereby admit the new Members and the parties execute this First Amendment to Operating Agreement for the Company as follows.

**ARTICLE 1**

**DEFINITIONS**

    1.    <u>Admission of Additional Members</u>.  Effective as of the date hereof, the existing Members hereby agree as follows:

        (a)    John Polumbo is hereby admitted as a Governing Member and a Class A Member.

1

LOSA2\301800.2 10/12/06
362049-20

Aloha Exhibit 5-A
Aloha Power Company, LLC
v
Regenesis Power, LLC et al

(b)    PTT Associates, LLC is hereby admitted as a Class B Member.

(c)    Each of the new Members shall have the transfer rights specified in the Operating Agreement and provided that PTT Associates shall have the right to transfer its interest to the members of PTT Associates, LLC.

2.    Assumption.  Each of Polumbo and PTT hereby assumes the rights and obligations as a Class A Member and Class B Member of the Company, respectively.

3.    Capital and Number of Units/Exhibit A.  Exhibit A is hereby deleted and the attached Amended and Restated Exhibit A is attached to and made a part of the Operating Agreement.

4.    Capital Accounts/Exhibit B.  Exhibit B is hereby deleted and the attached Amended and Restated Exhibit B is attached to and made a part of the Operating Agreement.

5.    Notices/Exhibit C.  Exhibit C is hereby deleted and the attached Amended and Restated Exhibit C is attached hereto and made a part of the Operating Agreement:

6.    Definitions.  Article 1, Definitions, of the Operating Agreement is amended as follows:

(a)    Section 1.16, Class A Member, is amended by adding the name, "John Polumbo".

(b)    Section 1.17, Class B Member, is amended by adding the name, "PTT Associates, LLC, a California limited liability company".

7.    Capital Contributions.  Section 3.6, Project Contribution, of the Operating Agreement is hereby amended by adding the words "in Hawaii" in the 3rd line thereof after the words "Cosco Stores".

8.    Management.  Article 5, Management and Operation of Business, of the Operating Agreement, is amended as follows:

(a)    Section 5.3, Meetings, is amended by adding the following sentence to the end thereof, "The Governing Members or their designee shall prepare and distribute to all Members minutes of all meetings."

(b)    Section 5.8.6, Signing Authority of Officers, is amended by adding the words "or with a duration of more than 1 year" in the second line thereof after the words "or more."

9.    Distributions.  Section 6.5.1, Cash Flow Distribution, is amended by deleting the first sentence thereof and adding, in lieu thereof, the following sentence, "Subject to applicable law, periodically the Governing Member shall distribute Distributable Cash first to the Members pro rata in the amount of their respective Capital Contributions set forth on Exhibit A and then

2

second to the Members and Economic Interest Owners in accordance with their Respective Percentage Interest.

10.   <u>Ratification</u>.  As amended hereby, the Operating Agreement remains in full force and effect and is hereby ratified and confirmed by the undersigned.

IN WITNESS WHEREOF, all of the Members of Regenesis Power LLC, a Delaware limited liability company, have executed this Agreement, effective as of the date written above.

CLASS A

**MEMBER**:   Aloha Power Company, LLC,
a Delaware limited liability company

By:
Name: Dennis Marini
Title: Managing Member

**MEMBER**:   Harvest, LLC
a Delaware limited liability company

By:
Name: William R. Hearst III
Its:   Managing Member

**MEMBER**:   Wallace Williams LLC
a limited liability company

By:
Name: William Foster
Its:   Manager

3

LOSA2\301800.2 10/12/06
362049-20

second to the Members and Economic Interest Owners in accordance with their Respective Percentage Interest.

10.    Ratification.  As amended hereby, the Operating Agreement remains in full force and effect and is hereby ratified and confirmed by the undersigned.

IN WITNESS WHEREOF, all of the Members of Regenesis Power LLC, a Delaware limited liability company, have executed this Agreement, effective as of the date written above.

CLASS A

MEMBER:    Aloha Power Company, LLC,
                a Delaware limited liability company

By:

Name:  Dennis Marini
Title:  Managing Member


MEMBER:    Harvest, LLC
                a Delaware limited liability company

By:

Name:  William R. Hearst II
Its:    Managing Member


MEMBER:    Wallace Williams LLC
                a limited liability company

By:

Name:  William Foster
Its:    Manager

LOSA2\301800.2 10/12/06
362049-20

second to the Members and Economic Interest Owners in accordance with their Respective Percentage Interest.

10.    Ratification.  As amended hereby, the Operating Agreement remains in full force and effect and is hereby ratified and confirmed by the undersigned.

IN WITNESS WHEREOF, all of the Members of Regenesis Power LLC, a Delaware limited liability company, have executed this Agreement, effective as of the date written above.

**CLASS A**

**MEMBER:**    Aloha Power Company, LLC,
                      a Delaware limited liability company

By:
Name:  Dennis Marini
Title:  Managing Member


**MEMBER:**    Harvest, LLC
                      a Delaware limited liability company

By:
Name:  William R. Hearst II
Its:    Managing Member


**MEMBER:**    Wallace Williams LLC
                      a limited liability company

By:
Name:  William Foster
Its:    Manager


3

LOSA2\301800.2 10/12/06
362049-20

**MEMBER**:   John Polumbo

Name: John Polumbo

**CLASS B**

**MEMBER**:   Michael Doman

_____

Name: Michael Doman

**MEMBER**:   Gerald Greenberg

_____

Name: Gerald Greenberg

**MEMBER**:   Marshall M. Taylor
individually and as a Trustee

_____
Name: Marshall M. Taylor

**MEMBER**:   PTT Associates, LLC,
a California limited liability
company

_____
Name:  Allen J. Potts
Its:   Manager

4

**AMENDED AND RESTATED**
**EXHIBIT "A"**

**CAPITAL AND NUMBER OF UNITS HELD BY EACH MEMBER**

| NAME | % | UNITS HELD | CAPITAL | MEMBER CLASS |
|---|---|---|---|---|
| Aloha LLC | 23.333 | 2,333,333 | | A |
| Harvest LLC | 23.333 | 2,333,333 | $200,000 | A |
| Wallace Williams LLC | 23.333 | 2,333,333 | | A |
| John Polumbo | 15.0 | 1,500,000 | | A |
| Michael Doman | 5.0** | 500,000 | | B |
| Marshall M. Taylor, Individually and as a Trustee | 1.501 | 150,001 | $100,000 | B |
| PTT Associates, LLC | 7.5 | 750,000 | $350,000 | B |
| Gerald Greenberg | 1.0 | 100,000 | | B |

A.     Dilution Provisions.

1.     Pursuant to Section 4.9, all Members are subject to dilution upon investment by a financial member/investor, as hereinafter set forth.

2.     All Members will be diluted proportionately with respect to a financial investor unless the Governing Members elect to allocate the dilution among Members in another ratio agreed upon by all Members.

B.     Vesting Restrictions.  The Units held by Michael Doman are subject to certain restrictions, as hereinafter set forth in below, which are dependent upon, in part, the continued employment by the Company of Michael Doman.

1.     All of the Units held by Michael Doman will be subject to the restrictions as hereinafter described.  For each year of continued employment, on each anniversary of the date of this Agreement, 125,000 Units will no longer be subject to any restriction except as provided in the Operating Agreement.

Exhibit A-1

2.      The restrictions applicable to the Units shall be that, under Section 7.14 of the Operating Agreement, in lieu of the Valuation determined under Section 7.15 of the Operating Agreement, the valuation of the Units subject to the restrictions shall be solely and exclusively limited to the Capital Account of the Member applicable to such Units. The Members acknowledge, agree and accept that such limitation in value and payment to the amount of the Capital Account may be more or less than the value determined under Section 7.15 and the Members agree to such risk and limitation. Notwithstanding the above, this limitation shall not be applicable in the event of a sale of the Company.

C.      Consulting Agreement/Commission. Within thirty (30) days after the admission of a financial investor in the Company, the Company shall enter into a three-year consulting agreement with Regenesis, Inc., a Nevada corporation, for it to provide the services of Dennis Marini to the Company with compensation of $10,000 per month plus health insurance coverage payable from the date of the investment. Upon the admission of a financial investor in the Company, introduced to the Company by WW or Aloha, which investor invests in excess of $1,000,000, after full disclosure to such investor, Aloha shall be paid a commission of 1½% of the amount of the investment, provided that for aggregate investment in the Company over $200,000,000, the commission shall be reduced to 1%.

Exhibit A-2

LOSA2\301800.2 10/12/06
362049-20

**AMENDED AND RESTATED
EXHIBIT "B"**

**CAPITAL ACCOUNTS (§3.4)**

| | |
|---|---|
| Harvest LLC | $200,000 |
| Taylor | $100,000 |
| PTT Associates | $350,000 |

Exhibit B-1

LOSA2\301800.2 10/12/06
362049-20

**AMENDED AND RESTATED
EXHIBIT "C"**

**NOTICE ADDRESS**

<u>CLASS A:</u>

Aloha Power:
Dennis Marini
P.O. Box 1150
Kula
Maui, Hawaii  96790

With Copy to:
Gary Jones
475 Southwestridge Circle
Anaheim Hills, California  92807

Harvest, LLC:
William R. Hearst II
1135 Makawao Avenue
P.M.B. #333
Makawao, Hawaii  96768

With Copy to:
Edward E. Sawyer, Esq.
White & Case LLP
200 South Biscayne Blvd.
Suite 4900
Miami, Florida 33131

Wallace Williams LLC:
Wallace Williams
c/o William Foster
228 Hamilton Ave., 3rd Floor
Palo Alto, California 94301

With Copy to:
James Foster
813 Pheasant Run Court North
Brentwood, Tennessee  37027

John Polumbo:
John Polumbo
c/o Irena Schwaderer
25 Greenwood Court
Orinda, CA  94563

With Copy to:
Robert Young, Esq.
Berding & Weil LLP
3240 Stone Valley Road West
Alamo, CA  94507

Exhibit C-1

LOSA2\301800.2 10/12/06
362049-20

**CLASS B:**

Michael Doman:

_____
_____
_____
_____

Marshall M. Taylor:          Marshall M. Taylor
                             285 Bellefontaine St.
                             Pasadena, California  91105

With Copy to:                William H. Taylor III
                             802 Pinesap
                             Houston, Texas  77079-4519

Gerald Greenberg:            Gerald Greenberg
                             P.O. Box 4034
                             Malibu, California 90264

PTT Associates, LLC          Allen J. Potts
                             800 Woodacres
                             Santa Monica, California  90402

With a Copy to:              Stanley Hausner
                             Stanley Hausner Accounting Corporation
                             1416 Sixth Street
                             Santa Monica, California  90402

Exhibit C-2

LOSA2\301800.2 10/12/06
362049-20

**ADMISSION OF MEMBERS AND
SECOND AMENDMENT TO
OPERATING AGREEMENT FOR
REGENESIS POWER LLC,
A DELAWARE LIMITED LIABILITY COMPANY**

This Admission of Members and Second Amendment to Operating Agreement (the "Agreement"), is made as of April 30, 2007, by and among ALOHA POWER COMPANY, LLC, a Delaware limited liability company ("Aloha"), HARVEST, LLC, a Delaware limited liability company, ("Harvest"), WALLACE WILLIAMS LLC, a limited liability company, ("WW") and the other parties now or hereafter executing this Agreement, with reference to the following facts:

      A.    The Certificate of Formation for Regenesis Power LLC (the "Company"), a limited liability company under the laws of the State of Delaware, was filed with the Delaware Secretary of State on May 4, 2006;

      B.    The Operating Agreement for the Company was executed as of June 1, 2006 and amended as of October 1, 2006 (as amended, the "Operating Agreement").

      C.    The Governing Members have decided to admit Steven Edwards ("Edwards") as a Governing Member and a Class A Member and Irena Schwaderer ("Schwaderer") as Trustee for a family trust, as a Class B Member of the Company.

      D.    The Operating Agreement provides for a reallocation of Units to new Members and for dilution of existing Members.

      E.    The parties hereto are all of the Members of the Company.

      F.    The Members wish to provide for loans to the Company.

      G.    The parties desire to amend the Operating Agreement as hereinafter set forth effective as of the date first set forth above.

      H.    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

NOW, THEREFORE, the Members hereby admit the new Members and the parties execute this Second Amendment to Operating Agreement for the Company as follows.

LOSA2\315130\4 5/14/07
362049-20

1

# ARTICLE 1

## DEFINITIONS

1.  <u>Admission of Additional Members</u>.  Effective as of the date hereof, the existing Members hereby agree as follows:

      (a)    Steven Edwards is hereby admitted as a Governing Member and a Class A Member.

      (b)    Irena Schwaderer, as Trustee, is hereby admitted as a Class B Member.

      (c)    Each of the new Members shall have the transfer rights specified in the Operating Agreement.

2.  <u>Assumption</u>.  Each of Edwards and Schwaderer hereby assumes the rights and obligations as a Class A Member and Class B Member of the Company, respectively.

3.  <u>Capital and Number of Units/Exhibit A</u>.  Exhibit A is hereby deleted and the attached Amended and Restated Exhibit A dated 4/30/07 is attached to and made a part of the Operating Agreement.

4.  <u>Notices/Exhibit C</u>.  Exhibit C is hereby deleted and the attached Amended and Restated Exhibit C dated 4/30/07 is attached hereto and made a part of the Operating Agreement:

5.  <u>Definitions</u>.  Article 1, Definitions, of the Operating Agreement is amended as follows:

      (a)    Section 1.16, Class A Member, is amended by adding the name, "Steven Edwards".

      (b)    Section 1.17, Class B Member, is amended by adding the name, "Irena Schwaderer, as Trustee".

6.  <u>Capital Contributions</u>.  Section 3.6, Project Contribution, of the Operating Agreement is hereby amended by adding the words "in California or Hawaii" in the 3rd line thereof after the words "Cosco Stores".

7.  <u>Loans</u>.  The following new Section 3.7 "Loans" is hereby added to the Operating Agreement:

      "3.7    <u>Loans</u>.  From time to time upon the request of the Governing Members, a Member may make loans to the Company upon such rates and terms as may be agreed.  Without such agreement, loans shall bear interest at the Bank of America prime rate and shall be paid prior to any other cash distribution to Members."

2

8.   <u>Transfers</u>.  Pursuant to the provisions of the Operating Agreement, John Polumbo
has transferred his interest to a limited liability company, SunSource, LLC, of which he is the
Manager.  Such Transfer is hereby acknowledged and accepted.

9.   <u>Ratification</u>.  As amended hereby, the Operating Agreement remains in full force
and effect and is hereby ratified and confirmed by the undersigned.

IN WITNESS WHEREOF, all of the Members of Regenesis Power LLC, a Delaware
limited liability company, have executed this Agreement, effective as of the date written above.

**CLASS A**

**MEMBER**:   Aloha Power Company, LLC,
              a Delaware limited liability company

By:
Name:  Dennis Marini
Title:  Managing Member

**MEMBER**:   Harvest, LLC,
              a Delaware limited liability company

By:
Name:  William R. Hearst II
Its:    Managing Member

**MEMBER**:   Wallace Williams LLC,
              a limited liability company

By:
Name:  William Foster
Its:    Manager

**MEMBER**:   SunSource, LLC,
              a California limited liability
              company

By:
Name:  John Polumbo
Its:    Manager

3

LOSA2\315130.4 5/14/07
362049-20

**MEMBER:**    Steven Edwards

Name: Steven Edwards

**CLASS B**

**MEMBER:**    Michael Doman

_____

Name: Michael Doman

**MEMBER:**    Gerald Greenberg

_____

Name: Gerald Greenberg

**MEMBER:**    Marshall M. Taylor,
individually and as a Trustee

Name: Marshall M. Taylor

**MEMBER:**    PTT Associates LLC,
a California limited liability
company

By:    _____
Name: Allen J. Potts
Its:    Manager

4

LOSA2\315130.4 5/14/07
362049-20

**MEMBER**:    Irena Schwaderer, as Trustee

Name:  Irena Schwaderer

LOSA2\315130.4 5/14/07
362049-20

5

**AMENDED AND RESTATED
EXHIBIT "A"**

**04/30/07**

### CAPITAL AND NUMBER OF UNITS HELD BY EACH MEMBER

| NAME | % | UNITS HELD | CAPITAL | MEMBER CLASS |
|---|---|---|---|---|
| Aloha LLC | 21.749 | 2,174,900 | | A |
| Harvest LLC | 21.749 | 2,174,900 | $200,000 | A |
| Wallace Williams LLC | 21.749 | 2,174,900 | | A |
| SunSource LLC | 13.253 | 1,325,300 | | A |
| Steven Edwards | 6.50 | 650,000 | | A |
| Michael Doman | 4.64 | 464,000 | | B |
| Marshall M. Taylor, Individually and as a Trustee | 1.30 | 130,000 | $100,000 | B |
| PTT Associates, LLC | 7.20 | 720,000 | $350,000 | B |
| Irena Schwaderer, as Trustee | .93 | 93,000 | | B |
| Gerald Greenberg | .93 | 93,000 | | B |

A.  <u>Dilution Provisions</u>.

    1.  Pursuant to Section 4.9, all Members are subject to dilution upon investment by a financial member/investor, as hereinafter set forth.

    2.  All Members will be diluted proportionately with respect to a financial investor unless the Governing Members elect to allocate the dilution among Members in another ratio agreed upon by all Members.

Exhibit A-1

LOSA2\315130.4 5/14/07
362049-20

B.   <u>Vesting Restrictions</u>.  The Units held by Michael Doman are subject to certain restrictions, as hereinafter set forth in below, which are dependent upon, in part, the continued employment by the Company of Michael Doman.

1.   All of the Units held by Michael Doman will be subject to the restrictions as hereinafter described.  For each year of continued employment, on each anniversary of the date of this Agreement, 125,000 Units will no longer be subject to any restriction except as provided in the Operating Agreement.

2.   The restrictions applicable to the Units shall be that, under Section 7.14 of the Operating Agreement, in lieu of the Valuation determined under Section 7.15 of the Operating Agreement, the valuation of the Units subject to the restrictions shall be solely and exclusively limited to the Capital Account of the Member applicable to such Units.  The Members acknowledge, agree and accept that such limitation in value and payment to the amount of the Capital Account may be more or less than the value determined under Section 7.15 and the Members agree to such risk and limitation.  Notwithstanding the above, this limitation shall not be applicable in the event of a sale of the Company.

C.   <u>Vesting Restrictions</u>.  The Units held by Steven Edwards are subject to certain restrictions, as hereinafter set forth in below, which are dependent upon, in part, the continued employment by the Company of Steven Edwards.

1.   All of the Units held by Steven Edwards will be subject to the restrictions as hereinafter described.  For the first year of continued employment 325,000 Units will no longer be subject to any restriction except as provided in the Operating Agreement.  On each thirty-day anniversary thereafter, an additional 27,083.333 Units will no longer be subject to any restriction with all Units being unrestricted as of the second anniversary except as provided in the Operating Agreement.

2.   The restrictions applicable to the Units shall be that, under Section 7.14 of the Operating Agreement, in lieu of the Valuation determined under Section 7.15 of the Operating Agreement, the valuation of the Units subject to the restrictions shall be solely and exclusively limited to the Capital Account of the Member applicable to such Units.  The Members acknowledge, agree and accept that such limitation in value and payment to the amount of the Capital Account may be more or less than the value determined under Section 7.15 and the Members agree to such risk and limitation.  Notwithstanding the above, this limitation shall not be applicable in the event of a sale of the Company.

D.   <u>Consulting Agreement/Commission</u>.  Within thirty (30) days after the admission of a financial investor in the Company, the Company shall enter into a three-year consulting agreement with Regenesis, Inc., a Nevada corporation, for it to provide the services of Dennis Marini to the Company with compensation of $10,000 per month plus health insurance coverage payable from the date of the investment.  Upon the admission of a financial investor in the Company, introduced to the Company by WW or Aloha, which investor invests in excess of $1,000,000, after full disclosure to such investor, Aloha shall be paid a commission of 1½% of

Exhibit A-2

LOSA2\315130.4 5/14/07
362049-20

the amount of the investment, provided that for aggregate investment in the Company over $200,000,000, the commission shall be reduced to 1%.

Exhibit A-3

LOSA2\315130.4 5/14/07
362049-20

**AMENDED AND RESTATED**
**EXHIBIT "B"**

**04/30/07**

**CAPITAL ACCOUNTS (§3.4)**

| | |
|---|---|
| Harvest LLC | $200,000 |
| Taylor | $100,000 |
| PTT Associates, LLC | $350,000 |

Exhibit B-1

LOSA2\315130.4 5/14/07
362049-20

**AMENDED AND RESTATED
EXHIBIT "C"**

**NOTICE ADDRESS**

<u>CLASS A</u>:

| | |
|---|---|
| Aloha Power: | Dennis Marini<br>P.O. Box 1150<br>Kula<br>Maui, Hawaii  96790 |
| With Copy to: | Gary Jones<br>475 Southwestridge Circle<br>Anaheim Hills, California  92807 |
| Harvest, LLC: | William R. Hearst II<br>1135 Makawao Avenue<br>P.M.B. #333<br>Makawao, Hawaii  96768 |
| With Copy to: | Edward E. Sawyer, Esq.<br>White & Case LLP<br>200 South Biscayne Blvd.<br>Suite 4900<br>Miami, Florida 33131 |
| Wallace Williams LLC: | Wallace Williams<br>c/o William Foster<br>228 Hamilton Ave., 3rd Floor<br>Palo Alto, California 94301 |
| With Copy to: | James Foster<br>813 Pheasant Run Court North<br>Brentwood, Tennessee  37027 |
| SunSource LLC | John Polumbo<br>c/o Irena Schwaderer<br>25 Greenwood Court<br>Orinda, California  94563 |
| With Copy to: | Robert L. Young<br>Berding & Weil, LLP<br>3240 Stone Valley Road West<br>Alamo, California  94507 |

Exhibit C-1

LOSA2\315130.4 5/14/07
362049-20

Steven Edwards:                    _____
                                   _____
                                   _____
                                   _____

With Copy to:                      _____
                                   _____
                                   _____
                                   _____

CLASS B:

Michael Doman:            Michael Doman
                          206 Camino El Rincon
                          Camarillo, California  93012

Marshall M. Taylor:       Marshall M. Taylor
                          285 Bellefontaine St.
                          Pasadena, California  91105

With Copy to:             William H. Taylor III
                          802 Pinesap
                          Houston, Texas  77079-4519

Gerald Greenberg:         Gerald Greenberg
                          P.O. Box 4034
                          Malibu, California 90264

PTT Associates, LLC:      Allen J. Potts
                          800 Woodacres
                          Santa Monica, California  90402

With a Copy to:           Stanley Hausner
                          Stanley Hausner Accounting Corporation
                          1416 Sixth Street
                          Santa Monica, California  90402

Irena Schwaderer:         Irena Schwaderer
                          25 Greenwood Court
                          Orinda, California  94563

With Copy to:             Robert J. Silverman
                          Berding & Weil, LLP
                          3240 Stone Valley Road West
                          Alamo, California  94507

Exhibit C-2

LOSA2\315130.4 5/14/07
362049-20

EXHIBIT "10"

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

EFiled: Dec 22 2017 11:32AM EST
Transaction ID 61497163
Case No. 12697-VCMR

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Dolaware 19801-3734

Date Submitted: September 29, 2017
Date Decided: December 22, 2017

Joanne P. Pinckney, Esquire
Seton C. Mangine, Esquire
Pinckney, Weidinger, Urban
& Joyce LLC
3711 Kennett Pike, Suite 210
Greenville, DE 19807

Jason C. Powell, Esquire
The Powell Firm, LLC
1201 North Orange Street, Suite 500
Wilmington, DE 19899

RE:    *Aloha Power Company, LLC v. Regenesis Power, LLC*
       Civil Action No. 12697-VCMR

Dear Counsel:

This post-trial Letter Opinion resolves the plaintiff's action to compel

inspection or production of certain books and records. For the reasons that follow,

the plaintiff is entitled to some, but not all, of the books and records it demands.

## I.    BACKGROUND

The facts stated herein reflect my findings based on the parties' stipulations,

forty-two documentary exhibits, and the testimony of one live witness during trial

on August 3, 2017. I grant the evidence the weight and credibility that I find it

deserves.[1]

---

[1]    Citations to testimony presented at trial are in the form "Tr. # (X)" with "X"
representing the surname of the speaker, if not clear from the text. After being
identified initially, individuals are referenced herein by their surnames without

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 2 of 14

Plaintiff Aloha Power Company, LLC ("Aloha") is a Delaware limited liability company founded in May 2006 by Dennis Marini.[2] Defendant Regenesis Power, LLC ("Regenesis" or the "Company") is a Delaware limited liability company founded in May 2006.[3] Aloha is a member of the Company.[4]

Aloha seeks inspection of the Company's books and records under the Company's operating agreement (the "Operating Agreement")[5] and 6 *Del. C.* § 18-305 of the Delaware Limited Liability Company Act.[6] On September 24, 2015 and December 7, 2015, Aloha sent letters to Regenesis demanding inspection of the

---

regard to formal titles such as "Dr." I intend no disrespect. Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2]    PTO ¶ 1.

[3]    PTO ¶ 4.

[4]    PTO ¶ 31.

[5]    The Operating Agreement was executed on June 1, 2006, and amended on October 1, 2006, and April 30, 2007. PTO ¶¶ 8, 10-11; JX 5, 5-A, 5-A.2.

[6]    While I rely on the language of the Operating Agreement to determine Aloha's demands for the Company's books and records, the Operating Agreement closely tracks the language of 6 *Del. C.* § 18-305, and both parties cite to case law interpreting the statute; thus, I consider, at times, case law interpretations of 6 *Del. C.* § 18-305.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 3 of 14

Company's books and reeords.   On October 7, 2016, Aloha filed its Verified

Amended Complaint for Inspection of Books and Reeords (the "Complaint").

## II.    ANALYSIS

Aloha seeks a host of books and records under the Operating Agreement.[7]

The Operating Agreement requires the Company to produce and send certain books

and records to members without the need for any demand, while other documents

under the Operating Agreement require members to show a proper purpose for

inspection. I address these two categories separately.

### A.    Books and Records that Reqnire No Demand for Inspection

Aloha seeks to inspect certain books and records that require no demand for

inspection under four provisions of the Operating Agreement.   First, Aloha seeks

copies of the Company's balance sheet, income statement, and statement of changes

in financial position from 2011 to 2017.   Section 8.3.1 of the Operating Agreement

provides:

> The Governing Members shall eause the Company to
> cause financial statements prepared in accordance with
> generally accepted accounting principles to be sent to each
> of the Members not later than ninety (90) days (or such
> other period as the Governing Members shall select) after
> the close of the Fiscal Year.   The report shall contain a

---

[7]    Capitalized terms not otherwise defined herein are defined under Artiele I of the
Operating Agreement.   JX 5 at 1.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 4 of 14

> balance sheet as of the end of the Fiscal Year and an
> income statement and statement of changes in financial
> position for the Fiscal Year. Such financial statements
> shall be accompanied by the report thereon, of the
> independent accountants engaged by the Company.[8]

Section 8.3.1 requires production of these documents without the need for a demand.

Thus, Aloha is entitled to inspect the books and records listed in Section 8.3.1 of the

Operating Agreement from 2011 to 2017.

Second, Aloha seeks the information that is necessary for Aloha to complete

its federal and state income tax or information returns and a copy of the Company's

federal, state, and local income tax or information returns from 2011 to 2017.

Section 8.3.2 provides:

> The Governing Members shall cause the Company to
> cause to be prepared at least annually, at Company
> expense, information necessary for the preparation of the
> Member's federal and state income tax returns. The
> Governing Members shall send or cause to be sent to each
> Member within ninety (90) days (or such other period as
> the Governing Members shall select) after the end of each
> taxable year such information as is necessary to complete
> federal and state income tax or information returns, and a
> copy of the Company's federal, state, and local income tax
> or information returns for that year. On or before
> November 15 of each year, the Governing Members shall
> provide each Member with the following: (i) a statement
> showing each Member's Capital Account as of the
> immediately preceding October 31; (ii) an estimate of each

---

[8]      *Id.* at 35.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 5 of 14

> Member's taxable income for the current Fiscal Year; and
> (iii) each Member's share of allocated non-recourse debt.[9]

Section 8.3.2 requires production of these documents without the need for a demand.

Thus, Aloha is entitled to inspect the books and records listed in Section 8.3.2 of the

Operating Agreement from 2011 to 2017 that have not already been provided. The

Company shall certify that such documents are complete and accurate.[10]

Third, Aloha seeks minutes of all meetings of the members as described in

Section 5.3.[11] The amendment to Section 5.3 of the Operating Agreement provides

that "[t]he Governing Members or their designee shall prepare and distribute to all

---

[9]    *Id.* at 35-36.

[10]   On May 3, 2017, Regenesis provided Aloha with copies of the K-1s for the years
       2010-2015, but Aloha questions whether the 2015 K-1 is complete "because it
       consists of only one page, whereas prior years contained multi-page K-1s." PTO
       13.

[11]   JX 5 at 14 ("At any time, and from time to time, the Governing Members may, but
       shall not be required to, call meetings of the Members. Written notice of any such
       meeting shall be given to all Members not less than five (5) days nor more than
       forty-five (45) days prior to the date of such meeting. Each meeting of the Members
       shall be conducted by the Governing Members or any designee(s) thereof. Each
       Member may authorize any other Person (whether or not such other Person is a
       Member) to act for it or on its behalf on all matters in which the Member is entitled
       to participate. Each proxy must be signed by the Member or such Member's
       attorney-in-fact. All other provisions governing, or otherwise relating to, the
       holding of meetings of the Members, shall from time to time be established in the
       sole discretion of the Governing Members.").

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 6 of 14

Members minutes of all meetings."[12]   Section 5.3 requires production of such minutes without the need for a demand.   Thus, Aloha is entitled to inspect the minutes of the meetings of the members called by governing members pursuant to Section 5.3 from 2011 to 2017.

Fourth and finally, Aloha seeks copies of any powers of attorney pursuant to which the Operating Agreement or any amendments thereto have been executed. Section 8.2.4 states that the "Governing Members shall promptly furnish to a Member a copy of any amendment to the . . . [Operating] Agreement executed by the Governing Members pursuant to a power of attorney from the Member."[13]   On May 3, 2017, Regenesis provided Aloha copies of the Operating Agreement and its two amendments,[14] but the Company provided no copies of any related powers of attorney.   Section 8.2.4 requires production of these documents without the need for a demand.   Thus, Aloha is entitled to copies of any related powers of attorney under Section 8.2.4 of the Operating Agreement.

---

[12]   JX 5A at 2 ("Section 5.3, Meetings, is amended by adding the following sentence to the end thereof, 'The Governing Members or their designee shall prepare and distribute to all Members minutes of all meetings.'").

[13]   JX 5 at 35.

[14]   PTO ¶ 29.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 7 of 14

### B.    Books and Reeords that Reqnire a Proper Pnrpose for Inspeetion

Similar to 6 *Del. C.* § 18-305(a), Section 8.2 of the Operating Agreement

permits Aloha to access certain books and records "for purposes reasonably related

to the interest" of Aloha as a member of the Company.[15]  "Once a member

demonstrates that its primary purpose is proper, any secondary purpose, whether

proper or improper, is irrelevant."[16]  "Any number of purposes may be proper,

depending on the context of a particular case, but a stockholder's purpose must not

be adverse to the company, unrelated to a legitimate interest of the stockholder, or

intended to harass the corporation."[17]  And a stockholder's entitlement to inspection

"is not open-ended; it is restricted to inspection of the books and records needed to

---

[15]    JX 5 at 35. *See Somerville S Tr. v. USV P'rs, LLC*, 2002 WL 1832830, at *5 (Del. Ch. Aug. 2, 2002) ("The case law interpreting Section 18-305 holds that for inspection relief to be granted, the plaintiff must first establish by a preponderance of the evidence the existence of a 'proper purpose' for inspection. A proper purpose is one that is 'reasonably related to such person's interest' as a member, limited partner or stockholder.") (eitations omitted).

[16]    *Somerville*, 2002 WL 1832830, at *5.

[17]    *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *5 (Del. Ch. Aug. 30, 2016) (citations omitted); *see Somerville*, 2002 WL 1832830, at *5 n.4 ("Because of a lack of reported decisions in the LLC context, the Court may look to cases interpreting similar Delaware statutes concerning corporations and partnerships.") (citing *Bond Purchase, L.L.C. v. Patriot Tax Credit Props., L.P.*, 746 A.2d 842, 851 (Del. Ch. 1999)).

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 8 of 14

perform the task. Accordingly, inspection is limited to those documents that are

necessary, essential, and sufficient for the shareholders' purpose."[18]

In order for Aloha to inspect the books and records that require a proper

purpose under Section 8 of the Operating Agreement, Aloha alleges a host of proper

purposes, which I divide into three categories: (1) to value its membership interest;

(2) to understand the dilution of its membership interest; and (3) to investigate

mismanagement.[19]

Regenesis argues that Aloha is barred from inspecting any books and records.

Regenesis insists that none of Aloha's purported proper purposes reflect its actual

purpose, which Regenesis claims is to harass the Company.[20] Regenesis's primary

evidence in support of its argument is a 2009 lawsuit between the parties in

California, in which Regenesis prevailed. While it is apparent that the parties have

mutual hostility between them, the evidence at trial did not show that Aloha's sole

purpose is to harass the Company. Therefore, Aloha is not barred from inspecting

books and records upon a showing of a proper purpose.

---

[18]    *BBC Acq. Corp. v. Durr-Fillauer Med., Inc.*, 623 A.2d 85, 88 (Del. Ch. 1992)
        (citations omitted).

[19]    Compl. ¶¶ 15-17.

[20]    Def.'s Opening Br. 9.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 9 of 14

To assess the value of Aloha's membership interest in Regenesis, Aloha seeks copies of the operating statements and general ledgers of the Company, if any, for the six most recent fiscal years under Section 8.1(f) of the Operating Agreement. Although "[v]aluing one's ownership interest is a proper purpose for seeking books and records,"[21] "the burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to [that party's] stated purpose."[22]  Here, Aloha makes no attempt to explain why the books and records under Section 8.3.1—the Company's financial statements, including a balance sheet, income statement, and statement of changes in financial position for the fiscal years 2011 to 2017—are insufficient to satisfy Aloha's stated purposes; nor does Aloha explain why the Company's operating statements and general ledgers are necessary for its purposes.  Thus, I deny Aloha access to the Company's operating statements and general ledgers.

Next, Aloha seeks under Section 8.1(a) "a current list of the full name and last known business or residence address of each Member and Economic Interest Owner

---

[21]    *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1193 (Del. Ch. 2011) (citing *Somerville*, 2002 WL 1832830, at *8).

[22]    *Id.* at 1194 (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)).

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
Deeember 22, 2017
Page 10 of 14

set forth in alphabetical order, togcther with the Capital Contributions, Capital Account, Number of Units and Percentage Interest of each Member and Economic Interest Owner"[23] in ordcr to understand the dilution of its membership interest in Regenesis since 2011. Regenesis's only response is that any purpose relating to Aloha's dilution is improper because it was the subject of a 2009 lawsuit between the parties in California. But Regenesis makes no attempt to explain why the California litigation—which ended in 2011—would bar inspection of documents related to events that took place *after* the resolution of that litigation. As such, Aloha is entitled to the books and records under Section 8.1(a) of the Operating Agrecment from 2011 to 2017 to understand the dilution of its membership interest after 2011.[24]

Aloha demands copies of "the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years" under Section 8.1(g) of the Operating Agreement.[25] Although Aloha does not specifically explain why books and records relating to the Company's internal affairs—which seems extrcmely broad and ambiguous—are necessary to fulfill any

---

[23]   JX 5 at 34.

[24]   *See Sanders*, 17 A.3d at 1193 (determining legitimaey of the dilution of member's interest is a proper purpose).

[25]   JX 5 at 35.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 11 of 14

of Aloha's proposed proper purposes,[26] it appears that Aloha seeks these documents

to allege mismanagement or wrongdoing.

The precise allegations of mismanagement or wrongdoing are unclear, but

Marini testified that he needs "to find out what's going on with the company, [and]

the internal structure of the company"[27] because there were decreases in the capital

account, new entities appeared on various K-1s, and the Company may have ceased

operations (which came to light after Aloha filed the Complaint).[28]  As this Court

has routinely held, "[a] mere statement of a purpose to investigate possible general

mismanagement, without more, will not entitle a shareholder to broad [books and

records] inspection relief."[29]  Aloha "must present some credible basis from which

the court can infer that waste or mismanagement may have occurred."[30]  "That

'threshold may be satisfied by a credible showing, through documents, logic,

---

[26]   Aloha's demand for books and records under Section 8.1(g) could be denied on this
basis alone.

[27]   Tr. 21.

[28]   Neither party provided any evidence that the Company has dissolved or filed for
bankruptcy.

[29]   *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006) (citing
*Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del.
Ch. 1987)).

[30]   *Thomas & Betts Corp.*, 681 A.2d at 1031.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 12 of 14

testimony or otherwise, that there are legitimate issues of wrongdoing.'"[31]  Neither

the proposed documentary evidence nor Aloha's testimony convinces me that Aloha

has presented some credible basis to infer mismanagement or wrongdoing.  Thus, I

deny Aloha's demand to inspect the books and records relating to the internal affairs

of the Company under Section 8.1(g) of the Operating Agreement.

### C.    Attorney Fees Award

Aloha seeks to recover attorney fees for this action.[32]  The parties' briefings

with respect to this issue are unhelpful.  Fortunately, however, Delaware case law

provides some guidance.  Delaware courts generally apply the American Rule,[33] but

"where the parties have determined the allocation of fees by private ordering," like

in an LLC's operating agreement,[34] "departure from this general rule and deference

---

[31]  *In re Plains All Am. Pipeline*, 2017 WL 6016570, at *2 (Del. Ch. Aug. 8, 2017) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

[32]  Compl. ¶ 28.

[33]  Under the American Rule, "each party is obligated to pay its own attorneys' fees regardless of the outcome." *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009).

[34]  Limited liability company agreements are "creatures of contract, which should be construed like other contracts." *Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009); 6 *Del. C.* § 18-1101(b). "Such agreements operate to displace otherwise applicable default provisions in Delaware's Limited Liability Company Act." *RED Capital Inv. L.P. v. RED Parent LLC*, 2016 WL 612772, at *2 (Del. Ch. Feb. 11, 2016); 6 *Del. C.* § 18-305(a).  The interpretation of

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 13 of 14

to their agreement are warranted. Absent any qualifying language that fees are to be awarded claim-by-claim or on some other partial basis, a contractual provision entitling the prevailing party to fees will usually be applied in an all-or-nothing manner."[35]

Aloha seeks an award of attorneys' fees under Section 11.18 of the Operating Agreement. Section 11.18 states:

> In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable actual fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable actual attorneys' fees and expenses.[36]

As shown above, Aloha is the prevailing party in this action. Section 11.18 contains no "qualifying language that fees are to be awarded claim-by-claim or on some other

---

an LLC agreement begins with the language of the agreement. *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681, at *3 (Del. Ch. Jan. 29, 2002).

[35]  *W. Willow-Bay Ct., LLC*, 2009 WL 458779, at *8; *see also Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *Choupak v. Rivkin*, 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015), *aff'd*, 129 A.3d 232 (Del. 2015); *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010); *Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004).

[36]  JX 5 at 44.

*Aloha Power Co., LLC v. Regenesis Power, LLC*
C.A. No. 12697-VCMR
December 22, 2017
Page 14 of 14

partial basis."[37] Thus, Aloha is entitled to all "reasonable actual attorneys' fees and

expenses."[38]

## III.    CONCLUSION

For the aforementioned reasons, Aloha is entitled to its reasonable attorneys'

fees under Section 11.18 and to books and records from 2011 to 2017 under Sections

5.3, 8.2.4, 8.3.1, 8.3.2, and 8.1(a) of the Operating Agreement.  Counsel shall confer

and submit an implementing form of order consistent with this ruling.

    **IT IS SO ORDERED.**

                                   Sincerely,

                                   */s/Tamika Montgomery-Reeves*

                                   Vice Chancellor

TMR/jp

---

[37]    *W. Willow-Bay Ct., LLC*, 2009 WL 458779, at *8.

[38]    JX 5 at 44.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
2211 Michelson Drive, Suite 700, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (specify): **CHAPTER 7 TRUSTEE'S MOTION TO SELL LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS IN REGENESIS POWER, LLC: (1) OUTSIDE THE ORDINARY COURSE OF BUSINESS; (2) SUBJECT TO OVERBID; (3) FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS; AND (4) WITH DETERMINATION OF GOOD FAITH PURCHASER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHARLES W. DAFF; AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) October 16, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (date) October 16, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Aloha Power, LLC
a Delaware limited liability
P.O. Box 1150
Kula, HI 96790-1150
(Ret'd Unable Fwd [2x])

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) October 16, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA OVERNIGHT MAIL
Honorable Wayne E. Johnson
United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 384 / Courtroom 304
Riverside, CA 92501-3819

VIA EMAIL
Dennis Marini
Email: regenesisinc@gmail.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 16, 2018 | Jeannie Mendez | *Jeannie Mendez* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF) [con't]:**

| | | |
|---|---|---|
| Cathrine M Castaldi | ccastaldi@brownrudnick.com | Attorney for Chapter 7 Trustee |
| Charles W Daff (TR) | charleswdaff@gmail.com, c122@ecfcbis.com | Chapter 7 Trustee |
| Steven J Shapero | sshapero@shaperoandshapero.com | Attorney for Petitioning Creditors Regenesis Power LLC, William Foster William Hearst, and Harvest, LLC |
| United States Trustee (RS) | ustpregion16.rs.ecf@usdoj.gov | United States Trustee |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**SERVED U.S. MAIL**

| | |
|---|---|
| Regenesis Power LLC<br>865 Laurel Street<br>San Carlos, CA 94070-3941 | Dennis Marini<br>P.O. Box 1<br>Morongo Valley, CA 92256 |
| William Foster<br>643 Camino de la Luz LR1<br>Santa Fe, NM 87505-5925 | Brad Beers<br>Beers Law Firm<br>The Historic Plaza Hotel Building<br>(in the Museum District)<br>5020 Montrose Blvd., Suite 700<br>Houston, Texas  77006 |
| William Hearst<br>c/o Edward E Sawyer<br>260 Cradnon Blvd<br>32 PMB 400<br>Key Biscayne, FL 33149-1626 | Joanne P. Pinckney<br>Pinckney, Weidinger, Urban & Joyce LLC<br>3711 Kennett Pike, Suite 210<br>Greenville, DE 19807 |
| Todd L Turoci<br>The Turoci Firm<br>3845 Tenth Street<br>Riverside, CA 92501-3519 | Wallace Williams LLC<br>c/o Arthur A. Ferraro<br>981 Fremont Street<br>Santa Clara CA 95050 |
| Employment Development Dept.<br>Bankruptcy Group MIC 92E<br>P.O. Box 826880<br>Sacramento, CA 94280-0001 | |
| Franchise Tax Board<br>Bankruptcy Section MS: A-340<br>P.O. Box 2952<br>Sacramento, CA 95812-2952 | |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1242726 v1-902101/0095

**F 9013-3.1.PROOF.SERVICE**